ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
    – and –
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTOR J. NG, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>BERKELEY LIGHTS, INC., ERIC D. HOBBS, SHAUN M. HOLT and KURT WOOD,<br><br>                              Defendants. | Case No.   3:21-cv-09497<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Victor J. Ng ("plaintiff"), individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings, press releases, earnings presentations, conference call transcripts and other information prepared for investors by Berkeley Lights, Inc. ("Berkeley Lights" or the "Company"), as well as media and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Berkeley Lights common stock between July 17, 2020 and September 14, 2021, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Berkeley Lights and certain of the Company's current and former senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), because the Company conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District.  Defendant Berkeley Lights maintains its corporate headquarters in this District.

4.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.    Plaintiff Victor J. Ng, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Berkeley Lights common stock during the Class Period and has been damaged thereby.

6.    Defendant Berkeley Lights is a biotechnology company headquartered in Emeryville, California.  The Company's common stock is listed on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "BLI."

7.    Defendant Eric D. Hobbs ("Hobbs") served as the Chief Executive Officer ("CEO") of Berkeley Lights and a member of the Company's Board of Directors (the "Board") at all relevant times.

8.    Defendant Shaun M. Holt ("Holt") served as the Chief Financial Officer ("CFO") of Berkeley Lights at all relevant times until his unexpected transition, effective March 15, 2021, to an advisory role and subsequent departure from the Company on April 30, 2021.

9.    Defendant Kurt Wood ("Wood") has served as the CFO of Berkeley Lights since March 15, 2021.  Prior to this position, defendant Wood served as the Company's Vice President of Business Development.

10.    Defendants referenced above in ¶¶7-9 are referred to herein as the "Individual Defendants."  During the Class Period, the Individual Defendants ran the Company as hands-on managers, overseeing Berkeley Lights' operations, business practices and finances, and made the materially false and misleading statements described herein.  The Individual Defendants had intimate knowledge about core aspects of Berkeley Lights' financial and business operations, including the Company's proprietary technologies and business relationships.  They were also intimately involved in deciding which disclosures would be made by the Company.

**BACKGROUND**

11.     Berkeley Lights is a biotechnology company headquartered in Emeryville, California. The Company was founded in 2011 by Ming Wu, William Davidow and Igor Khandros.  Berkeley Lights owns and operates a proprietary platform for analyzing and processing cell data for use in the development and commercialization of biotherapeutics and other cell-based products, focusing on the markets of antibody therapeutics, cell therapy and synthetic biology.

12.     Berkeley Lights claims that its proprietary platform provides the most advanced technology available for the rapid functional characterization of single cells at scale.  This technology purportedly enables the end user, such as a biotechnology company or research institution, to characterize the performance of cells relevant to the desired cell-based product early in the research and development process and then connect this phenotypic data to the genetic code to each cell.  The Company claims that the level of scale and precision offered by its platform "is not attainable with other approaches," allowing vast amounts of cell data to be analyzed much quicker and with more control than in traditional processes.

13.     The centerpiece of the Berkeley Lights platform is the Company's advanced automation system, the Beacon.  The Beacon is a fully automated, high throughput system designed to allow detailed cell analysis at scale.  The Beacon is used by Berkeley Lights' customers for tasks such as antibody discovery and cell line development and uses a proprietary light imaging technology known as OptoElectro Positioning.  The Company reportedly charges $2 million for each Beacon instrument – far above the industry standard for other cell screening machines – and justifies this high cost by pointing to the purported improvement in speed, scale and precision offered by the instrument.  Berkeley Lights also offers a pared down automation system known as the Lightning at a lower price point, as well as an instrument for use in workflows requiring an extended cell culture period known as the Berkeley Lights Culture Station.

14.     In addition to its automation systems, Berkeley Lights manufactures proprietary consumables such as its OptoSelect chips and reagent kits.  The Company's proprietary OptoSelect chips are used to house and manipulate cells and cell environments using the Company's NanoPen technology.  Berkeley Lights OptoSelect chips are commercially available in 5 different sizes, with

1   the largest housing 14,000 pens.  The OptoSelect chips are single-use consumables and must be

2   replaced after each workflow.  Similarly, the Company offers reagent kits to support on-chip

3   analysis with a variety of capabilities, such as sample preparation, enhancement of culture cells,

4   assays, and other tasks.  These workflow consumables can significantly increase the costs of using

5   the Berkeley Lights platform.  For example, the Beacon is estimated to cost $15,000 per full run

6   based on the four OptoSelect chips that would be used.

7          15.    The Berkeley Lights platform is further supported by the Company's proprietary

8   automation and analysis software, including the Company's Cell Analysis Suite software.  The Cell

9   Analysis Suite forms the foundation for all workflows run on the Beacon and Lightning.  The

10  software controls the systems, acquires and analyzes data, and directs all operations included in each

11  automated workflow, including cell and NanoPen selection, on-chip immunoassay analysis, single-

12  cell imaging, automatic clone selection, and removal from the NanoPens and exporting living cells.

13         16.    Berkeley Lights generates both product revenue and service revenue.  The Company

14  defines sales of advanced automation systems, recurring revenue from consumables, workflow

15  subscription agreements and workflow licenses as "product revenue," and revenue from joint

16  development agreements and partnerships, service and warranty contracts, feasibility studies and

17  platform support as "service revenue."  These revenues are derived through three revenue streams:

18  (i) direct platform sales, comprised of the sale of advanced automation systems and, in certain

19  instances, fully paid workflow licenses and platform support services; (ii) recurring revenue,

20  comprised of the sale of consumables such as the Company's OptoSelect chips and reagent kits, as

21  well as extended warranty and service programs and, in certain instances, renewable workflow

22  licenses; and (iii) revenue from joint development agreements and partnerships whereby the

23  Company provides services for the development of new workflows, cell or organism types, or

24  delivers specific biological assets to meet specific customers' needs, often in connection with

25  specified development milestones.  Direct platform sales account for the majority of Company

26  revenues.  For example, during its fiscal 2019, direct platform sales accounted for 69% of total

27  Berkeley Lights revenue, compared to 14% attributable to recurring revenue and 17% attributable to

28  milestone revenue.

17.     In July 2020, Berkeley Lights conducted its initial public offering, which generated over $200 million in offering proceeds including the full exercise of the underwriters' over-allotment option (the "IPO").  At the time of the IPO, Berkeley Lights' co-founders and the venture capital firms WRVI Capital and Sequoia Capital collectively owned a majority of the outstanding shares of the Company.

18.     In the lead up to the IPO, Berkeley Lights claimed to be experiencing revenue growth, in particular in connection with its direct platform sales.  IPO offering documents stated that, during fiscal 2019, Berkeley Lights' direct platform sales had increased 84% year-over-year to $39.1 million in sales.  Similarly, IPO offering documents stated that, during the first quarter of 2020, Berkeley Lights' direct platform sales had increased 5% year-over-year to $9.4 million in sales. These trends purportedly continued after the IPO, as Berkeley Lights stated that it continued to experience year-over-year increases in its direct platform sales revenue.  For example, on August 25, 2020, Berkeley Lights released its financial results for the second quarter of 2020, stating that during the quarter the Company had achieved $7.5 million in direct platform revenue, a 9% year-over-year increase.  And, on November 12, 2020, Berkeley Lights released its financial results for the third quarter of 2020, stating that during the quarter the Company had achieved $12.4 million in direct platform revenue, a 65% sequential increase.  During this time, the price of Berkeley Lights common stock quadrupled from the IPO price, reaching over $90 per share on November 12, 2020.

19.     On November 16, 2020, Berkeley Lights announced it would be conducting a secondary offering of stock to allow certain insiders to sell their personal Berkeley Lights shareholdings (the "SPO").  In the SPO, several Berkeley Lights insiders, including the Company's venture capital backers, its co-founders and members of its Board, sold 3.45 million Berkeley Lights shares to investors at $86 per share, generating nearly $300 million in gross offering proceedings. The SPO was unusual not only because of its close proximity to the IPO – which had been conducted less than four months previously – but also because the underwriters for the IPO had agreed to allow the selling stockholders to exit their IPO lockup agreements early.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS DURING THE CLASS PERIOD**

20.     The Class Period begins on July 17, 2020.  On that date, Berkeley Lights filed with the SEC a prospectus on Form 424B4, which incorporated and formed part of the registration statement for the IPO and was signed by defendants Hobbs and Holt (the "IPO Registration Statement").  The IPO Registration Statement highlighted the purported superiority of the Berkeley Lights platform compared to existing cell analyzing instruments, stating, for example, that the platform provides "the most advanced environment for rapid functional characterization of single cells at scale."  The IPO Registration Statement similarly stated that the Berkeley Lights platform delivered "the best cells" and "provides the deepest information, with linked phenotypic and genotypic data, on tens of thousands of live single cells relevant to the customers' end product specifications."  The IPO Registration Statement also claimed that "this level of scale and precision is not attainable with other approaches."  The IPO Registration Statement described the Berkeley Lights platform as enabling the Company's customers "to find the best cells" by offering advanced capabilities, including as follows:

- Performing rapid functional characterization of tens of thousands of single cells in parallel;

- Precisely controlling the environment around each cell, and maintaining cells in a healthy state for further use;

- Accessing a high degree of cell biodiversity;

- Deep Opto Profiling of the relevant phenotypic characteristics, at single-cell resolution over time and connecting this to the genotypic information for each cell;

- Performing a broad range of workflows, including single-cell assays, on an integrated platform; and

- Digitally aggregating, accessing and analyzing a rich data library for each single cell.

21.     The IPO Registration Statement also highlighted Berkeley Lights' purported operational and financial growth, stating that the Company's direct platform sales had increased 84% year-over-year to $39.1 million for its fiscal 2019.  The IPO Registration Statement stated that this segment growth had continued in the first quarter of 2020, as the Company generated $9.4 million in

direct platform sales during the quarter, an increase over the first quarter of 2020.  Similarly, the IPO Registration Statement stated that Berkeley Lights had placed 26 machines in 2019, a 117% increase over the prior year, and six machines in the first quarter of 2020, a 20% increase over the first quarter of 2019.  The IPO Registration Statement represented that the "total addressable market" for the Company's products and services was "$23 billion."

22.     On August 25, 2020, Berkeley Lights issued a release providing the Company's financial and operational results for the quarter ended June 30, 2020 ("2Q20").  The release stated that Berkeley Lights had achieved total revenue of $10.6 million during the quarter and made four platform placements.  The release also stated that Berkeley Lights had generated $7.5 million in direct platform revenue for the quarter, compared to $6.9 million for the comparable period in 2019.

23.     Also on August 25, 2020, Berkeley Lights filed with the SEC its quarterly results for 2Q20 on Form 10-Q, which was signed by defendants Hobbs and Holt, who also filed certifications attesting to the Form 10-Q's accuracy and completeness.  The 2Q20 Form 10-Q contained the financial and operational information contained in the 2Q20 Berkeley Lights release.  The 2Q20 Form 10-Q highlighted the purported capabilities and effectiveness of the Berkeley Lights platform, stating that the platform "captures and delivers rich single-cell data to find the best cells" and "allows for a high level of control over live single cells or other micro-objects throughout the functional characterization process."  In addition, the 2Q20 Form 10-Q stated that the Company had experienced an increase in product revenues during the quarter, stating in pertinent part as follows:

> Product revenue increased by $1.3 million, or 17%, for the three months ended June 30, 2020, compared to the three months ended June 30, 2019.  The increase was primarily driven by an increase of $0.8 million in consumables sales driven by additional demand from our customers due to the increase in our installed base as well as increased activity by our customers related to the COVID-19 pandemic, an increase of $0.4 million in revenue from direct platform and system sales driven by regional mix of the platform placements during the three months ended June 30, 2020, including license arrangements related to our workflows, and an increase of $0.1 million in workflow subscription revenue.

24.     On November 12, 2020, Berkeley Lights issued a release providing the Company's financial and operational results for the quarter ended September 30, 2020 ("3Q20").  The release stated that Berkeley Lights had achieved total revenue of $18.2 million during the quarter.  The

release also stated that Berkeley Lights had generated $12.4 million in direct platform revenue for the quarter, an increase over the comparable period in 2019.

25.     That same day, Berkeley Lights held an earnings call to discuss the Company's 3Q20 results hosted by defendants Hobbs and Holt.  During his prepared remarks, defendant Hobbs claimed that Berkeley Lights offered "the most advanced environment for functional testing of live single cells."  Defendant Hobbs similarly stated that the Berkeley Lights "platform enables customers to perform standardized and automated workflows, with precise control over the environment, which enables functional testing of 10s of thousands of live single cells in parallel." Defendant Hobbs represented that the Company's machines created "the largest data cube for single cells in the industry" and that Berkeley Lights was "the only Company commercializing a platform that can do this in a scalable way."  Defendant Hobbs further stated that during "the third quarter, [the Company] placed 8 platforms of customers, which was up from 4 platforms placed in the second quarter."  Defendant Hobbs also represented that Berkeley Lights was experiencing numerous tailwinds driving sales growth, stating in pertinent part as follows:

> We saw an increase in the current revenues, which were up 26% from last quarter and up 92% year-over-year.  Growth over the prior quarter, was seen across all geographical regions, with Asia leading new platform placements, followed by Europe and the United States.  Revenue was driven by strong demand for the discovery and development of cell-based products, especially for antibody therapeutic workflows.  We continue to see capacity expansion in the industry led by strong investment activity in the CRO, CDMO space.  In addition, the trend of increasing functional single-cell characterization continues to gain momentum, which is a key driver in our long-term growth strategy and core to our mission at Berkeley Lights.

26.     Also on November 12, 2020, Berkeley Lights filed with the SEC its quarterly results for 3Q20 on Form 10-Q, which was signed by defendants Hobbs and Holt, who also filed certifications attesting to the Form 10-Q's accuracy and completeness.  The 3Q20 Form 10-Q contained the financial and operational information contained in the 3Q20 Berkeley Lights release and earnings call.  The 3Q20 Form 10-Q highlighted the purported capabilities and effectiveness of the Berkeley Lights platform, stating that the platform "captures and delivers rich single-cell data to find the best cells" and "allows for a high level of control over live single cells or other micro-objects throughout the functional characterization process."  In addition, the 3Q20 Form 10-Q stated

that the Company had experienced an increase in product revenues during the quarter, stating in pertinent part as follows:

> Product revenue increased by $0.9 million, or 7%, for the three months ended September 30, 2020, compared to the three months ended September 30, 2019. The increase was primarily driven by an increase of $1.0 million in consumables sales driven by additional demand from our customers due to the increase in our installed base, as well as workflow subscription revenue of $0.2 million. This increase was offset by a decrease in platform sales of $0.4 million resulting from the mix of system type placed as well as the regional mix of placements. During both of the three months ended September 30, 2020 and 2019, we sold 8 platforms.

27.     On November 19, 2020, Berkeley Lights filed with the SEC a prospectus on Form 424B4, which incorporated and formed part of the registration statement for the SPO and was signed by defendants Hobbs and Holt (the "SPO Registration Statement"). The SPO Registration Statement highlighted the purported superiority of the Berkeley Lights platform compared to existing cell analyzing instruments, stating, for example, that the platform provides "the most advanced environment for rapid functional characterization of single cells at scale." The SPO Registration Statement similarly stated that the Berkeley Lights platform delivered "the best cells" and "provides the deepest information, with linked phenotypic and genotypic data, on tens of thousands of live single cells relevant to the customers' end product specifications." The SPO Registration Statement also claimed that "this level of scale and precision is not attainable with other approaches." The SPO Registration Statement described the Berkeley Lights platform as enabling the Company's customers "to find the best cells" by offering advanced capabilities, including the following:

- Performing rapid functional characterization of tens of thousands of single cells in parallel;

- Precisely controlling the environment around each cell, and maintaining cells in a healthy state for further use;

- Accessing a high degree of cell biodiversity;

- Deep Opto Profiling of the relevant phenotypic characteristics, at single-cell resolution over time and connecting this to the genotypic information for each cell;

- Performing a broad range of workflows, including single-cell assays, on an integrated platform; and

- Digitally aggregating, accessing and analyzing a rich data library for each single cell.

28.     The SPO Registration Statement repeated the Company's financial and operational results provided in Berkeley Lights' 2Q20 Form 10-Q and 3Q20 Form 10-Q, as detailed above. The SPO Registration Statement also represented that the "total addressable market" for the Company's products and services was "$23 billion."

29.     On February 25, 2021, Berkeley Lights issued a release providing the Company's financial and operational results for the quarter and fiscal year ended December 31, 2020 ("FY20"). The release stated that Berkeley Lights had achieved total revenue of $21.7 million during the quarter and total revenue of $64.3 million during FY20. The release also stated that Berkeley Lights had placed nine platforms during the fourth quarter.

30.     That same day, Berkeley Lights held an earnings call to discuss the Company's FY20 results hosted by defendants Hobbs, Wood and Holt. During his prepared remarks, defendant Hobbs claimed that Berkeley Lights was experiencing "three key tailwinds that are driving growth across [the Company's] markets," describing these tailwinds in pertinent part as follows:

> First, demand for cell-based products is growing. Second, the complexity of cell-based products is increasing, requiring more precise multifunctional assays with the highest resolution. And third, there are new therapeutic modalities, including multi-specific antibodies, cell and gene therapies using DNA or mRNA therapeutics, which require precise functional validation.
>
> As a result of these tailwinds, the number of customers is growing, with many smaller biotech companies chasing specific drug targets with even shorter drug development times. This is creating rapid growth in the number of CDMO customers that we serve and provides us with the opportunity to offer different access models for our technology and attract new customers onto the Berkeley Lights platform.

31.     Similarly, during the FY20 earnings call, defendant Wood stated that Berkeley Lights was experiencing robust direct platform sales growth, stating "direct platform sales totaled $44.7 million in 2020 and $15.3 million in the fourth quarter of 2020, increasing by 14% and 39% respectively over the prior year periods." In addition, defendant Wood stated: "We continue to expand our customer base, with 18 placements coming from new customers and nine being repeat orders. This brought our install base to 75 systems at year end, a 56% increase over 2019."

32.     On March 12, 2021, Berkeley Lights filed with the SEC its annual report for FY20 on Form 10-K, which was signed by defendants Hobbs and Holt, who also filed certifications attesting

1  to the Form 10-K's accuracy and completeness.  The FY20 Form 10-K contained the financial and

2  operational information contained in the FY20 Berkeley Lights release and earnings call.  The FY20

3  Form 10-K highlighted the purported capabilities and effectiveness of the Berkeley Lights platform,

4  stating that the platform "captures and delivers rich single-cell data to find the best cells" and

5  "allows for a high level of control over live single cells or other micro-objects throughout the

6  functional characterization process."  In addition, the FY20 Form 10-K stated that the Company had

7  experienced an increase in product revenues during the quarter, stating in pertinent part as follows:

8          Product revenue increased by $8.1 million, or 19% for the year ended
      December 31, 2020, compared to the year ended December 31, 2019.  The increase
9      during the year ended December 31, 2020 compared to December 31, 2019, was
      primarily driven by an increase of $3.8 million in consumables sales driven by
10     additional demand from our customers due to the increase in our installed base, an
      increase of $3.3 million from platform and system sales, including sales-type lease
11     arrangements and license arrangements related to our workflows, and an increase of
      $1.0 million in subscription arrangement and related revenue driven by the launch of
12     our subscription access program in February 2020. During the year ended December
      31, 2020 we sold 27 platforms compared to 26 platforms during the year ended
13     December 31, 2019.  Revenue from platform and system sales in the year ended
      December 31, 2020 as compared to the prior year was impacted by the regional mix
14     of the platform placements as well as the mix of system type placed.

15         33.    The statements referenced in ¶¶20-32 above were materially false and/or misleading

16  when made because they failed to disclose the following adverse facts pertaining to Berkeley Lights'

17  business, operations and financial condition, which were known to or deliberately disregarded by

18  defendants:

19         (a)    that Berkeley Lights' flagship instrument, the Beacon, suffered from

20  numerous design and manufacturing defects including breakdowns, high error rates, data integrity

21  issues and other problems, limiting the ability of biotechnology companies and research institutions

22  to consistently use the machines at scale;

23         (b)    that Berkeley Lights had received numerous customer complaints regarding

24  the durability and effectiveness of the Company's automation systems, including complaints related

25  to the design and manufacturing detailed in (a), above, and described herein;

26         (c)    that the actual market for Berkeley Lights' products and services was a

27  fraction of the $23 billion represented to investors because of, *inter alia*, the relatively high cost of

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 11 -

1   the Company's instruments and consumables and inability to provide the sustained performance

2   necessary to justify these high costs; and

3          (d)      as a result of (a)-(c), above, defendants' statements to investors during the

4   Class Period regarding Berkeley Lights' business, operations and financial results were materially

5   false and misleading.

6          34.      In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item

7   303"), required the Company's quarterly and annual financial reports issued during the Class Period

8   to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a

9   material favorable or unfavorable impact on net sales or revenues or income from continuing

10  operations."  Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105(a) ("Item 105"),

11  required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of

12  the material factors that make an investment in the registrant or offering speculative or risky" and

13  required each risk factor to "adequately describe[] the risk."  Defendants' failure to disclose the

14  severe problems being experienced by Berkeley Lights' customers when using the Company's

15  products and services and the true size of the Company's total addressable market violated Item 303

16  because these adverse facts represented trends and uncertainties known to defendants that were

17  likely to (and did) have a material unfavorable impact on the Company's business and financial

18  results.  Defendants' failure to disclose these adverse facts also violated Item 105 because they

19  represented some of the most important factors that made an investment in Berkeley Lights

20  particularly risky and speculative.

21         35.      Then, on September 15, 2021, research analyst firm Scorpion Capital issued a

22  scathing investigative report, titled "Fleecing Customers And IPO Bagholders With A $2 Million

23  Black Box That's A Clunker, While Insiders and Silicon Valley Bigwigs Race To Dump Stock.  Just

24  Another VC Pump at 27X Sales.  Target Price: $0," which criticized Berkeley Lights' technology

25  and questioned the durability of the Company's most important business relationships and its

26  business growth plan (the "Scorpion Capital Report").  Although Scorpion Capital stated it was short

27  Berkeley Lights, the information contained in the Scorpion Capital Report was purportedly based on

28  extensive proprietary research and analysis, including 24 research interviews with former Berkeley

1   Lights employees, industry scientists and end users across 14 of the Company's largest customers.

2   The Scorpion Capital Report detailed a "trail of customers who allege they were 'tricked,' misled, or

3   over-promised into buying a $2 million lemon" and concluded that the "reality is so far from BLI's

4   grandiose hype that we believe its  product claims and practices may constitute outright fraud."

5           36.     Examples from witness interviews detailed in the Scorpion Capital Report include,

6   *inter alia*: (i) an Amgen employee who stated that Berkeley Lights machines had an error rate 50%

7   higher than standard lab equipment; (ii) a Bristol Myers Squibb employee who described the

8   machines as onerous and unusable and a waste of money; (iii) a Pfizer senior scientist who implied

9   that the Company's key product claims and capabilities are false; (iv) a Novartis ex-manager who

10  described the products as a farce that does not work; and (v) an AbbVie scientist who stated that in

11  their experience 40% to 50% of all cells were ruined during runs on the Berkeley Lights machines.

12  In total, the Scorpion Capital Report claimed to have interviewed customers representing 30% to

13  50% of Berkeley Lights' entire installed base and that "[a]ll 14 customers indicated that BLI's

14  machine is a flop" and that the authors could not "recall hearing feedback as scathing and universal

15  during customer checks."  Problems cited in the Scorpion Capital Report included the fact that the

16  Company's instruments were not robust enough for commercial use and frequently broke down,

17  were prone to contamination, suffered from throughput limitations, were plagued by data integrity

18  issues, and experienced repeated software problems.

19          37.     In addition, the Scorpion Capital Report found "virtually every" ex-employee

20  interviewed had described Berkeley Lights' total addressable market as "negligible," with one

21  describing the addressable market claimed by the Company in its communications to investors as

22  "'ridiculous.'"  The Scorpion Capital Report concluded that only a relatively small number of

23  biotech companies could afford the relatively expensive machines produced by Berkeley Lights and

24  that most of these had already made a purchase.  In addition, the Scorpion Capital Report found that

25  negative customer experiences had further crimped the Company's growth potential.  According to

26  the Scorpion Capital Report, the availability of cheaper and better alternatives compounded the

27  problem.  The Scorpion Capital Report stated that Berkeley Lights was experiencing anemic or even

28  declining product sales and growth and had been forced to move into bespoke projects and

1  subscription-based offerings in order to "scrape together enough shards of revenue to try and keep

2  the story going while insiders dump stock." The Scorpion Capital Report estimated the Company's

3  actual total addressable market based on interviews with former Berkeley Lights employees to be

4  only $400 million to $600 million.

5       38.  The price of Berkeley Lights common stock plummeted on the information revealed

6  in the Scorpion Capital Report, falling nearly 30% over two trading days to close at $23.53 on

7  September 16, 2021, on abnormally high trading volume.

8       39.  The scope and specificity of the Scorpion Capital Report bolstered its credibility, with

9  the report describing itself as the "most in-depth due diligence to date" on the Company. Moreover,

10  the fact that the price of Berkeley Lights common stock plummeted on the publication of the

11  Scorpion Capital Report and failed to recover even after Berkeley Lights responded to the report

12  indicates that the market found the Scorpion Capital Report's allegations credible and directly

13  contrary to defendants' prior representations to investors. Indeed, as recently as December 6, 2021,

14  the price of Berkeley Lights stock fell to a low of just $18.35 per share. Certain aspects of the

15  Scorpion Capital Report were also generally corroborated by available public information, including

16  the Company's relatively flat sales of its flagship Beacon instruments, alarming increase in accounts

17  receivables, and move into more subscription-based and bespoke product offerings.

18       40.  As a result of defendants' wrongful acts and omissions, and the decline in the price of

19  Berkeley Lights common shares detailed herein, plaintiff and other members of the Class (as defined

20  below) have suffered significant losses and damages.

21                  **ADDITIONAL SCIENTER ALLEGATIONS**

22       41.  As alleged herein, Berkeley Lights and the Individual Defendants acted with scienter

23  in that: (i) they knew or recklessly disregarded that the public documents and statements issued or

24  disseminated in the name of the Company were materially false and misleading; (ii) they knew or

25  recklessly disregarded that such statements or documents would be issued or disseminated to the

26  investing public; and (iii) they participated or acquiesced in the issuance or dissemination of such

27  statements or documents as primary violations of the federal securities laws. The Individual

28  Defendants, by virtue of their receipt of information reflecting the true facts regarding Berkeley

1   Lights, their control over and/or receipt and/or modification of Berkeley Lights' allegedly materially

2   misleading statements, and/or their associations with the Company that made them privy to

3   confidential proprietary information concerning Berkeley Lights, participated in the fraudulent

4   scheme alleged herein.

5          42.     In addition, defendants had the motive and opportunity to commit fraud.  In

6   November 2020, Berkeley Lights conducted a secondary offering of common stock that allowed

7   certain insiders, including the Company's private equity backers, co-founders and certain directors,

8   to sell 3.45 million shares of Berkeley Lights common stock at $86 per share, generating nearly $300

9   million in offering proceeds.  Adding to the highly unusual nature of this sale so close to the

10  Company's IPO, the underwriters allowed the IPO lockup to expire early so that insiders could sell

11  their shares at peak prices.  The SPO offering price was more than 3.65 times higher than the price to

12  which Berkeley Lights stock fell following the revelation of the true facts concealed by defendants.

13  In addition, numerous Company insiders sold tens of millions of dollars' worth of additional

14  Berkeley Lights stock in the secondary market, including defendants Hobbs and Holt who

15  collectively sold over $34 million worth of their personal Berkeley Lights stock at prices as high as

16  $62 per share.  These sales were suspicious in both timing and amount.

17         43.     Furthermore, the unexpected departure of key executives, including the Company's

18  former CFO defendant Holt, its former Chief Accounting Officer Matthew W. Rosinack and its

19  former director Michael Marks, so soon after the IPO bolster an already compelling inference of

20  scienter.

21                                    **NO SAFE HARBOR**

22         44.     Berkeley Lights' "Safe Harbor" warnings accompanying its reportedly forward-

23  looking statements ("FLS") issued during the Class Period were ineffective to shield those

24  statements from liability.  To the extent that projected revenues and earnings were included in the

25  Company's financial reports prepared in accordance with Generally Accepted Accounting

26  Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of

27  the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

28

45.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Berkeley Lights who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

### APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

46.     At all relevant times, the market for Berkeley Lights common stock was an efficient market for the following reasons, among others:

(a)     Berkeley Lights stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b)     according to the Company's Form 10-Q filed November 4, 2021, Berkeley Lights had more than 67 million shares of common stock outstanding as of October 29, 2021;

(c)     as a regulated issuer, Berkeley Lights filed periodic public reports with the SEC;

(d)     Berkeley Lights regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)     unexpected material news about Berkeley Lights was rapidly reflected in and incorporated into the price of Berkeley Lights common stock during the Class Period.

47.     As a result of the foregoing, the market for Berkeley Lights common stock promptly digested current information regarding Berkeley Lights from publicly available sources and reflected such information in the price of Berkeley Lights common stock.  Under these circumstances, all

1   purchasers of Berkeley Lights common stock during the Class Period suffered similar injury through

2   their purchases of Berkeley Lights common stock at artificially inflated prices, and a presumption of

3   reliance applies.

4         48.     A presumption of reliance is also appropriate in this action under the Supreme Court's

5   holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims

6   are based, in significant part, on defendants' material omissions.  Because this action involves

7   defendants' failure to disclose material adverse information regarding Berkeley Lights' business,

8   operations and risks, positive proof of reliance is not a prerequisite to recovery.  All that is necessary

9   is that the facts withheld be material in the sense that a reasonable investor might have considered

10  them important in making investment decisions.  Given the importance of defendants' material

11  misstatements and omissions set forth above, that requirement is satisfied here.

12  **LOSS CAUSATION/ECONOMIC LOSS**

13        49.     During the Class Period, as detailed herein, defendants made false and misleading

14  statements and engaged in a scheme to deceive the market and a course of conduct that artificially

15  inflated the price of Berkeley Lights common stock and operated as a fraud or deceit on Class Period

16  purchasers of Berkeley Lights common stock by misrepresenting the value of the Company's

17  business and prospects by concealing the significant defects in its underwriting and due diligence

18  practices and deficiencies in its commercial credit portfolio and related securitized assets.  As

19  defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of

20  the Company's stock fell precipitously as the prior artificial inflation came out of the stock's price.

21  As a result of their purchases of Berkeley Lights common stock during the Class Period, plaintiff and

22  other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

23  **CLASS ACTION ALLEGATIONS**

24        50.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

25  Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of

26  Berkeley Lights during the Class Period (the "Class").  Excluded from the Class are defendants and

27  members of their immediate families, the officers and directors of the Company, at all relevant

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 17 -

times, and members of their immediate families, the legal representatives, heirs, successors or assigns of any of the foregoing, and any entity in which defendants have or had a controlling interest.

51.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Berkeley Lights common stock was actively traded on the Nasdaq.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Berkeley Lights or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

53.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business, operations and management of Berkeley Lights; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

55.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

56.    Plaintiff incorporates ¶¶1-55 by reference.

57.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Berkeley Lights common stock during the Class Period.

59.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Berkeley Lights common stock.  Plaintiff and the Class would not have purchased Berkeley Lights common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

60.    Plaintiff incorporates ¶¶1-59 by reference.

61.    Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company and their ownership of Company stock, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.  The Company controlled the Individual

Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury

DATED:  December 8, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS


_____
        s/ Shawn A. Williams
      SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

1

2          JOHNSON FISTEL, LLP
           FRANK J. JOHNSON
3          501 West Broadway, Suite 800
           San Diego, CA  92101
4          Telephone:  619/230-0063
           619/255-1856 (fax)
5          frankj@johnsonfistel.com

6          Attorneys for Plaintiff

7    I:\Admin\CptDraft\Securities\Cpt Berkeley Lights.docx

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

Victor J. Ng ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of December, 2021.

12/8/2021



Victor J. Ng

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|:---:|:---:|:---:|
| 04/05/2021 | 70 | $49.94 |
| 04/05/2021 | 40 | $49.98 |

Prices listed are rounded to two decimal places.