MUNGER, TOLLES & OLSON LLP
John W. Spiegel (SBN 78935)
Robert L. Dell Angelo (SBN 160409)
John M. Gildersleeve (SBN 284618)
Lauren C. Barnett (SBN 304301)
350 S. Grand Ave., 50th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-9100
Facsimile:  (213) 687-3702
john.spiegel@mto.com
robert.dellangelo@mto.com
john.gildersleeve@mto.com
lauren.barnett@mto.com

Attorneys for Defendants Berkeley Lights,
Inc., Eric D. Hobbs, Shaun M. Holt, Kurt
Wood, Igor Khandros, Michael Marks,
Sarah Boyce, Gregory Lucier, Michael
Moritz, Elizabeth Nelson, James Rothman,
Ming Wu, and Makoto Shintani

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| VICTOR J. NG, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BERKELEY LIGHTS, INC., et al. <br><br> Defendants. | Case No.  4:21-cv-09497-HSG <br><br> <u>CLASS ACTION</u> <br><br> **NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Filed concurrently: <br><br> - Request for Judicial Notice and to Consider Incorporated Documents <br> - Declaration of Lauren C. Barnett <br> - [Proposed] Order <br><br> Judge:  Hon. Haywood S. Gilliam, Jr. <br> Date:    March 16, 2023 <br> Time:    2:00 p.m. <br> Ctrm:    2 |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION...................................................................................................1

II.   BACKGROUND...................................................................................................3

    A.    BLI Becomes a Public Company ...............................................................4

    B.    A Short Seller Publicly Criticizes BLI.......................................................4

    C.    BLI Provides a Leadership and Financial Update.......................................5

    D.    Plaintiffs File Securities Claims.................................................................6

III.  THE EXCHANGE ACT CLAIMS FAIL ............................................................6

    A.    No Specific Pleaded Facts Show Any False or Misleading Statement .....6

        1.    Plaintiffs Cannot Plead Falsity Based on the Scorpion Report.....6

        2.    Statements About BLI's Product Are Not Actionable .................8

        3.    Statements About BLI's Financials Are Not Actionable ...........12

    B.    No Specific Pleaded Facts Support a "Strong Inference" of Scienter.....15

        1.    No Facts Show Knowledge by Individual Defendants ...............16

        2.    The Stock Sales by Hobbs and Holt Were Not Suspicious.........17

        3.    The Executive Departures Were Not Suspicious .......................18

        4.    Plaintiffs' Remaining Scienter Allegations Fail........................18

    C.    No Specific Pleaded Facts Establish Loss Causation...............................19

        1.    The Scorpion Report Was Not a Corrective Disclosure .............20

        2.    The Other Alleged Dates Were Not Corrective Disclosures.......22

IV.   THE SECURITIES ACT CLAIMS FAIL .........................................................23

V.    THE CONTROL-PERSON CLAIMS FAIL.......................................................25

VI.   CONCLUSION ..................................................................................................25

MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 4:21-CV-09497-HSG

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021).................................................................................................9

*Bao v. SolarCity Corp.*,
   2015 WL 1906105 (N.D. Cal. Apr. 27, 2015) ..................................................................25

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020)............................................................................................19

*In re Cloudera, Inc. Sec. Litig.*,
   2022 WL 14813896 (N.D. Cal. Oct. 25, 2022) ................................................................10

*Curry v. Yelp Inc.*,
   875 F.3d 1219 (9th Cir. 2017).................................................................................3, 16, 22

*Dean v. China Agritech, Inc.*,
   2011 WL 5148598 (C.D. Cal. Oct. 27, 2011) ..................................................................24

*Diaz v. N. Dynasty Mins. Ltd.*,
   2018 WL 5099749 (C.D. Cal. Apr. 30, 2018)....................................................................6

*In re Downey Sec. Litig.*,
   2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ..................................................................16

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009)...............................................................................................22

*Fouad v. Isilon Sys., Inc.*,
   2008 WL 5412397 (W.D. Wash. Dec. 29, 2008)..............................................................25

*Gaylinn v. 3Com Corp.*,
   185 F. Supp. 2d 1054 (N.D. Cal. 2000) ..........................................................................17

*Glazer Cap. Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008)............................................................................................19

*Graves v. AECOM*,
   2017 WL 5502774 (C.D. Cal. June 19, 2017)..................................................................21

*Grigsby v. BofI Holding, Inc.*,
   979 F.3d 1198 (9th Cir. 2020)..........................................................................................21

*In re Harmonic Inc. Sec. Litig.*,
   2006 WL 3591148 (N.D. Cal. Dec. 11, 2006) ..................................................................24

*Hershewe v. JOYY Inc.*,
   2021 WL 6536670 (C.D. Cal. Nov. 5, 2021).............................................................2, 6, 7, 8

-ii-

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000).................................................................................................25

*Hunt v. Bloom Energy Corp.*,
  2021 WL 4461171 (N.D. Cal. Sept. 29, 2021).........................................................................23

*In re Intel Corp. Sec. Litig.*,
  2019 WL 1427660 (N.D. Cal. Mar. 29, 2019).......................................................................9, 11

*In re Intrexon Corp. Sec. Litig.*,
  2017 WL 732952 (N.D. Cal. Feb. 24, 2017)..........................................................................7, 20

*Jedrzejczyk v. Skillz Inc.*,
  2022 WL 2441563 (N.D. Cal. July 5, 2022).............................................................................21

*Kang v. PayPal Holdings, Inc.*,
  2022 WL 3155241 (N.D. Cal. Aug. 8, 2022)............................................................................23

*Kim v. Allakos Inc.*,
  2022 WL 976974 (N.D. Cal. Mar. 31, 2022)..............................................................................6

*In re LexinFintech Holdings Ltd. Sec. Litig.*,
  2021 WL 5530949 (D. Or. Nov. 24, 2021)...........................................................................7, 21

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014).....................................................................................................22

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*,
  39 F.4th 1092 (9th Cir. 2022).....................................................................................................9

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
  2011 WL 4389689 (C.D. Cal. May 5, 2011).............................................................................24

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008).................................................................................3, 13, 17, 19

*Miller v. PCM, Inc.*,
  2018 WL 5099722 (C.D. Cal. Jan. 3, 2018).............................................................................21

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018)................................................................................................19, 23

*Monachelli v. Hortonworks, Inc.*,
  225 F. Supp. 3d 1045 (N.D. Cal. 2016)....................................................................................13

*In re Nektar Therapeutics*,
  2020 WL 3962004 (N.D. Cal. July 13, 2020).......................................................................7, 8, 17

-iii-

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022)................................................................................ 2, passim

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020)..............................................................................................16

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
    2016 WL 7475555 (N.D. Cal. Dec. 29, 2016) ....................................................................10, 24

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
    2018 WL 3126393 (N.D. Cal. June 26, 2018) ....................................................................17

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014)..............................................................................16, 18, 19

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ..............................................................................................10

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014)................................................................................ 3, passim

*Pino v. Cardone Cap., LLC*,
    2021 WL 3502493 (C.D. Cal. Apr. 27, 2021)....................................................................14

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ..............................................................................................24

*In re Pivotal Sec. Litig.*,
    2020 WL 4193384 (N.D. Cal. July 21, 2020) ....................................................................9, 24

*Police & Fire Ret. Sys. of Detroit v. Axogen, Inc.*,
    2020 WL 13547449 (M.D. Fla. Apr. 21, 2020) ....................................................................14

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)................................................................................ 9, passim

*Prodanova v. H.C. Wainwright & Co.*,
    993 F.3d 1097 (9th Cir. 2021)..............................................................................................16

*In re QuantumScape Sec. Class Action Litig.*,
    580 F. Supp. 3d 714 (N.D. Cal. 2022) ....................................................................8

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012)..............................................................................10, 15, 23, 25

*Rodriguez v. Gigamon Inc.*,
    325 F. Supp. 3d 1041 (N.D. Cal. 2018) ....................................................................18

-iv-

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ........................................................................................11, 17

*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009) ......................................................................................11, 23

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ..............................................................................................19

*In re Siebel Sys., Inc. Sec. Litig.*,
2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) .....................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .........................................................................................................2, 16

*In re Tezos Sec. Litig.*,
2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) ......................................................................25

*Webb v. SolarCity Corp.*,
884 F.3d 844 (9th Cir. 2018) ...............................................................................16, 18, 19

*Weston Family P'ship LLLP v. Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022) ...............................................................................................12

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) .............................................................................10, 11, 13, 15

*Yokell v. Draper*,
2018 WL 3417514 (N.D. Cal. July 13, 2018) ....................................................................23

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ...............................................................................16, 17, 18, 19

**FEDERAL STATUTES**

15 U.S.C. § 78u-4(b) ...............................................................................................................6, 16

15 U.S.C. § 78u-5(c) ...........................................................................................................13, 14, 15

Securities Exchange Act, § 10(b) ..........................................................................................6, 9, 23

Securities Exchange Act, § 20(a) .........................................................................................6, 25

Securities Act, § 11 ................................................................................................................6, 23

Securities Act, § 12 ....................................................................................................3, 6, 23, 24, 25

Securities Act, § 15 ................................................................................................................6, 25

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

**FEDERAL RULES**

Fed. R. Civ. P. 8 .................................................................................................................1

Fed. R. Civ. P. 9 ..............................................................................................................1, 23

Fed. R. Civ. P. 12 ...............................................................................................................1

Rule 10b-5 ......................................................................................................................6, 23

Rule 10b5-1 ....................................................................................................................3, 17

-vi-

PLEASE TAKE NOTICE that on March 16, 2023, at 2:00 p.m., or as soon thereafter as counsel may be heard, before the Honorable Haywood S. Gilliam, Jr. in Courtroom 2 of the United States District Court, 1301 Clay Street, Oakland, CA 94612, Defendants Berkeley Lights, Inc. ("BLI"), Eric D. Hobbs, Shaun M. Holt, Kurt Wood, Igor Khandros, Michael Marks, Sarah Boyce, Gregory Lucier, Michael Moritz, Elizabeth Nelson, James Rothman, Ming Wu, and Makoto Shintani (all, "BLI Defendants") will and hereby do move for an order dismissing the Amended Complaint ("Complaint") under Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA").  The Motion is based on the Memorandum of Points and Authorities, Request for Judicial Notice and to Consider Incorporated Documents, Declaration of Lauren C. Barnett and its exhibits, any Reply Memorandum, the complete files and records in this action, and such other matters as may be presented at the hearing on this Motion.

## ISSUES TO BE DECIDED

1.  Whether the Complaint should be dismissed in its entirety for failure to plead facts showing any false or misleading statement.

2.  Whether the Securities Exchange Act claims should be dismissed for the additional reasons that no pleaded facts show scienter, loss causation, and control-person liability.

3.  Whether the Securities Act claims should be dismissed for the additional reasons that no pleaded facts show solicitation of stock sales and control-person liability, and because the absence of loss causation is apparent on the face of the Complaint.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

BLI developed a revolutionary way to study cells.  It launched a laboratory instrument in 2016 that allows a large volume of single cells to be analyzed in a timeframe that was previously impossible.  BLI has placed over 100 of these instruments with pharmaceutical and biotechnology companies and academic researchers, a number of whom have multiple instruments.  These customers use BLI's technology to build new antibody therapies and for cell line development.

In September 2021, a short seller named "Scorpion Capital" posted on the internet a critical "investigative report" about BLI.  Scorpion disclosed it had taken a short position on BLI's stock,

-1-

meaning it would "realize significant gains" if BLI's stock price fell.  Citing purported discussions with unnamed former employees and dissatisfied customers, Scorpion disparaged BLI's instrument as "a lemon" and "a clunker."  BLI's stock price fell, and Scorpion presumably profited.  Scorpion's criticism also led to this action, in which Plaintiffs allege, based on the Scorpion report, that BLI's statements to investors about its product and financials were false and misleading.

Plaintiffs' claims fail under clear Ninth Circuit law.  As the Ninth Circuit recently confirmed, Plaintiffs cannot premise allegations that a company misled investors on "an anonymous and self-interested short-seller's internet musings." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 832 (9th Cir. 2022).  Allegations that merely parrot a short seller's criticism "fail[] to meet the PSLRA's 'exacting requirements for pleading "falsity,"'" and fail to support the required "strong inference" of scienter.  *Hershewe v. JOYY Inc.*, 2021 WL 6536670, at *8-9 (C.D. Cal. Nov. 5, 2021).  Similarly, loss causation allegations based on a short seller report fail because, as the Ninth Circuit held, "the nature of the report means that investors would have taken its 'contents with a healthy grain of salt.'" *Nektar*, 34 F.4th at 840.  The Securities Exchange Act claims fail for all three of these reasons, each of which is an independent ground for dismissal.

***No false statement.***  Plaintiffs claim that two sets of statements were false or misleading.  The first set—descriptions of BLI's mission and product capabilities, such as "We believe our platform rapidly provides the deepest information, with linked phenotypic and genotypic data, on tens of thousands of live single cells"—are statements of opinion and puffery that are not actionable under the securities laws.  In any event, Plaintiffs plead no particularized facts showing that any of these statements was false or misleading.  The second set of statements concern financial results and expectations.  But Plaintiffs plead no particularized facts showing that BLI misstated its revenues or product sales.  In addition, projections of BLI's "total addressable market" ("TAM") and future revenues are classic non-actionable forward-looking statements.

***No scienter.***  The Complaint also fails to allege particularized facts supporting a "strong inference" of scienter—that is, intent to defraud or deliberate recklessness—that is "cogent and at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007).  Lacking "detailed and specific allegations" showing the "Individual

-2-

Defendants' knowledge" of purported misstatements, *Curry v. Yelp Inc.*, 875 F.3d 1219, 1227-28 (9th Cir. 2017), Plaintiffs resort mostly to asserting that stock sales by BLI's former CEO and CFO establish scienter. Yet Plaintiffs plead that the sales occurred when these individuals first "gained access" to BLI stock and pursuant to pre-arranged Rule 10b5-1 trading plans. Those circumstances are not suspicious and "'rebut [] an inference of scienter.'" *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 & n.11 (9th Cir. 2008).

***No loss causation.*** The Scorpion report was not a corrective disclosure under Ninth Circuit law, foreclosing Plaintiffs' attempt to plead loss causation. *See Nektar*, 34 F.4th at 840 ("[I]t is not plausible that the market would perceive the Plainview Report as revealing false statements."). Nor do Plaintiffs plead specific facts showing that BLI's Q1 and Q2 2021 earnings releases revealed any concealed "truth," not least because Plaintiffs claim the same releases were false and misleading. And BLI's announcement of full-year 2021 expected revenue, and its CEO's transition to a different role at the company, likewise did not "ma[k]e untrue or call[] into question" any prior statements. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014).

Plaintiffs' Securities Act claims fail as well. Because the Securities Act claims challenge the same statements as the Exchange Act claims, they fail to plead false or misleading statements for the same reasons. They also fail because the absence of loss causation appears on the face of the Complaint. In addition, the section 12(a)(2) claim against BLI's officers and directors fails because they did not "solicit" the sale of securities, and the control-person claims against BLI's officers and co-founder Igor Khandros fail for lack of a primary violation, as well as failure to plead facts showing that Khandros was a control person.

## II.   BACKGROUND

BLI focuses on digital cell biology, an emerging field that "combines bioscience, technology, and information to dramatically advance how scientists study cellular interactions." ¶¶ 1, 33; Ex. 34.[1] In 2016, BLI launched a laboratory instrument called the Beacon. ¶¶ 1, 3. The

---

[1] Paragraph citations and "Ex. A" refer to the Complaint. Exhibit citations otherwise refer to exhibits to the Barnett Declaration. Facts are drawn from the allegations and from documents incorporated by reference or subject to judicial notice and are assumed true for this Motion only.

Beacon is "a fully automated, high throughput system designed to allow detailed cell analysis at scale." ¶ 35. It does this by using "light and semiconductor technology to move individual cells so they can be isolated, cultured, assayed, and exported." ¶¶ 3-4, 35.

The Beacon is marketed "For Research Use Only." Ex. 1 at 133. That means it is "[n]ot for use in diagnostic procedures" that other kinds of lab equipment may perform. *Id.* The Beacon's customers include drug development and pharmaceutical companies and research institutions. ¶¶ 1, 187. They use the Beacon "for tasks such as antibody discovery and cell line development." ¶¶ 33, 35. A number of customers acquired a second instrument. ¶¶ 68, 115.

### A.    BLI Becomes a Public Company

On July 17, 2020, BLI conducted an initial public offering. ¶¶ 6, 21. On November 16, 2020, BLI conducted a secondary offering of three million shares. ¶ 76. Like many instruments relying on novel technology, the Beacon continued to evolve. Throughout 2020 and 2021, BLI repeatedly disclosed that it had experienced challenges "with respect to the reliability of our systems and workflow yields" and with the extensive customer training required to use the Beacon. *E.g.*, Ex. 1 at 22-23. BLI also disclosed the precise number of instruments it had placed with customers each quarter, with total placements roughly doubling from 54 as of March 31, 2020 to 105 as of September 30, 2021. ¶ 68; Ex. 1 at 80; Ex. 24 at 6. BLI generated revenue from direct Beacon sales and part sales (including proprietary consumable chips and kits), licenses and services, and partnerships. ¶¶ 37-39. In May 2021, BLI also introduced a new subscription model that allows customers to use a Beacon without purchasing it. ¶ 103.

### B.    A Short Seller Publicly Criticizes BLI

On September 15, 2021, an "activist" short seller posted a purported "investigative report" that "represents the current opinions of Scorpion Capital LLC concerning Berkeley Lights." ¶¶ 2, 136 & Ex. A. At the outset, Scorpion conceded that, as an investor shorting BLI stock, it "stands to realize significant gains in the event that the price of its . . . securities decline." Ex. A at 2. Scorpion then "criticized Berkeley Lights's technology and questioned the sustainability of the Company's most important business relationships and its business growth plan." ¶ 136. It called the Beacon "a lemon," "a clunker," and "a flop" and BLI's business a "raging dumpster fire." Ex. A at 1, 3, 8, 31.

-4-

Scorpion claimed to have spoken with former BLI employees and individuals affiliated with BLI's customers—all of whom were unidentified and who are referred to in the report as "experts"—and included selective paraphrased remarks from some of those discussions.

Scorpion qualified all of its criticism with elaborate disclosures, including:

1. Scorpion "cannot and does not provide any representations or warranties with respect to the accuracy" of information from any "sources."

2. Former employees with whom Scorpion allegedly spoke "are by definition separated from the company and thus the information they have provided may be outdated."

3. "[Q]uotations of experts used in this article do not reflect all information they have shared with us, including without limitation, certain positive comments and experience with respect to Berkeley Lights" and "may be paraphrased, truncated, and/or summarized solely at our discretion, and do not always represent a precise transcript of those conversations."

*Id.* at 2.  As an example of "summarizing" evident even on the face of the report, a "Bristol Meyers expert" reportedly said of flow cytometry machines like the Beacon: "*If you don't know how to take care of them*, they become a very expensive doorstop very fast."  Ex. A at 58 (emphasis added). Scorpion turned this into the headline "can become a '<u>very expensive doorstop</u>.'"  Ex. A at 58.

BLI responded that the report "contains highly misleading statements, groundless claims and a clear lack of industry understanding."  ¶ 144; Ex. 15.  Research analysts issued similar comments. Ex. 27 at 1 (Stifel: "Our view on Berkeley's technology and platform remains unchanged."); Ex. 28 at 1 (BTIG: "our thinking that the claims in the short report are not accurate").  Still, over the next "two trading days," BLI's stock price fell 30%.  ¶ 139; Ex. 35 at 7.

### C.   BLI Provides a Leadership and Financial Update

On January 5, 2022, almost four months after the Scorpion report, BLI made two announcements:  first, that CEO Eric Hobbs would become president of its Antibody Therapeutics business line; and second, that preliminary total revenue for the 2021 full year was "expected to be in the range of $84.0 million to $84.5 million," below the range previously predicted.  ¶¶ 148-149; Ex. 18.  Analysts explained that the earnings miss was "attributed entirely to the delay of 3 Beacon placements . . . all of which occurred within the last week of the quarter."  Ex. 30 at 1 (J.P.Morgan).

-5-

On January 6, 2022, BLI's stock price fell 39.3%.  ¶ 152; Ex. 35 at 9.

### D.    Plaintiffs File Securities Claims

The Complaint alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act from July 17, 2020 to January 5, 2022, as well as violations of sections 11, 12(a)(2), and 15 of the Securities Act.  It asserts claims against BLI, Hobbs, former CFOs Shaun Holt and Kurt Wood, current and former BLI directors, underwriters for BLI's IPO, and three investors in BLI.  Plaintiffs challenge statements about BLI's mission and the Beacon's capabilities, as well as BLI's financial disclosures and projections.  According to Plaintiffs, the "truth" was revealed through a series of partial corrective disclosures:  (1) BLI's quarterly earnings releases in May and August 2021, (2) the Scorpion report in September 2021, and (3) BLI's announcement in January 2022 of expected year-end revenue and its CEO's transition to a new role.  ¶¶ 119-152.

## III.    THE EXCHANGE ACT CLAIMS FAIL

"To plead a claim under § 10(b) and Rule 10b-5, a plaintiff must allege '(1) a material misrepresentation or omission [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.'"  *Nektar*, 34 F.4th at 835.  "Securities fraud complaints face heightened pleading requirements."  *Id.*  The elements of falsity, scienter, and loss causation all must be pleaded with particularity.  *Apollo*, 774 F.3d at 603-05; *see* 15 U.S.C. § 78u-4(b)(1)(B).

### A.    No Specific Pleaded Facts Show Any False or Misleading Statement

#### 1.    Plaintiffs Cannot Plead Falsity Based on the Scorpion Report

There is an overarching problem with the Complaint:  its allegations rely "almost entirely on a negative report published by a short seller."  *Hershewe*, 2021 WL 6536670, at *8 (citation omitted); *see* ¶ 2 n.1 ("This Amended Complaint incorporates the allegations in the Scorpion Capital Report.").  Such allegations "fail[] to meet the PSLRA's 'exacting requirements for pleading "falsity."'"  *Hershewe*, 2021 WL 6536670, at *8; *see Kim v. Allakos Inc.*, 2022 WL 976974, at *2, *8-9 (N.D. Cal. Mar. 31, 2022) (dismissing claims that "rely on the findings in [short seller] Report as the basis for their complaint"); *Diaz v. N. Dynasty Mins. Ltd.*, 2018 WL 5099749, at *6 (C.D. Cal. Apr. 30, 2018) (alleged statements "fail[] to meet the falsity requirements of the PSLRA" when

-6-

"[t]he basis for each and every allegation of falsity in the FAC is [short seller] Report"); *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *1, *4 (N.D. Cal. Feb. 24, 2017) (rejecting allegations which "primarily recite[] the findings of [short seller] report" that claimed company's "core technology suite was overhyped" and revenues overstated).

The Scorpion report has no identified author. *See Hershewe*, 2021 WL 6536670, at *4 (report was by "'Muddy Waters' and not a named author"); *In re Nektar Therapeutics*, 2020 WL 3962004, at *10 (N.D. Cal. July 13, 2020) (report by "Plainview LLC and its affiliates" had no "information regarding the authors"). An authorless report is "'subject to the same standard applied to evaluate facts alleged to have originated with any "confidential informant."'" *Nektar*, 2020 WL 3962004, at *10. Plaintiffs must describe the short seller "with 'sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged' and provide 'adequate corroborating details.'" *Hershewe*, 2021 WL 6536670, at *5.

Scorpion is not "an expert [who] has sufficient expertise in the specific subject matter at issue"—that is, digital cell biology. *Id.*; *see id.* (rejecting claim that "Muddy Waters has ample experience investigating and exposing fraud and other misconduct, including involving PRC-based companies"). The Complaint alleges only that Scorpion is an "activist short seller firm focused on exposing frauds and stock promotions in the life science industry." ¶ 12. Moreover, Scorpion relies on "unverified and unverifiable information," *Hershewe*, 2021 WL 6536670, at *5, including unidentified sources whose remarks Scorpion *admits* were truncated or paraphrased and which are used with no pretense of objectivity. Scorpion purports to cite former employees without specifying when they worked at BLI, "what they did for the company," and "whether they were in a position to observe" details about the Beacon or BLI's finances. *Id.* at *8; *see In re LexinFintech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949, at *7-8 (D. Or. Nov. 24, 2021) (rejecting report quoting anonymous customer complaints as "unsubstantiated" and "too vague and conclusory").

Under similar circumstances, this Court rejected allegations based on a short seller report in *Nektar*. 2020 WL 3962004, at *10. Given "disclosures detailing that it stood to benefit from a poor performance in Nektar's stock price and the lack of any information establishing why [short seller]'s opinions on the highly-technical matters at issue here are reliable," plaintiffs failed to "sufficiently

-7-

show that the Report supports their allegations of falsity." *Id.*  The same result holds here.

Plaintiffs cite *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714 (N.D. Cal. 2022), as purportedly "credit[ing] Scorpion Capital's research" and deeming it "reliable."  ¶ 31 & n.2.  On the contrary, the court noted that Scorpion's short position "may raise serious credibility issues for a factfinder" and held only that the report's content "suffic[ed] to survive a challenge at the pleadings."  580 F. Supp. 3d at 732.  The Ninth Circuit's later decision in *Nektar* is inconsistent with *QuantumScape*'s view that the problematic *source* of allegations can be set aside until "factfind[ing]."  Whereas in *QuantumScape* the analysis concerned the "nature of the revelation *more than it coming from a short-seller*," *id.* at 731-32 (emphasis added), *Nektar* made clear that, in fact, the "character of the report" is what matters at this stage, especially given the heightened pleading standard.  34 F.4th at 840 (evaluating loss causation).  This Court is bound by *Nektar*.

In any event, the *QuantumScape* court also held that information in the report was supported by other sources, including a named expert who had published a separate report.  580 F. Supp. 3d at 728, 732.  Plaintiffs here make no comparable allegations, claiming that "[t]he truth about Berkeley Lights's platform" was "revealed in significant part as a result of an investigative analyst report issued by Scorpion Capital."  ¶ 79.  The PSLRA demands far more than "incorporat[ing] wholesale" a short seller report that "presented its conclusions as fact."  *Hershewe*, 2021 WL 6536670, at *5.

### 2. Statements About BLI's Product Are Not Actionable

The crux of the Complaint is that BLI made "false and misleading statements and omissions regarding the functionality" of the Beacon and the "purported superiority of the Beacon compared to existing cell analyzing instruments."  ¶ 1.  The statements are:

- "We developed the Berkeley Lights Platform to provide *the most advanced environment for rapid functional characterization of single cells at scale*."

- "We believe our platform rapidly *provides the deepest information, with linked phenotypic and genotypic data, on tens of thousands of live single cells*."

- "We believe we are the only company exclusively focused on this approach to Digital Cell Biology, and we believe *this level of scale and precision is not attainable with other approaches*."

-8-

- "This allows our customers to find *the best cells*" by offering advanced capabilities like "controlling the environment," "[p]erforming a broad range of workflows," and "[d]igitally aggregating" data for each cell.

*E.g.*, ¶ 80; Ex. 1 at 102 (emphases added); *see also* ¶ 85 & Ex. 12 at 23 (platform "delivers rich single-cell data to find the best cells" and allows control throughout "the functional characterization process"); ¶ 88 & Ex. 20 at 5 ("what we believe to be the largest data cube for single cells in the industry"; "only Company commercializing a platform that can do this in a scalable way"); ¶ 107 & Ex. 12 at 23 (BLI's platform is a "fully integrated-end-to-end solution, comprised of proprietary consumables."). Plaintiffs claim these statements failed to disclose that the Beacon "suffered from numerous design and manufacturing defects" and that BLI "had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems." ¶ 83.

### a.  The Statements Are Puffery and Opinion Statements

A statement that provides only "general terms" and "nothing concrete" is not actionable. *Apollo*, 774 F.3d at 606. "[P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (citation omitted); *see also Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022) ("generically positive" statements about market opportunities "plainly fit beneath the umbrella of puffery").

The challenged statements are broad descriptions of BLI's mission, product platform, and product capabilities. Courts regularly deem such statements "vague and generalized corporate commitments, aspirations, or puffery that cannot support statement liability under Section 10(b)." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 708 (9th Cir. 2021); *see In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *7 (N.D. Cal. July 21, 2020) (statements that product "provid[es] a 'cutting-edge,' 'leading,' and 'turnkey cloud-native platform'" were not actionable as they "'represent the "feel good" speak that characterizes "non-actionable puffing"'"); *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *9 (N.D. Cal. Mar. 29, 2019) (statements that chips were "optimized particularly for data protection" and "provide a 'robust multifactor verification solution'" were not actionable (emphasis omitted)). As in these cases, statements that "highlighted the purported superiority of the

-9-

Berkeley Lights platform," ¶ 80, are puffery. *See also In re Cloudera, Inc. Sec. Litig.*, 2022 WL 14813896, at *11 (N.D. Cal. Oct. 25, 2022) ("our functionality is best-in-class" was puffery).

In addition, most challenged statements about BLI's product are statements of opinion that began with the words "we believe"—which the Complaint omits. *Compare, e.g.*, ¶ 80 *with* Ex. 1 at 102 ("*we believe* this level of scale and precision is not attainable with other approaches" (emphasis added)). These "pure statements of opinion" are not actionable "regardless whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015). Plaintiffs fail to meet the narrow exception that such statements may be actionable if they contain "'*embedded* statements of fact'" or if the speaker does not actually hold the stated belief. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188-89 (9th Cir. 2021). Plaintiffs identify no embedded falsities or omitted facts making the opinion statements misleading; they do not claim, for example, that the "level of scale and precision" offered by the Beacon was in fact attainable with other approaches. Nor do they plead specific facts showing that BLI did not believe in the capabilities of its product. As a result, these alleged misstatements are non-actionable.

### b.     No Statements Were False or Misleading When Made

Plaintiffs also fail to plead particularized facts showing that statements about BLI's product were "false or misleading at the time they were made." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Plaintiffs do not allege facts showing that BLI's platform did *not* offer capabilities like "[p]erforming a broad range of workflows," or that it was not a "fully integrated end-to-end solution." ¶¶ 80, 107. They plead no "contemporaneous facts that would establish a contradiction between the alleged materially misleading statements and reality." *Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016).

Indeed, BLI's ample disclosures negate Plaintiffs' claim. Plaintiffs claim BLI's statements omitted "that the Beacon suffered from numerous design and manufacturing defects" and that BLI "received numerous customer complaints." ¶ 10. Yet BLI disclosed challenges regarding reliability and yields, that errors and defects might not meet expectations, and that customers must undertake expensive and time-consuming training—the very facts Plaintiffs claim were omitted. In its IPO Registration Statement and in SEC filings throughout the class period, BLI disclosed:

> The Berkeley Lights Platform is comprised of OptoSelect chips and reagent kits, advanced automation systems and advanced application and workflow software, **which may contain undetected errors or defects and may not meet the expectations of our customers . . . . [W]e believe that pharmaceutical and biotechnology companies are likely to be particularly sensitive to product defects and errors in the use of our platform** . . . . **[W]e have experienced in the past, and may experience in the future, challenges with respect to the reliability of our systems and workflow yields**. . . . These complexities also require that we train our customers to operate them, which is expensive and time-consuming. . . .
>
> Our ability to achieve and maintain commercial market acceptance of our Berkeley Lights Platform . . . will depend on a number of factors, including . . . whether our platform reliably provides advantages over legacy and other alternative technologies and is perceived by customers to be cost effective . . . the relative reliability and robustness of our platform . . . **[and] negative publicity regarding our or our competitors' products resulting from defects or errors.**

Ex. 1 at 17-18, 22-23 (emphases altered); *see* Ex. 10 at 22-23, 27; *see, e.g.*, Ex. 17 at 39 (incorporating prior risk factors). BLI "affirmatively acknowledge[d]" that it "has 'experienced to date' the sort of 'challenges' that it would have to overcome in order to achieve its stated objective." *Tesla*, 985 F.3d at 1196. BLI was not required to disclose that the Beacon has had defects each time BLI described its product. *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162-63 (9th Cir. 2009) ("[I]t is pointless and costly to compel firms to reprint information already in the public domain." (citation omitted)); *Intel*, 2019 WL 1427660, at *10-12 (statements about processor performance being 30% improved were not rendered false by vulnerabilities, the risk of which was understood); *In re Siebel Sys., Inc. Sec. Litig.*, 2005 WL 3555718, at *4 (N.D. Cal. Dec. 28, 2005) ("That a new program has kinks does not make a positive statement about the program false.").[2]

Nor was BLI required to recite the specifics of all customer complaints and product errors, such as that one customer reportedly found the machine "tedious" to use or experienced software "bugs" or that former employees noted past problems with "contamination." Ex. A at 39, 78. "Problems . . . are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements." *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001). The Ninth

---

[2] To the extent Plaintiffs challenge BLI's risk factor *itself*, *e.g.*, ¶ 82, no pleaded facts show how stating that BLI experienced challenges and may continue to do so is false and misleading. *See Tesla*, 985 F.3d at 1196. For similar reasons, the risk factor after the Scorpion report that third-party reports "could" harm BLI's share price is not actionable. ¶ 114.

Circuit has "expressly declined to require a rule of completeness for securities disclosures because '[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'" *Intuitive Surgical*, 759 F.3d at 1061 (citation omitted); *see Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) ("[C]ompanies do not have an obligation to offer an instantaneous update of every internal development, especially when it involves the oft-tortuous path of product development.").

### 3.   Statements About BLI's Financials Are Not Actionable

Plaintiffs allege that BLI misstated its "operational and financial growth" in the form of:

- Periodic statements about sales and revenue, *e.g.*, that direct platform sales increased 84% year-over-year to $39.1 million for 2019 and generated $9.4 million during the first quarter 2020.  ¶ 81; Ex. 1 at 82, 83.

- Periodic statements about actual instrument sales, *e.g.*, that BLI placed 26 machines in 2019, a 117% increase over the prior year.  ¶ 81; Ex. 1 at 82.

- Statements that BLI "estimate[d] our total addressable market to be approximately $23 billion."  *E.g.*, ¶ 81; Ex. 1 at 104.

- 2021 statements that BLI's "technology adoption strategy" includes "offering alternative access models to accommodate customers through a subscription-based approach," that "[w]e believe this will increase our serviceable available market, broaden our customer base and drive incremental demand," and that the subscription program was "off to a good start with getting three contracts signed."  *E.g.*, ¶¶ 103-104, 111; Ex. 22 at 5, 7; Ex. 23 at 7, 9.

- 2021 statements that BLI "continue[d] to expect revenue to be in the range of $90 to $100 million."  ¶¶ 104, 110, 116; Ex. 22 at 7; Ex. 23 at 6; Ex. 24 at 7.

### a.   Statements About Past Financial Performance Were Not False

Plaintiffs claim statements about instrument placements and revenues were false because BLI "received numerous customer complaints" and its product "suffered from numerous design and manufacturing defects."  ¶ 83(a)-(b).  That is a non sequitur.  Plaintiffs do not allege that BLI had not placed a certain number of instruments or generated the stated revenue.  They do not allege that BLI has ever restated its financial results.  Whether BLI received complaints or experienced defects

-12-

does not change how much revenue it made.  The Complaint fails to meet the PSLRA's standard of pleading "specific facts indicating why those statements were false." *Metzler*, 540 F.3d at 1070; *see id.* (rejecting allegations that "virtually every statement made by Corinthian during the Class Period related to the company's financial health or performance was, by definition, false"); *Monachelli v. Hortonworks, Inc.*, 225 F. Supp. 3d 1045, 1055 (N.D. Cal. 2016) ("'disclosure[s] of accurate historical data accompanied by general statements of optimism'" were "not actionable").

### b.   Projections of the TAM Were Forward-Looking and Not False

Plaintiffs next claim that BLI's estimated TAM was false or misleading because "the actual market for Berkeley Lights's products and services was a fraction of the $23 billion represented." ¶ 83(c). "[T]otal addressable market" is an "estimate" of "market opportunity" "based on *potential* customer research and development spending, addressable aspects of *potential* customers' end product development processes, and *potential* platform usage." Ex. 1 at 122 (emphasis added); *see* Ex. 10 at 14.  BLI disclosed that TAM has limited "predictive accuracy":

> **We estimate annual total addressable markets** and forecasts of market growth . . . .  These estimates, forecasts and key performance indicators are based on a number of . . . assumptions and estimates relating to our ability to generate revenue from the development of new workflows. . . . **As a result, these assumptions and estimates may not be correct** and the conditions supporting our assumptions or estimates may change at any time, thereby reducing the predictive accuracy of these underlying factors and indicators.  **As a result, our estimates of the annual total addressable market . . . may prove to be incorrect.**

Ex. 1 at 27 (emphasis added).

BLI's statements about the TAM are forward-looking statements protected by the PSLRA's safe harbor and the bespeaks caution doctrine.  Forward-looking statements include "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *Intuitive Surgical*, 759 F.3d at 1058 (citation omitted).  Such a statement is non-actionable if it is "accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *Tesla*, 985 F.3d at 1190 (citation omitted); *see* 15 U.S.C. § 78u-5(c)(1).  Similarly, the bespeaks caution doctrine, which applies to statements in IPO materials, "protects affirmative, forward-looking statements . . . when they are accompanied by cautionary language or risk

-13-

disclosure." *Pino v. Cardone Cap., LLC*, 2021 WL 3502493, at *8 & n.7 (C.D. Cal. Apr. 27, 2021).

These doctrines apply here. By nature, TAM is an estimate of the market opportunity that could be available to BLI *in the future*. *See Police & Fire Ret. Sys. of Detroit v. Axogen, Inc.*, 2020 WL 13547449, at *7-8 (M.D. Fla. Apr. 21, 2020) (statement estimating "the market or TAM for Axogen's products" was forward-looking because it was "inherently a future-oriented abstraction of where and to whom goods might be sold" and "involved a 'projection of revenues'"). BLI expressly told investors that "estimates of our addressable market, market growth" were "forward-looking statements." Ex. 1 at 62. BLI cautioned that "management's beliefs and assumptions are not guarantees of future performance or development and involve known and unknown risks." *E.g., id.*; *see* Ex. 10 at 1. BLI also referred to the detailed "risk factors," which included risks that BLI's platform would not obtain market acceptance and BLI's disclosure that TAM was an estimate based on assumptions that may not be correct. Ex. 1 at 17-18, 27, 63. This extensive cautionary language triggers the safe harbor, *see Intuitive Surgical*, 759 F.3d at 1059, and the bespeaks caution doctrine, *see Pino*, 2021 WL 3502493, at *11-13. Even absent this language, the safe harbor still would apply to statements about BLI's TAM made after the IPO because Plaintiffs fail to plead facts showing that any statement was made with "actual knowledge" of falsity. 15 U.S.C. § 78u-5(c)(1)(B); *see infra* at 15-19 (failure to plead scienter).

In any case, Plaintiffs plead no facts showing that the TAM was incorrectly estimated based on facts known to BLI at the time it was disclosed. The Complaint's entire basis for challenging the TAM is the self-interested pessimism of the Scorpion report and the former employees Scorpion chose to feature in its report. As discussed *supra* at 6-8, the PSLRA's exacting standard does not permit pleading that a complex financial indicator is false based on the mere say-so of sources in a short seller report whose expertise is not alleged.

### c.   Statements About the Subscription Model Were Forward-Looking and Not False

Plaintiffs claim statements about BLI's 2021 subscription model and other partnerships were false or misleading because customers "were unlikely to become long term subscription or platform customers" and the change was "a stop gap necessitated by the Beacon's weaknesses." *E.g.*, ¶¶ 105, 112. But Plaintiffs' mere doubt that a business initiative will succeed does not make for falsity.

-14-

Statements that BLI introduced the model were accurate, that "we believe" the model would do well are opinions, and that the program was "off to a good start" are puffery. *See supra* at 9-10.

In addition, opinion statements about the expected impact of the model ("[w]e believe this will increase our serviceable available market," Ex. 22 at 5, are forward-looking and protected by the bespeaks caution doctrine and the statutory safe harbor, regardless of whether the model ultimately succeeds. *See supra* at 13-14; *Tesla*, 985 F.3d at 1189 ("This safe harbor 'is designed to protect companies and their officials' when they merely fall short of their 'optimistic projections.'"). On the calls on which these statements were made, BLI made cautionary statements as to why results may differ and referred to written cautionary statements. *E.g.*, Ex. 22 at 4; *see* 15 U.S.C. § 78u-5(c)(2)(B). Nor do specific pleaded facts show that BLI predicted the impact of the new model with "actual knowledge" that its expectations would be unrealized.

### d.     Revenue Projections Were Forward-Looking and Not False

Finally, the 2021 year-end revenue guidance of $90-$100 million that BLI offered in May, August, and November 2021, ¶¶ 104, 111, 116, is not actionable. Plaintiffs claim the guidance was "unachievable." ¶ 112(f). But revenue guidance is a forward-looking statement protected by the safe harbor and bespeaks caution doctrine. *See Intuitive Surgical*, 759 F.3d at 1058 ("[G]rowth and revenue projections . . . are forward-looking on their face."). Each time BLI stated it "expect[ed]" revenue to be in that range, ¶ 104, it included meaningful cautionary language, Ex. 22 at 4, Ex. 23 at 4, Ex. 24 at 4, which incorporated disclosures that platform sales "require[] a substantial sales cycle" and were "prone to quarterly fluctuations in revenue." Ex. 1 at 18. That year-end revenue differed from expectations did not mean prior guidance was false and misleading. *See Rigel*, 697 F.3d at 882 n.12 ("The mere fact that stated expectations fail to come to pass does not make a statement concerning expectations or plans false."). To the contrary, as discussed *infra* at 22, BLI's fourth-quarter revenue miss was "attributed entirely to the delay of 3 Beacon placements . . . all of which occurred within the last week of the quarter." Ex. 30 at 1 (J.P.Morgan). Plaintiffs plead no facts that BLI released guidance with "actual knowledge" at the time that the guidance was false.

### B.     No Specific Pleaded Facts Support a "Strong Inference" of Scienter

Plaintiffs must "state with particularity facts giving rise to a strong inference that

-15-

[Defendants] acted" with scienter.  15 U.S.C. § 78u-4(b)(2)(A).  Scienter is the "'intent to deceive, manipulate, or defraud'" or "'deliberate recklessness.'"  *Webb v. SolarCity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018); *see In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) ("the standard for recklessness is actually much closer to one of intent").  "The PSLRA's 'strong inference' requirement has teeth."  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020).  "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable —it must be cogent and at least as compelling as any opposing inference."  *Tellabs*, 551 U.S. at 309.  The Court must "consider plausible, nonculpable explanations for the defendant's conduct."  *Id.* at 324.  The Complaint pleads no specific facts supporting a strong inference of scienter, and the Exchange Act claims should be dismissed on that ground alone.

### 1.    No Facts Show Knowledge by Individual Defendants

The Ninth Circuit requires "detailed and specific allegations" showing "a nexus between the wrongful behavior and Individual Defendants' knowledge."  *Curry*, 875 F.3d at 1227-28.  The Complaint must "allege scienter with respect to each of the individual defendants."  *Apollo*, 774 F.3d at 607; *see Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1108 (9th Cir. 2021); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *3 (C.D. Cal. Aug. 21, 2009) (dismissing complaint lacking "particularized facts demonstrating that each Individual Defendant knew . . . that a particular statement was false or misleading when made").

Plaintiffs plead *no* particularized facts showing that Defendants Hobbs, Holt, or Wood acted with scienter.  No allegations cite confidential witnesses purporting to have personal knowledge of what the Individual Defendants knew.  The Complaint "incorporates the allegations in the Scorpion Capital Report, including the many confidential witness interviews summarized therein."  ¶ 2 n.1. But even if unidentified ex-employees employed at undisclosed times selectively quoted in a short seller report could pass the Ninth Circuit's test for whether confidential-witness allegations are reliable, *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), that would get Plaintiffs nowhere.  The Scorpion report makes only passing references to Hobbs and Holt, says nothing about Wood, and says nothing about what any of the three knew during the class period.

MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 4:21-CV-09497-HSG

### 2.    The Stock Sales by Hobbs and Holt Were Not Suspicious

Plaintiffs attempt to muster a "strong inference" of scienter based on stock sales by Hobbs and Holt—but Plaintiffs concede the sales were "predetermined trades" made "pursuant to 10b5-1 plans."  ¶ 171 & n.4.  "Sales according to pre-determined plans may 'rebut [] an inference of scienter.'"  *Metzler*, 540 F.3d at 1067 n.11; *see Nektar*, 2020 WL 3962004, at *16 (sales under Rule 10b5-1 plans "weigh[] against an inference of scienter").  The more compelling explanation is the nonculpable one Plaintiffs allege:  the trades were executed pursuant to pre-determined plans.

Even absent the plans, the sales would not satisfy the test for when insider sales can support scienter allegations.  *See Metzler*, 540 F.3d at 1067.  Plaintiffs plead *no facts* about "the amount and percentage" of Hobbs' and Holt's holdings that were sold.  *See id.*  On the timing, 82% of Hobbs' class period sales, and 100% of Holt's sales, were in March 2021—when, as Plaintiffs plead, Hobbs and Holt first "gained access to all the Berkeley Lights common stock they had built up from FY2020."  ¶ 165; Ex. 19 (Forms 4).  Prior restrictions on trade further undercut any scienter inference.  *See Ronconi*, 253 F.3d at 423.  Plaintiffs even concede another reason for Holt's sales: he was "prepar[ing] to leave" BLI.  ¶ 169.  "It is not unusual for individuals leaving a company . . . to sell shares."  *Gaylinn v. 3Com Corp.*, 185 F. Supp. 2d 1054, 1067 (N.D. Cal. 2000).  Plaintiffs also plead no trading history—as Plaintiffs concede, there is no relevant "trading history" because Hobbs and Holt did not trade until March 2021.  ¶ 165.  Without that context, the sales are not suspicious.  *See Zucco*, 552 F.3d at 1005 (citation omitted); *Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2018 WL 3126393, at *9 (N.D. Cal. June 26, 2018).  Plaintiffs do not allege that Wood (BLI's now former CFO) sold *any* stock in the class period, which further undercuts any scienter inference.  *See Metzler*, 540 F.3d at 1067 ("Digiovanni meanwhile sold nothing at all, suggesting that there was no insider information from which to benefit.").

Unable to show that sales by Hobbs and Holt were suspicious, Plaintiffs attempt to substitute stock sales in BLI's secondary offering or soon thereafter by other individuals and entities.  ¶¶ 157, 160-162, 172-182.  The fact of an SPO, which generated no proceeds for BLI, ¶ 42, does not show scienter.  *See Zucco*, 552 F.3d at 1006 (private placement of 1.8 million shares was not suspicious as "mere generalized assertions about 'routine business objectives, without more' cannot support"

scienter); *see Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1057 (N.D. Cal. 2018). The trading histories or percentages sold by others—even if alleged—would not matter because Hobbs, Holt, and Wood are the only individuals who allegedly made misstatements.

### 3.    The Executive Departures Were Not Suspicious

Nor do the departures of Holt and Wood, and change in Hobbs' title, raise a strong inference of scienter. ¶¶ 203, 209-210. An executive departure can contribute to a scienter inference only if specific facts show that it "was uncharacteristic when compared to . . . typical hiring and termination patterns or was accompanied by suspicious circumstances." *Zucco*, 552 F.3d at 1002. Plaintiffs fail to meet this standard. And, they concede that Holt, along with BLI's Chief Accounting Officer Rosinack and one director, Marks, left BLI "soon after the IPO," ¶ 203, which is a nonculpable reason given the fundamental change and need for executives with public company experience. *See, e.g.*, *Webb*, 884 F.3d at 857 (no scienter because plaintiff failed to "rebut the 'reasonable assumption' that the reshuffling 'occurred as a result of [the] restatement's issuance itself'").

Hobbs, Holt, and Wood *remained* in their roles for a transition period, which undercuts any scienter inference. ¶¶ 22-24; Ex. 18; *see NVIDIA*, 768 F.3d at 1063 (no scienter when executives "remained . . . in some type of advisory role"). Moreover, as Plaintiffs concede, Hobbs did not leave BLI at all. He assumed a new role to "focus on growing the Company's largest business line" in light of his "deep knowledge of this area." Ex. 18. The nonculpable inference is that the CEO change was for business reasons, as understood by the market, including the need for a CEO with public company experience. *E.g.*, Ex. 33 at 1 (William Blair: "Dr. Hobbs informed us that he asked for this transition to take place so that the company could bring in a leader with more experience at running multiple businesses across multiple markets."); Ex. 31 at 1 (Morgan Stanley: "[B]oth Dr. Hobbs and the Board . . . believe that given the current size and stage of BLI, the Company will need a seasoned CEO with a proven track record of scaling a company.").

### 4.    Plaintiffs' Remaining Scienter Allegations Fail

Plaintiffs allege that despite the lack of specific facts showing knowledge of false statements, the Court simply may presume that Hobbs, Holt, and Wood "were fully aware of the status of all material matters involving Berkeley Lights's core business operations." ¶ 212. But this "core

-18-

operations" theory applies only in an "exceedingly rare category of cases." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008). It requires "either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Intuitive Surgical*, 759 F.3d at 1062. Plaintiffs allege nothing of the sort. Instead, they allege generically that Hobbs, Holt, and Wood "ran the Company as hands-on managers." ¶ 25. But "management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1068. That BLI (like many companies) was allegedly "a one-product company," ¶¶ 211-212, changes nothing. *See NVIDIA*, 768 F.3d at 1064 (no core operations inference despite defect in "flagship product").

Finally, Plaintiffs' allegations of scienter are even more deficient when viewed holistically. *See Zucco*, 552 F.3d at 1008 ("A comprehensive perspective . . . cannot transform a series of inadequate allegations into a viable inference of scienter."). Plaintiffs' theory is that since BLI was a growth company seeking to go public, its executives must have been motivated to deceive investors about product and financial performance. ¶¶ 154-158. But a plaintiff does not plead a compelling inference of scienter even if "there is a strong incentive to present an appearance of profitability and to keep stock prices high in the months immediately preceding and following a company's IPO." *Webb*, 884 F.3d at 856. The PSLRA demands more than "mere 'motive and opportunity.'" *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008) (citation omitted). "'[R]ather, [Plaintiffs] must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent.'" *Id.* The Complaint fails that exacting standard.

### C.     No Specific Pleaded Facts Establish Loss Causation

To plead loss causation with particularity, Plaintiffs must allege that "(1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020). The Complaint must establish a "'causal connection' between the fraud and the loss by tracing the loss back to the 'very facts about which the defendant lied.'" *Mineworkers' Pension Scheme v. First*

-19-

*Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018); *see Apollo*, 774 F.3d at 608 (requiring "specific statements . . . made untrue or called into question by subsequent public disclosures").

### 1.   The Scorpion Report Was Not a Corrective Disclosure

#### a.   Plaintiffs' Reliance on a Short Seller Report Fails

The Ninth Circuit's decision in *Nektar* forecloses Plaintiffs from pleading loss causation based on the Scorpion report.  In *Nektar* (which was decided after this action was filed), plaintiffs alleged that the truth about a drug company's clinical trials was revealed by a short seller report questioning the use of outlier data from a single patient.  Like the Scorpion report here, the report in *Nektar* "disclaime[d] that its authors 'make no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information' in the report," and was created by "anonymous short-sellers who had a financial incentive to convince others to sell."  34 F.4th at 832-34, 839-40.  Affirming this Court, the Ninth Circuit rejected the allegation that the report "served as a corrective disclosure."  *Id.* at 839.  It was "not plausible that the market would perceive [it] as revealing false statements because the nature of the report means that investors would have taken its 'contents with a healthy grain of salt.'"  *Id.* at 840.  The Ninth Circuit followed *BofI*, the "central holding" of which was that "the character of the report—anonymous and self-interested short sellers who disavowed any accuracy—rendered it inadequate."  *Id.*

*Nektar* governs.  Given the Scorpion report's nature as a short seller report, and its elaborate disclaimers of accuracy, Plaintiffs cannot clear the "high bar . . . in relying on self-interested and anonymous short-sellers."  *Id.* at 839.  Indeed, analyst commentary confirms that the market did not view the report as "revealing false statements."  *Id.* at 840.  Rather, Scorpion lobbed "accusations" that were not merited.  *See, e.g.*, Ex. 26 at 1 (J.P. Morgan: "[W]e see little merit in most of the accusations made in the short report.").  Scorpion itself characterized the report as containing not facts, but only its "current opinions"—which opinions, investors knew, happened to advance its financial interests.  Ex. A at 2; *see Intrexon*, 2017 WL 732952, at *7 (rejecting short seller report as a corrective disclosure where "the report states that it 'expresses our research opinions'").

Even before *Nektar*, courts in this circuit regularly rejected loss causation allegations based on a short seller report.  In *LexinFintech*, plaintiffs alleged that a report by "Grizzly Research"

-20-

revealed false statements about loan practices. 2021 WL 5530949, at *3. The court held that "even assuming the Grizzly report was new information, it is not plausible that the market would view it as a corrective disclosure" as it "was issued by anonymous, self-interested short sellers and . . . contained a broad disclaimer" that it lacked "statements of fact." *Id.* at *15 (footnote omitted); *see Miller v. PCM, Inc.*, 2018 WL 5099722, at *11 (C.D. Cal. Jan. 3, 2018) (no loss causation based on blog post by anonymous short seller who "professed no expertise, and clarified that the post represented his or her 'own opinions'"); *Graves v. AECOM*, 2017 WL 5502774, at *11 (C.D. Cal. June 19, 2017) (no loss causation based on short seller report "critical of [company's] methods used to calculate free cash flow"). After *Nektar*, it is even clearer that "Plaintiffs will face challenges in establishing loss causation due to their reliance on short seller reports." *Jedrzejczyk v. Skillz Inc.*, 2022 WL 2441563, at *6 (N.D. Cal. July 5, 2022). Even if a short seller provided "new information" to the market by "pull[ing] together disparate sources and connected data in ways that were not plainly obvious," the unreliable "character" of such a report still would render it "inadequate" for purposes of pleading loss causation. *Nektar*, 34 F.4th at 840.

### b.     The Scorpion Report Revealed No New Information

In any event, the Scorpion report did not "provide[] new information to the market that was not yet reflected in the company's stock price." *Nektar*, 34 F.4th at 839 (citation omitted). Looking past the report's inflammatory rhetoric, one analyst confirmed that it revealed nothing new:

> Is There Really Anything New Out There? It doesn't seem so. BLI's Beacon is (a) expensive in absolute dollar terms, (b) is still relatively early in a process of continuous improvement when it comes to system reliability, and (c) requires 3-6 months for users to become proficient. While it would be better for BLI if these weren't all true, **it is important to note that these were established 'knowns' and do not represent new information**.

Ex. 25 at 1 (Cowen) (emphasis altered). Even Scorpion admitted its reliance on public information: the number of Beacons sold, revenue figures "hiding in plain sight," an agreement detailed "below the headline" in a press release, and "the fine print in BLI's filings." Ex. A at 17, 19, 21, 24. Absent new information, the report is not a corrective disclosure. *See Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020) ("Because publicly available information in an efficient market is generally reflected in the price of a security, the disclosure of confirmatory information—or

-21-

information already known by the market—will not cause a change in stock price.").

It is not surprising that the Scorpion report revealed no new information given the context: the Beacon had been commercially available for years and dozens of customers were using it, so its features were readily known. Nor do purported customer complaints constitute "new information." As the Ninth Circuit has held, given the heightened pleading requirements, "the element of loss causation cannot be adequately made out merely by resting on a number of customer complaints and asserting that where there is smoke, there must be fire." *Curry*, 875 F.3d at 1225.

## 2. The Other Alleged Dates Were Not Corrective Disclosures

Plaintiffs also claim the "truth became known" on (1) May 11, 2021 when BLI's first-quarter results and new subscription model purportedly "indicated serious issues with [the] Beacon," ¶ 223, and (2) on August 11, 2021 when second-quarter results "missed earnings marks." ¶¶ 227-228. These dates were not corrective disclosures. Plaintiffs cannot claim the same statements that allegedly were "materially false and misleading," ¶¶ 101-112, also revealed the concealed "truth." *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) ("Plaintiffs cannot have it both ways. They cannot allege that Defendants made certain misstatements . . . and simultaneously argue that the misstatement itself constituted a corrective disclosure."). No specific facts show that the earnings releases "made untrue or called into question" a prior statement. *Apollo*, 774 F.3d at 608; *see Loos v. Immersion Corp.*, 762 F.3d 880, 888 (9th Cir. 2014) (no loss causation on "disappointing earnings" which "simply reveal that Immersion failed to meet its revenue goals").

Plaintiffs also fail to plead loss causation through BLI's announcement on January 5, 2022 that Hobbs would take on a new role and that total revenue for 2021 was expected to be between $84 and $84.5 million. No pleaded facts show the market treated the CEO transition as revealing prior statements as false. Rather, analysts viewed it as evidencing "a business model shift" to "find a CEO with experience more aligned" with the subscription model approach and partnership business, plus the need for a CEO with public company experience. Ex. 29 at 1 (Cowen); Ex. 32 at 1 (BTIG: "[W]e don't view the CEO changes as due to the miss, but to higher-level succession planning and finding the best fit for Mr. Hobbs.").

As for the revenue guidance, Plaintiffs fail to plead how a shortfall in expectations for year-

-22-

end revenue revealed the falsity of any prior statements, rather than disappointing business results. Plaintiffs must show a "causal connection" by "tracing the loss back to 'the very facts about which the defendant lied.'" *First Solar*, 881 F.3d at 753. Yet as the market understood, the 4Q revenue shortfall was "due to unexpected instrument placement delays": three Beacon placements were pushed out "within the last week of the quarter." Ex. 30 at 1 (J.P.Morgan); Ex. 33 at 2 (William Blair: "Orders expected in the fourth quarter appear to have been shifted out a bit, highlighting the well-known and accepted risk of a lumpy business model reliant on high-priced capital sales.").[3]

## IV.    THE SECURITIES ACT CLAIMS FAIL

If a complaint "employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, [the Court] can assume that it sounds in fraud," and the Securities Act claims must be pleaded with particularity. *Rubke*, 551 F.3d at 1161; *see Rigel*, 697 F.3d at 885 ("nominal efforts to disclaim allegations of fraud" for Securities Act claims "are unconvincing"); *Yokell v. Draper*, 2018 WL 3417514, at *12 (N.D. Cal. July 13, 2018) (applying Rule 9(b) to section 12(a)(2) claim). The Securities Act claims are subject to this rule. They challenge the same statements at issue in the fraud claims. Moreover, the Complaint alleges fraud by claiming in its scienter section that misstatements in IPO materials "were necessary to go public," ¶ 154, to benefit BLI, directors, and investors, ¶¶ 157-158.

The Securities Act claims fail, regardless of whether Rule 9(b) applies, because Plaintiffs fail to show the IPO materials contained false or misleading statements. *See Rigel*, 697 F.3d at 886. Plaintiffs' reliance on a short seller report to show falsity is equally untenable for Securities Act claims. *See Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *6, *10 (N.D. Cal. Sept. 29, 2021) (rejecting reliance on "self-interested" report where its authors "are short sellers with a financial interest in highlighting possible problems with Bloom's business" and cited "anonymous experts"). Though Plaintiffs claim BLI "had received numerous customer complaints" and knew of "numerous design and manufacturing defects," ¶ 268, no pleaded facts show that such "adverse facts" were

---

[3] The "scheme" theory under Rule 10b-5(a) and (c) fails for the same reasons as the 10b-5(b) claim, and because Plaintiffs plead no additional facts as to scheme liability. *See Kang v. PayPal Holdings, Inc.*, 2022 WL 3155241, at *12-13 (N.D. Cal. Aug. 8, 2022).

-23-

known at the time of the IPO. *See Solazyme*, 2016 WL 7475555, at *3 ("Generically asserting in an undifferentiated manner that facts occurred 'during the Class Period' is insufficient, especially when almost 90% of that Class Period occurred after the offerings at issue."). The Securities Act claims should be dismissed for the additional reason that, as discussed in Part III.C *supra*, "the face of the complaint and judicially noticeable facts demonstrate that the plaintiff cannot establish loss causation." *Dean v. China Agritech, Inc.*, 2011 WL 5148598, at *8 (C.D. Cal. Oct. 27, 2011).

Plaintiffs do not support the conclusory allegation that "known trends or uncertainties" were required to be disclosed, but were not disclosed, in BLI's IPO materials under Item 303. ¶¶ 271-272. Plaintiffs do not allege what trends were omitted, let alone sufficient facts to "show that the trend, demand, commitment, event, or uncertainty 'is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation.'" *Pivotal*, 2020 WL 4193384, at *8. Nor do Plaintiffs explain why the robust risk factors in the IPO materials were insufficient "discussion of the material factors that make an investment in the registrant or offering speculative or risky" under Item 105. *See id.* (rejecting similar claim as "Pivotal's risk disclosures discuss exactly" the possibilities allegedly omitted).

Finally, the section 12(a)(2) claim should be dismissed against Hobbs, Holt, and the Director Defendants (*see* ¶ 262) because Plaintiffs fail to plead that they were "statutory sellers." "The 'offers or sells' clause limits § 12(a)(2) liability to two narrow classes of defendants: (1) immediate sellers . . . and (2) those who solicit purchases to serve their 'own financial interests or those of the securities owner.'" *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *9 (C.D. Cal. May 5, 2011) (quoting *Pinter v. Dahl*, 486 U.S. 622, 644 n.21 (1988)). While the Ninth Circuit has not ruled on this issue, the Court should reject Plaintiffs' conclusory allegation that Hobbs, Holt, and the Director Defendants, collectively with BLI, solicited stock purchases by "participating in the preparation of, or signing, the false and misleading IPO Materials, and/or selling shares of stock pursuant to the false and misleading IPO Materials." ¶ 290. District courts reject similar allegations, holding that "mere preparation of prospectus supplements" does "not constitute active solicitation under *Pinter*." *Countrywide*, 2011 WL 4389689, at *9 (requiring "very specific allegations of solicitation, including direct communication with Plaintiffs"); *see, e.g., In re Harmonic Inc. Sec.*

-24-

*Litig.*, 2006 WL 3591148, at *13-14 (N.D. Cal. Dec. 11, 2006).  Because Hobbs, Holt, and the Director Defendants did not solicit Plaintiffs' purchases, the 12(a)(2) claims against them fail.

## V.     THE CONTROL-PERSON CLAIMS FAIL

Finally, because the Complaint fails to plead a primary violation of the securities laws, the control-person claims under section 15 and section 20(a) fail.  *See, e.g.*, *Rigel*, 697 F.3d at 886.  In addition, the control-person claims against Khandros fail because no pleaded facts show that he "acted as [a] controlling person[] . . . by virtue of [his] share of ownership, power to appoint directors . . . and/or agreements with [BLI]."  ¶¶ 255, 302.  Khandros is a co-founder and former CEO of BLI, but as of the IPO he served only as a director who owned 22.3% of BLI's stock (later 13%).  ¶ 29.  Before the IPO, Khandros could nominate individuals to fill two of ten board seats.  ¶¶ 51, 56.  "Courts in this Circuit have held that a defendant's status as minority shareholder is insufficient to establish control person liability, even when combined with the power to appoint directors."  *Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *13 (W.D. Wash. Dec. 29, 2008) (citing cases).  Courts regularly dismiss control allegations against defendants with similar or larger holdings.  *See Bao v. SolarCity Corp.*, 2015 WL 1906105, at *5 (N.D. Cal. Apr. 27, 2015) (30% shareholder who was board chairman); *Fouad*, 2008 WL 5412397, at *13 (three minority shareholders that each appointed a director and together held over 60% of issuer's stock).  Nor do allegations that Khandros "maintain[ed] a very active presence" in BLI or served on a committee tasked with "developing and recommending to the Board corporate governance principles" establish control.  ¶¶ 60-61.  Plaintiffs do not show that he had "actual authority over the preparation and presentation to the public of the financial statements," *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065-66, 1067 n.13 (9th Cir. 2000), or "'day-to-day' interaction with a company," *see In re Tezos Sec. Litig.*, 2018 WL 4293341, at *10 (N.D. Cal. Aug. 7, 2018).

## VI.     CONCLUSION

Plaintiffs' claims against the BLI Defendants should be dismissed.  Because its defects cannot be cured, the Complaint should be dismissed with prejudice.  To the extent Plaintiffs believe amendment would not be futile, Plaintiffs should identify what additional facts they would plead in a further amended complaint.

Dated:  November 11, 2022          Respectfully submitted,


MUNGER, TOLLES & OLSON LLP

By /s/ *Lauren C. Barnett*
   John W. Spiegel (SBN 78935)
   Robert L. Dell Angelo (SBN 160409)
   John M. Gildersleeve (SBN 284618)
   Lauren C. Barnett (SBN 304301)
   350 S. Grand Ave., 50th Floor
   Los Angeles, CA  90071
   Telephone:  (213) 683-9100
   Facsimile:  (213) 687-3702
   *john.spiegel@mto.com*
   *robert.dellangelo@mto.com*
   *john.gildersleeve@mto.com*
   *lauren.barnett@mto.com*

Attorneys for Defendants Berkeley Lights, Inc., Eric D. Hobbs, Shaun M. Holt, Kurt Wood, Igor Khandros, Michael Marks, Sarah Boyce, Gregory Lucier, Michael Moritz, Elizabeth Nelson, James Rothman, Ming Wu, and Makoto Shintani

-26-