Reed R. Kathrein (SBN 139304)
Lucas E. Gilmore (SBN 250893)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Attorneys for Lead Plaintiff*
*Michael Damelio*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| VICTOR J. NG, Individually and On Behalf Of All Others Similarly Situated, | No. 4:21-cv-09497-HSG |
| Plaintiff, | CLASS ACTION |
| v. | **OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
| BERKELEY LIGHTS, INC., ERIC D. HOBBS, SHAUN M. HOLT, and KURT WOOD, | |
| Defendants. | |

**TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................................................................1

II.  SUMMARY OF THE COMPLAINT ...........................................................................4

    A.  Berkeley Lights and Its Flagship Product, the Beacon........................................4

    B.  The July 17, 2020 IPO and the False Statements Made in the IPO Materials .............................................................................................................4

    C.  Defendants' Post-IPO False Statements and Omissions ......................................6

    D.  Defendants' Fraud Exposed Via Investigative Research and Interviews...................6

III.  THE COMPLAINT SUFFICIENTLY ALLEGES THAT DEFENDANTS MADE MISSTATEMENTS OF FACT THAT WERE FALSE AND MISLEADING .................................................................................................................7

    A.  The Scorpion Report Credibly Demonstrates Defendants' Statements' Falsity. ....................................................................................................................7

    B.  The Complaint Sufficiently Pleads that Defendants Made or Caused the Company to Make False Statements About BLI's Product................................11

    C.  Defendants' Statements Regarding BLI's Financial State Were Also False and Misleading. ........................................................................................16

IV.  THE COMPLAINT SUFFICIENTLY PLEADS SECURITIES ACT VIOLATIONS .........................................................................................................26

    A.  The Securities Act Imposes a Minimal Pleading Burden....................................27

    B.  The Securities Act Defendants Made Material Misrepresentations of Fact in Connection with the IPO. .......................................................................29

    C.  Hobbs, Holt, the Director Defendants, and the Underwriter Defendants Are Statutory Sellers Under Section 12(a)(2). .................................................32

    D.  Plaintiffs Have Standing to Move Forward on the Securities Act Claims.................................................................................................................36

V.  THE COMPLAINT SUFFICIENTLY PLEADS EXCHANGE ACT VIOLATIONS .........................................................................................................37

    A.  Plaintiffs Have Sufficiently Alleged Defendants' Scienter..................................38

    B.  The Complaint Adequately Pleads Loss Causation Based on the Scorpion Report and BLI's Other Class Period Disclosures Regarding its Finances and Executive Departures....................................................................43

VI.  THE COMPLAINT SUFFICIENTLY PLEADS CONTROL PERSON LIABILITY UNDER BOTH ACTS ...........................................................................47

    A.  The Applicable Legal Standard for Control Person Liability. .............................47

    B.  The Control Defendants Control Over BLI...........................................................48

    C.  Defendants Hobbs, Holt, and Wood's Control Over BLI. ...................................49

    D.  The Control Defendants Had the Power To Influence and Control, and Did Influence and Control, Berkeley Lights. .................................................50

VII.    OPPOSITION TO JUDICIAL NOTICE..................................................................................55

    A.    The RJN Improperly Asks this Court to Consider Wholesale 36 Documents Without Meeting the Requirements of *Khoja* as to Any of Those Documents. ...............................................................................................56

    B.    The RJN Is An Improper Attempt to Argue Defendants' Versions of the Facts....................................................................................................................58

VIII.    CONCLUSION ........................................................................................................................60

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ................................................................................ 15, 38, 39, 50

*In re Am. Apparel, Inc. S'holder Litig.*,
  2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) ........................................................ 48

*In re Am. Apparel, Inc. S'holder Litig.*,
  2013 WL 174119 (C.D. Cal. Jan. 16, 2013) ........................................................... 52

*Anderson v. Teck Metals, Ltd.*,
  2015 WL 59100 (E.D. Wash. Jan. 5, 2015) ........................................................... 27

*Applestein v. Medivation, Inc.*,
  2011 WL 3651149 (N.D. Cal. Aug. 18, 2011) ........................................................ 40

*Arthur Children's Trust v. Keim*,
  994 F.2d 1390 (9th Cir. 1993) ................................................................................ 52

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) .................................................................................. 14

*Azar v. Yelp, Inc.*,
  2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ........................................................ 40

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .................................................................................. 39

*In re BofI Holdings, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ............................................................................ 43, 44, 45

*Capaci v. Sports Rsch. Corp.*,
  445 F. Supp. 3d 607 (C.D. Cal. 2020) .................................................................... 57

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009) ...................................................................... 29, 33, 34

*In re Cloudera, Inc.*,
  2021 WL 2115303 (N.D. Cal. May 25, 2021) ......................................................... 29

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
  2016 WL 215476 (S.D. Tex. Jan 19, 2016) ....................................................... 53, 55

*Costabile v. Natus Med. Inc.*,
  293 F. Supp. 3d 994 (N.D. Cal. 2018) .................................................................... 18

*In re Cylink Secs. Litig.*,
178 F. Supp. 2d 1077 (N.D. Cal. 2001)........................................................................47

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ........................................................9, 19, 30, 52

*In re DDi Corp. Sec. Litig.*,
2005 WL 3090882 (C.D. Cal. July 21, 2005) ...............................................37, 38

*Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .......................................................................14

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ...................................................................................43

*In re Energy Recovery Sec. Litig.*,
2016 WL 324150 (N.D. Cal. Jan. 27, 2016)...............................................47, 52, 60

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ...................................................................................27

*Feyko v. Yuhe Int'l, Inc.*,
2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ............................................................36

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) .......................................................................19

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016)................................................35, 36

*Fosbre v. Las Vegas Sands Corp.*,
2013 WL 5970250 (D. Nev. Nov. 7, 2013).............................................16, 25, 26

*Garcia v. J2 Glob., Inc.*,
2021 WL 1558331 (C.D. Cal. Mar. 5, 2021) ...................................................7, 8

*Hefler v. Wells Fargo & Co.*,
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018).....................................................51

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ...............................................................................1, 7, 27

*Hershewe v. JOYY Inc.*
2021 WL 6536670 (C.D. Cal. Nov. 5, 2021) .....................................................11

*Hildes v. Arthur Andersen LLP*,
734 F.3d 854 (9th Cir. 2013).......................................................................32

*Hill York Corp. v. Am. Int'l Franchises, Inc.*,
448 F.2d 680 (5th Cir. 1971) .......................................................................53

*Hollinger v. Titan Capital Corp.*,
914 F.2d 1564 (9th Cir. 1990) ...........................................................................................47

*Howard v. Everex Sys.*,
228 F.3d 1057 (9th Cir. 2000) ...........................................................................................47

*Hunt v. Bloom Energy Corp.*,
2021 WL 4461171 (N.D. Cal. Sep. 29, 2021) ..............................................................28, 30

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014)..................................................................................40

*Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*,
2020 WL 1244936 (N.D. Cal. Mar. 16, 2020) ...................................................................60

*Jackson v. Fischer*,
931 F. Supp. 2d 1049 (N.D. Cal. 2013)...............................................................................48

*Kaplan v. Rose*,
49 F.3d 1363 (9th Cir. 1994) ........................................................................................48, 53

*Khoja v. Orexigen Ther., Inc.*,
899 F.3d 988 (9th Cir. 2018) .......................................................................................*passim*

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012)...........................................................................53, 54

*Lee v. Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ..............................................................................................55

*Limcaco v. Wynn*,
2023 WL 154965 (9th Cir. Jan. 11, 2023)...........................................................................56

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011) ...............................................................................................31

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) ..............................................................................................26

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016)..............................................................................................43

*Longo v. OSI Sys., Inc.*,
2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ....................................................................24

*In re Lyft Inc. Sec. Litig.*,
484 F. Supp. 3d 758 (N.D. Cal. 2020)...............................................................27, 28, 29, 31

*In re Lyft Sec. Litig.*,
2020 WL 1043628 (N.D. Cal. Mar. 4, 2020) .....................................................................32

*Mallen v. Alphatec Holdings, Inc.*,
   2013 WL 1294640 (S.D. Cal. Mar. 28, 2013)................................................................................31

*Mallen v. Alphatec Holdings, Inc.*,
   861 F. Supp. 2d 1111 (S.D. Cal. 2012) ...................................................................17, 18, 22

*Marsh & McLennan Agency, LLC v. Teros Advisors, LLC*,
   2021 WL 4133858 (N.D. Cal. Sept. 10, 2021)................................................................................56

*Mart v. Tactile Sys. Tech., Inc.*,
   2022 WL 980438 (D. Minn. Mar. 31, 2022) ................................................................................9

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ................................................................................14, 15

*In re Metro. Sec. Litig.*,
   532 F. Supp. 2d 1260 (E.D. Wash. 2007)................................................................................20

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008)................................................................................22, 27

*Mills v. Molina Healthcare, Inc.*,
   2022 WL 17825534 (C.D. Cal. Dec. 8, 2022)................................................................................57

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ................................................................................43, 56

*Mulligan v. Impax Lab'ys, Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014)................................................................................40

*In re Nat'l Golf Properties, Inc.*,
   2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ................................................................................33

*In re Nektar Therapeutics*,
   2020 WL 3962004 (N.D. Cal. July 13, 2020) ................................................................................10, 44

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ................................................................................48

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014)................................................................................40, 42

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ................................................................................14

*One Longhorn Land I, L.P. v. FF Arabian, LLC*,
   2015 WL 7432360 (E.D. Tex. Nov. 23, 2015)................................................................................53

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ................................................................................13

*In re OSG Sec. Litig.*,
    971 F. Supp. 2d 387 (S.D.N.Y. 2013) ................................................................................... 33

*Pension Fund v. Mentor Graphics Corp.*,
    2017 WL 3668957 (D. Or. June 2, 2017*)* .............................................................................. 22

*Pino v. Cardone Cap., LLC*,
    2021 WL 3502493 (C.D. Cal. Apr. 27, 2021) ............................................................ 28, 29, 36

*Pinter v. Dahl*,
    486 U.S. 622 ............................................................................................................ 27, 32, 34, 35

*Pirani v. Slack Techs., Inc.*,
    445 F. Supp. 3d 367 (N.D. Cal. 2020) ....................................................................... 31, 33, 48

*In re Plantronics, Inc. Sec. Litig.*,
    2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ................................................................. 13, 41

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ........................................................................................ 13, 40

*In re Portal Software, Inc. Sec. Litig.*,
    2006 WL 2385250 (N.D. Cal. 2006) ............................................................................... 33, 34

*Primo v. Pac. Biosciences of California, Inc.*,
    940 F. Supp. 2d 1105 (N.D. Cal. 2013) ...................................................................... 28, 29, 33

*In re QLT Inc. Sec. Litig.*,
    312 F. Supp. 2d 526 (S.D.N.Y. 2004) ................................................................................... 24

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ........................................................................................ 17, 21

*In re QuantumScape Sec. Class Action Litig.*,
    580 F. Supp. 3d 714 (N.D. Cal. 2022) (Orrick, J.) ....................................................... 3, 8, 10, 11

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ................................................................................................. 14

*In re Refco, Inc. Sec. Litig.*,
    503 F.Supp.2d 611 (S.D.N.Y. 2007) ..................................................................................... 52

*Ret. Sys. v. Align Tech., Inc.*,
    39 F.4th 1092 (9th Cir. 2022) ................................................................................................ 13

*Rieckborn v. Jefferies LLC*,
    81 F. Supp. 3d 902 (N.D. Cal. 2015) ..................................................................................... 35

*Rihn v. Acadia Pharms. Inc.*,
    2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) ....................................................................... 39

*Rodriguez v. Gigamon Inc.*,
    325 F. Supp. 3d 1041 (N.D. Cal. 2018)...................................................................................20

*In re Romeo Power Inc. Sec. Litig.*,
    2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022) ........................................................................20

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ..................................................................................................36

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ..................................................................................................40

*Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*,
    375 U.S. 180 (1963) ................................................................................................................27

*In re Secure Computing Corp. Sec. Litig.*,
    120 F. Supp. 2d 810 (N.D. Cal. 2000)....................................................................................17

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003)..................................................................................25

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017)..................................................................................26

*In re Shoretel Inc., Sec. Litig.*,
    2009 WL 248326 (N.D. Cal. Feb. 2, 2009) ............................................................................29

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010) ...................................................................................................26

*In re SLMCorp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010) ....................................................................................17

*Snellink v. Gulf Res., Inc.*,
    870 F. Supp. 2d 930 (C.D. Cal. 2012)....................................................................................44

*In re Splunk Inc. Sec. Litig.*,
    592 F. Supp. 3d 919 (N.D. Cal. 2022).....................................................................................13

*Sudunagunta v. NantKwest, Inc.*,
    2017 WL 8811116 (C.D. Cal. May 16, 2017).........................................................................29

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ...................................................................................................29

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..........................................................................................................38, 54

*Threshold Enters. Ltd. v. Pressed Juicery, Inc.*,
    445 F. Supp. 3d 139 (N.D. Cal. 2020).............................................................................57, 58

*In re Ubiquiti Networks, Inc. Sec. Litig.*,
  33 F. Supp. 3d 1107 (N.D. Cal. 2014 ...............................................................................36, 37

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ..............................................................................................58

*Va. Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991) ..........................................................................................................26

*In re Violin Memory, Inc. Sec. Litig.*,
  2015 WL 1968766 (N.D. Cal. Apr. 30, 2015)...............................................................36, 37

*Violin Memory Sec. Litig.*,
  2014 WL 5525946................................................................................................................29

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
  259 F.R.D. 490 (W.D. Wash. 2009)....................................................................................35

*Webb v. Solarcity Corp.*,
  884 F. 3d 844 (9th Cir. 2018) .............................................................................................42

*In re Willis Towers Watson PLC Proxy Litig.*,
  439 F. Supp. 3d 704 (E.D. Va. 2020) .................................................................................53

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ............................................................................................15

*Wool v. Tandem Computers, Inc.*,
  818 F.2d 1433 (9th Cir. 1987) ............................................................................................48

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ...........................................................................................9, 42

**TABLE OF DEFINED TERMS**

| Term | Definition |
|---|---|
| ¶ | Paragraph(s) alleged in the Amended Complaint (Dkt. No. 89), referred to herein as "Complaint" |
| Beacon | BLI's flagship product—a laboratory instrument used for screening cells sold to drug development and large pharmaceutical/biotech companies |
| BLI or the Company | Defendant Berkeley Lights, Inc. |
| BLI Defendants | Defendants BLI, Eric D. Hobbs ("Hobbs"), Shaun M. Holt ("Holt"), Kurt Wood ("Wood"), Igor Khandros ("Khandros"), Michael Marks ("Marks"), Sarah Boyce ("Boyce"), Gregory Lucier ("Lucier"), Michael Moritz ("Moritz"), Elizabeth Nelson ("Nelson"), James Rothman ("Rothman"), Ming Wu ("Wu"), and Makoto Shintani ("Shintani") |
| BLI Defs.' MTD | The BLI Defendants' Motion to Dismiss Amended Complaint and Memorandum of Supporting Points and Authorities (Dkt. No. 126) |
| Celesta Defendants of WRVI | Defendants Celesta Capital (f/k/a WRVI Capital), Walden Riverwood GP, LLC, Walden Riverwood Ventures, L.P., WIIG Communications Management LLC, WRV-BLI LLC, WRV-BLI II, LLC, WRV-BLI III LLC, WRV-BLI IV, LLC, WRV GP II, LLC, and WRV II, L.P |
| Celesta Defs.' MTD | Celesta Defendants' Motion to Dismiss Amended Complaint and Joinder to Motion to Dismiss of BLI Defendants (Dkt. No. 131) |
| Class | All persons similarly situated, who purchased or otherwise acquired: (a) Berkeley Lights common stock pursuant and/or traceable to the IPO Materials issued in connection with the Company's initial public offering on or about July 17, 2020; and/or (b) securities of Berkeley Lights during the period from July 17, 2020 and January 5, 2022, inclusive and were damaged thereby |
| Class Period | The Period from July 17, 2020 to January 5, 2022, inclusive |
| Control Defendants | Celesta Defendants, Sequoia, Nikon, and Khandros |
| Director Defendants | Refers to the following current and former BLI Directors, each of whom signed the IPO Materials at issue and/or were named as directors in the registration statements for the IPO: Defendants Khandros, Marks, Boyce, Lucier, Moritz, Nelson, Rothman, Wu, and Shintani |
| Exchange Act | Securities Exchange Act of 1934 |
| IPO | The Company's July 17, 2020 Initial Public Offering |
| IPO Materials | The July 17, 2020 IPO documents |

| Nikon | Defendant Nikon Corp. |
|---|---|
| Nikon's MTD | Nikon's Motion to Dismiss the Amended Complaint (Dkt. No. 129) |
| Offerings | The Company's IPO and SPO, collectively |
| Plaintiffs | Lead Plaintiff Michael Damelio, together with Plaintiff Pompano Beach Police & Firefighters' Retirement System (the "Retirement System") |
| PSLRA | The Private Securities Litigation Reform Act of 1995 |
| Scorpion Report or Report | The September 17, 2021 report issued by activist short seller firm Scorpion Capital (led by Kir Kahlon) which, based on 24 research interviews, including interviews with 14 of Berkeley Lights's largest customers, that described a "trail of customers who allege they were 'tricked,' misled, or over-promised into buying a $2 million lemon." The full Report is available at Dkt. No. 89-1. |
| Securities Act | Securities Act of 1933 |
| Securities Act Defendants | The BLI Defendants (excluding Defendant Wood), the Control Defendants, and the Underwriter Defendants, collectively |
| SEC | Securities and Exchange Commission |
| Sequoia Capital | Defendant Sequoia Capital and related entities named in the Complaint |
| Sequoia's MTD | Sequoia's Motion to Dismiss (Dkt. No. 132) |
| SPO | The Company's November 2020 Secondary Public Offering |
| TAM | Total addressable market |
| Underwriter Defendants | Defendants J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Cowen and Company, LLC, and William Blair & Company L.L.C. |
| Underwriter Defs.' MTD | Underwriter Defendants' Motion to Dismiss Amended Complaint (Dkt. No. 128) |

I.    INTRODUCTION

This federal securities class action concerns Defendants' false and misleading statements and omissions regarding Berkeley Lights's ("BLI") platform (namely, its flagship instrument, the Beacon) and BLI's present financial circumstances, including its total addressable market ("TAM") and purported prospects for growth. In BLI's IPO Materials and throughout the Class Period, Defendants repeatedly emphasized the purported superiority of BLI's products compared to existing cell analyzing instruments. Among other things, they claimed the Beacon's "unprecedented speed" and revolutionary technology had already garnered positive customer validation, was driving sustainable revenue growth, and afforded BLI an enormous market opportunity with a $23 billion TAM.

The Complaint details how, in reality, BLI's flagship product suffered from severe design and performance issues, lack of customer validation, and a saturated potential-customer base. These problems rendered the $2 million instrument virtually nonfunctional and caused the Company's representations regarding its current financial situation and growth prospects to be false or misleading. Nevertheless, Defendants' misrepresentations inflated the price of BLI's securities until respected activist and short seller firm Scorpion Capital (founded and led by Kir Kahlon) released a scathing and detailed investigatory report, based in part on damning research interviews with BLI's 14 largest customers, describing a "trail of customers who allege they were 'tricked,' misled, or over-promised into buying a $2 million lemon." Kahlon explained and defended the Report's methodologies and conclusions in various media. In the aftermath of the Report and other alleged disclosures, BLI reported deteriorating revenue, waning demand for the Beacon, a dismal financial outlook, and the demotion of the Company's CEO—almost precisely the same fate Scorpion Capital predicted.

Facing liability under both the Securities Act and Exchange Act, Defendants filed *five* motions to dismiss, each of which make non-persuasive arguments that ignore the Complaint's detailed allegations. As this omnibus opposition shows, Defendants' arguments fall short.

**Securities Act Claims.** First, with respect to Plaintiffs' Securities Act claims, the Securities Act "allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). The Securities Act does not require Plaintiffs to plead scienter,

loss causation, or reliance. Rather, under Section 11 of the Act, a plaintiff who purchased the security "need only show a material misstatement or omission to establish his prima facie case." *Id.*

Despite Defendants' aspersions to the contrary, the Complaint pleads numerous objectively verifiable misstatements and omissions of fact regarding BLI's products and the Company's financial state of affairs, which Defendants made both at the time of the IPO and throughout the remainder of the Class Period. These actionable statements were false and/or misleading when made because the Defendants failed to disclose that BLI's platform *always* suffered from numerous design and manufacturing defects, including breakdowns, high error rates, data integrity issues, and other problems, which were so severe that they limited the ability of biotechnology companies and research institutions to consistently and effectively use the machines at scale. Given these known problems with the Company's products, Defendants' Class Period statements about BLI's revenue, TAM, growth, and guidance were false and misleading when made. Further, this information was undoubtedly material, as a reasonable investor would want to know about the longstanding serious design flaws in the Beacon, as well as the negative financial impact the Beacon's failures were having on the Company. Defendants, however, never disclosed these facts to the investing public.

**Exchange Act Claims—Scienter.** In addition to the falsity element, which as described above is adequately alleged for the purpose of both Plaintiffs' Securities Act and Exchange Act claims, the Complaint also sufficiently pleads a "strong inference" of scienter and loss causation—as is required to plead Exchange Act claims. In short, Defendants simply recycle the oft repeated argument that the Complaint "'lack[s] detailed and specific allegations' showing the 'Individual Defendants' knowledge' of purported misstatements." *See* BLI Defs.' MTD at 2. To the contrary, the Complaint sets forth with particularity each BLI executive Defendants' tenured history at BLI and the reasons why neither they nor the Company can plausibly claim ignorance of the severe inherent defects of BLI's core (and arguably sole) technology. Further, the Complaint shows how Defendants Hobbs and Holt engaged in insider trading during the Class Period. Though Defendants claim these sales occurred pursuant to pre-arranged Rule 10b5-1 trading plans, they make no effort to show that these stock plans were adopted before their allegedly fraudulent conduct began. Further, Defendants' briefing glosses over the peculiar circumstances under which Hobbs, Holt, and Wood were functionally terminated.

OMNIBUS OPP'N TO DEFENDANTS' MOTIONS TO DISMISS - 2
Case No.: 4:21-cv-09497-HSG

**Exchange Act Claims—Loss Causation.** Defendants erroneously contend that this Circuit's precedent forecloses Plaintiffs from pleading loss causation based on information disclosed in a short seller report that purportedly has no publicly identifiable author and purportedly has disavowed any accuracy (the Report makes no such claim). This, however, is nothing more than a false narrative constructed by Defendants to evade liability. In reality, Scorpion Capital and its founder/CIO—Kir Kahlon—are highly credible and experienced securities analyst investors who have publicly explained the Report's findings (none of which are highly technical), as well as the interview screening methods employed to support the findings and/or opinions asserted therein. The Report discloses over one hundred pages of notes from interviews with 7 former BLI employees and executives, as well as 17 scientists and users across 14 of BLI's largest customers. The inordinate details provided by the witness accounts corroborate the credibility of these sources while protecting their anonymity. Indeed, at least one court in this District has already credited Scorpion Capital's research in another securities case. *See In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714 (N.D. Cal. 2022) (Orrick, J.).

**Control Person Claims.** Despite Defendants' assertions to the contrary, the Complaint sufficiently alleges the Control Defendants' power to influence and control BLI, as well as their actual exertion of that control, including during the SPO. As the Company explicitly recognized in the IPO Materials, its principle stockholders—the Control Defendants—"if they act together, will be able to control the management and affairs of our company and most matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions." The fact that the Control Defendants were able to wrest early releases from their lock up agreements from the underwriters and convince the Company to undergo the burden of conducting the SPO, which resulted in no financial gain to BLI, more than sufficiently evidences the level of control these Defendants had.

**Request for Judicial Notice ("RJN").** This Circuit's precedent makes clear that defendants may only "seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Khoja v. Orexigen Ther., Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Defendants fail to cite 13 of the SEC documents for which they seek notice. Further they ask this Court to notice documents neither cited nor referenced in the Complaint for the truth of the matters asserted therein. The RJN is clearly improper and must be denied.

II.     SUMMARY OF THE COMPLAINT

      A.     **Berkeley Lights and Its Flagship Product, the Beacon**

Founded in 2011 and based in Emeryville, California, Berkeley Lights is a venture capital-backed biotechnology company that sells primarily one product, the Beacon—a high-end flow cytometry and cell sorting machine launched in 2016 under the direction of Defendant Eric Hobbs. In simple terms, the Beacon uses light and semiconductor technology to move individual cells so they can be isolated, cultured, assayed, and exported.

This flow cytometer technology has been a standard tool in labs for half a century. Scores of vendors, including well-established, multi-billion-dollar market cap companies such as Sony, Becton Dickinson, and Thermo Fisher sell cytometers at retail prices between $75,000 to $100,000. In contrast, BLI reportedly charges customers 20 times more, or nearly $2 million for each of its Beacon cytometers. Although the use cases for flow cytometers and the Beacon are substantially identical, BLI claims the Beacon's advanced functionality allows for faster screens. Notably, these claims omit the Beacon suffers from inherent, preexisting design and manufacturing defects that limit its use at scale.

      B.     **The July 17, 2020 IPO and the False Statements Made in the IPO Materials**

In the Company's early stages, BLI received hundreds of millions of dollars in private equity financing from several Menlo Park, California-based venture capital firms, including Defendants Sequoia Capital and WRVI, as well as Japanese imaging-technology provider Defendant Nikon Corp. In the summer of 2020, in the wake of several notable tech stock debuts, BLI announced its intent to go public through an IPO valuing the Company at more than $1 billion, putting the Company's venture capital investors in a prime spot to exit their position in BLI while raking in enormous returns.

In BLI's July 17, 2020 IPO documents ("IPO Materials"), Defendants hyped the functionality of BLI's platform, claiming it provides "the most advanced environment for rapid functional characterization of single cells at scale." ¶ 266. Among other things, Defendants stated that BLI's platform delivered "the best cells" and "provide[d] the deepest information, with linked phenotypic and genotypic data, on tens of thousands of live single cells relevant to the customers' end product specifications." *Id.* They further claimed that "this level of scale and precision is not attainable with other approaches." *Id.*

OMNIBUS OPP'N TO DEFENDANTS' MOTIONS TO DISMISS - 4
Case No.: 4:21-cv-09497-HSG

Defendants also highlighted in the IPO Materials BLI's purported operational and financial growth, and further enticed investors by representing that the TAM for BLI's products and services was an astounding "$23 billion." *Id.* To aid BLI's go-public efforts, Defendant Hobbs met one-on-one with potential investors, holding over 180 Zoom calls in the three days preceding the IPO. ¶ 7.

Propelled by the IPO Materials' glowing statements concerning the Beacon's superior functionality and BLI's growth potential, the IPO closed on July 21, 2020 in a rousing success. Altogether, the Company sold approximately 9.315 million shares of common stock to the public at the IPO price of $22 per share, for approximate proceeds to the Company of $204.9 million before deducting underwriting discounts, commissions, and other offering expenses payable by BLI. Prominent investment banks J.P. Morgan, Morgan Stanley, and Cowen acted as lead book-running managers for the offering, with William Blair acting as a co-manager.

Unbeknownst to investors, the IPO Materials contained untrue statements of material fact, omitted other facts necessary to make the statements not misleading, and were not prepared in accordance with applicable rules and regulations. Defendants echoed and/or built upon these materially false and misleading statements and omissions concerning the effectiveness of the Company's platform, the platform's value to BLI's potential and existing customers, and the size of the biotechnology market for the platform throughout the Class Period. Specifically, the IPO Materials and Defendants' Class Period statements misled investors by concealing that the Beacon (and derivative products such as the Lightning) suffered from numerous design and manufacturing defects, including breakdowns, high error rates, data integrity issues and other problems, which limited the ability of biotechnology companies and research institutions to consistently and effectively use the machines at scale. Defendants failed to disclose that BLI had received numerous customer complaints regarding the durability and effectiveness of its automated systems, including complaints related to the design and manufacturing defects. Moreover, the IPO Materials and Defendants' Class Period statements overstated the actual market for BLI's products and services, which, in reality, was merely a fraction of the $23 billion TAM represented to investors. This was due to the relatively high cost of BLI's instruments and consumables, as well as these instruments' inability to provide the sustained performance necessary to justify the high costs incurred by existing and potential customers.

## C.    Defendants' Post-IPO False Statements and Omissions

Throughout the Class Period, Defendants continued to emphasize the purported capabilities and effectiveness of the BLI platform (*i.e.*, the Beacon), stating, for example, that the platform "captures and delivers rich single-cell data to find the best cells" and "allows for a high level of control over live single cells or other micro-objects throughout the functional characterization process." ¶¶ 85, 89. They also represented that BLI was experiencing numerous tailwinds driving sales growth. ¶ 88.

Defendants profited greatly from their misstatements and omissions at the expense of unsuspecting investors. After Defendants converted their initial BLI ownership interests into common stock via the IPO, Defendants cashed in on those holdings in BLI's November 2020 Secondary Public Offering ("SPO," and, with IPO, the "Offerings"). Thereafter, Defendants continued to derive substantial benefit, to the detriment of the Class, from their pervasive and significant insider sales, until the truth about the BLI platform was slowly, but eventually, revealed to the market.

## D.    Defendants' Fraud Exposed Via Investigative Research and Interviews

The truth about BLI's failed platform began to emerge slowly as the Company repeatedly reported dismal results at the start of 2021, but continued to be concealed by various mechanisms Defendants used to prop up sales and placements of BLI's platform. Then, on September 17, 2021, Scorpion Capital, an activist short seller firm focused on exposing fraud and stock promotions in the life science industry, issued a short seller report ("Scorpion Report") outlining BLI's many failures. As detailed herein, the Scorpion Report was based on 24 research interviews, including interviews with 14 of BLI's largest customers, that described a "trail of customers who allege they were 'tricked,' misled, or over-promised into buying a $2 million lemon." ¶ 136. The Report also featured interviews with former BLI employees and executives, who corroborated cost and defect claims. Though the Report detailed the repeated failures of BLI's platform, Defendants kept their finger in the dam for months, denying the Scorpion Report's accuracy in an attempt to minimize the financial damage.

By January 2022, the dam could no longer hold, as BLI demoted its CEO and announced a significant revenue shortfall for 2021. Over the course of the Class Period, BLI fell from an $80+ per share rising IPO star (when Defendants offloaded their own shares) to a $10 per share company with a defective and unreliable flagship product in search of a market.

## III.   THE COMPLAINT SUFFICIENTLY ALLEGES THAT DEFENDANTS MADE MISSTATEMENTS OF FACT THAT WERE FALSE AND MISLEADING

Defendants first claim that the Complaint fails to plead particularized facts showing that they made any actionable false or misleading statements—an element common to Plaintiffs' Securities Act and Exchange Act Claims.[1] To that end, Defendants incorrectly assert that the 138-page investigative report published by Scorpion Capital, and the 24 research interviews with BLI customers and former employees/executives summarized in detail therein, cannot be credibly relied on to demonstrate falsity. Additionally, Defendants attempt to recast their false and misleading statements regarding BLI's platform and financials as non-actionable puffery, opinion, or protected forward-looking statements. These arguments misunderstand the law and facts of this case and should thus be rejected.

### A.   The Scorpion Report Credibly Demonstrates Defendants' Statements' Falsity.

Defendants contend that the Court should dismiss Plaintiffs' securities law claims because they arise, in substantial part, from findings and confidential witness statements made in a short seller investigative report—the publication of which caused the price for BLI's securities to plummet to the significant injury of investors. Specifically, Defendants assert that the Scorpion Report (Dkt. No. 89-1) cannot be relied upon because the Report, in their view, has no identified author and cites purportedly unverifiable information. *See* BLI Defs.' Mot. at 6. In doing so, they disregard that the Report has an identified author, provides previously unknown information from interviews with BLI customers and former employees, was publicly defended by Scorpion Capital's founder on CNBC, and is corroborated by other facts and documents discussed in the Complaint.

Despite Defendants' dressings, the Scorpion Report's author, Scorpion Capital, is not "anonymous," but rather, a well-known "activist short seller" entity in the securities law field which, over the past four years, "has released investigative reports on at least seven publicly traded companies." ¶ 31; *see also Garcia v. J2 Glob., Inc.*, 2021 WL 1558331, at *22 (C.D. Cal. Mar. 5, 2021) (crediting short seller findings where "the articles at issue were not anonymously posted on a

_____

[1] As discussed in Part III, *infra*, under Section 11 of the Securities Act, a plaintiff who purchased a security in a registered offering "when false or misleading information [wa]s included in a registration statement . . . need only show a material misstatement or omission to establish [their] prima facie case." *Huddleston*, 459 U.S. at 381-82. Under the Exchange Act, a plaintiff must similarly show that defendants made a material misstatement, as well as scienter, loss causation, and reliance. *See id.*

website such as Seeking Alpha" but instead "were authored by two named firms"). The firm's founder and chief investment officer, Kir Kahlon, who directs Scorpion Capital's short seller research activities, has "frequently appeared on business news and financial news media outlets including CNBC and Zer0es TV to address and defend Scorpion Capital's reports." ¶ 32 (also describing Mr. Kahlon's substantial experience in finance prior to founding Scorpion Capital). Indeed, Mr. Kahlon provided an extensive interview on CNBC the day after the Scorpion Report was issued, reiterating all the major points of the Report. ¶¶ 141-43. Mr. Kahlon has also spoken publicly regarding Scorpion Capital's bioscience investment expertise. And at least one court in this District has credited Scorpion Capital's research in upholding another securities fraud complaint. *See QuantumScape*, 580 F. Supp. 3d at 732 (finding Scorpion Capital report based on unnamed employees and experts to be reliable).

Here, the 138-page Scorpion Report describes in inordinate detail its carefully screened interviews with seven former employees and 14 major BLI customers and the basis for the firm's conclusions regarding the extent of Defendants' fraud. *See* ¶¶ 142-43 (discussing interview in which Mr. Kahlon described Scorpion Capital's methodology for the Report).[2] For the Report, Scorpion Capital, under the direction of Mr. Kahlon, conducted research interviews with over seven former BLI employees and executives, which divulged non-public information regarding BLI's sales, technology, and market share.[3] The information provided by these sources, as described in the Report, shows that the interviewed employees held relevant roles in the Company, through which they could observe details about the Beacon and BLI's finances.[4] *See Quantumscape*, 580 F. Supp. 3d at 732 (finding that

---

[2] As explained by Mr. Kahlon: "'We're very careful to screen for the former employees that we speak with. Occasionally, you can have employees that are disgruntled, but we talked to former executives. You know, these are extremely credible people. We verify that information by talking to many different ex-employees. . . . And in this case the information was very consistent from employee to employee, from customer to customer, so we're very confident that the findings are correct.'" ¶ 143.

[3] *See* Scorpion Report at 143 (Regarding pricing: "Q: So, if you have four runs on a machine that has four of these chips and you need to swap them out every day, that could be $12,000 a day just in consumables? That's millions of dollars a year per machine." Former BLI employee: "Right, yes. That's the operating cost."); *as corroborated by id.* at 98 (Former Harbour BioMed Executive: "But given that each run ran $15,000 to $17,000, we were apprehensive about spending that kind of money on it. But from the get-go, to go in with that kind of pricing, not being able to get the level of data and output that you're expecting.").

[4] *See* Scorpion Report at 144 (Former BLI scientist: "By the end of 2020, we had probably placed six to eight [Lightning] platforms."); at 145 (Former BLI employee: "We were involved in demo'ing the system for these potential customers. . . . It was always a matter of the platform was still quite expensive. It was always difficult to ensure a sale rapidly."); *id.* (Former BLI Scientist: "The lack of

OMNIBUS OPP'N TO DEFENDANTS' MOTIONS TO DISMISS - 8
Case No.: 4:21-cv-09497-HSG

short seller report where "[m]any of the employees are described as former 'research and development' employees, which plausibly means they would know about the internal details of QuantumScape's testing," was sufficiently reliable to sustain complaint's allegations). The Scorpion Report also summarizes information provided by 17 scientists and users across 14 of BLI's largest customers—all of whom worked with the Company's platform and confirmed that the Beacon suffered from numerous design and manufacturing defects hindering its represented functionality and marketability.

The confidential witness statements described in the Report regarding BLI's platform and marketability are further corroborated by other facts and documents. *See Mart v. Tactile Sys. Tech., Inc.*, 2022 WL 980438, at *7 (D. Minn. Mar. 31, 2022) (finding that documents discussed in a short seller report "offer[ed] an indicum of reliability" supporting allegations); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) ("Where a complaint relies on both confidential witnesses and other factual information, such as documentary evidence, the plaintiffs need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false."). For example, despite the Company's functionality and TAM claims, its publicly reported product revenues and platform revenues (*i.e.*, machines, excluding consumables) remained mostly stagnant for two years (from 3Q19 to 2Q21), corroborating witness claims regarding the Beacon's defects and the platform's inability to penetrate the market. *See* Scorpion Report at 20. Likewise, searches for academic papers referencing BLI's platform on reputable, scientific research websites yielded no substantial results, corroborating ex-employee and customer statements highlighting the lack of publications as a limit on the platform's commercial potential. *Id.* at 23.

The number of corroborating statements in the Report provided by its 28 carefully screened witnesses further rebuts Defendants' formulaic attacks regarding confidential witness reliability. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (noting that "adequate corroborating details" may include "the level of detail provided . . . , the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources,

papers hurt mostly the sales of the Lightning in particular because it's kind of a vicious circle. We were relying on our customers to generate more publications. The timing of academic publications is not a fast process either. We prioritized product and assay development to have applications to sell together with the platform over generating that body of data that could be published. . . .").

the reliability of sources, and similar indicia"); *Quantumscape*, 580 F. Supp. 3d at 732 (noting that "overlapping and corroborative information" provided by nine confidential witnesses bolstered reliability even though report did not identify witnesses by name). Defendants' arguments (repeated throughout their motion) that the Scorpion Report "has no identified author" and "relies on unverified or unverifiable information," *see* BLI Defs.' MTD at 7, thus fail at the starting line.

Defendants nevertheless contend that the Court must exclude the Scorpion Report under its prior holding in *In re Nektar Therapeutics*, 2020 WL 3962004 (N.D. Cal. July 13, 2020), *aff'd* 34 F.4th 828 (2002). This is incorrect. *Nektar* did not, as Defendants suggest, categorically exclude plaintiffs from citing short seller reports in securities law complaints. *See* BLI Defs.' MTD at 7. Rather, the Court simply found that the "character" of a short seller report is what matters at the pleading stage. In *Nektar,* the plaintiffs made the highly technical claim that the defendants' statements regarding clinical results for their flagship cancer drug "were false and misleading because they [we]re 'based on the inclusion of an outlier patient.'" 2020 WL 3962004, at *10. To support this highly technical allegation, the plaintiffs cited a short seller report (the Plainview Report) which failed to explain why its opinions on highly technical matters were reliable—*e.g.*, "expertise in oncology or methodologies for conducting clinical trials". *Id.* This Court held that, given Plainview's short seller positions and "the lack of any information establishing why Plainview's opinions on the highly-technical matters at issue here [we]re reliable," the plaintiffs had "fail[ed] to sufficiently show that the Report supports their allegations of falsity." *Id.*; *see also Nektar*, 34 F.4th at 837 (explaining that "[i]n the highly technical task of evaluating scientific studies and their impact on investment decisions, plaintiffs must provide some specificity to anchor their contentions that investors would find one study outcome to be meaningfully different from another.")

Here, in contrast, Plaintiffs do not rely on the findings or opinions in the Scorpion Report to plead any highly technical matters. Rather, Plaintiffs rely on sales, marketability, and product defect information provided to Scorpion Capital by credible BLI customers and former BLI employees with personal knowledge of the matters on which they spoke. As such, this case is more like *QuantumScape*, where the court credited Scorpion Capital's research and deemed it "reliable" because "[i]nvestors need not only have relied on the say-so of the short seller because the report interviewed nine former

QuantumScape employees about QuantumScape's testing and four experts about its conclusions." 580 F. Supp. 3d at 732. Defendants never explain how Scorpion Capital's thorough interview methodology fails to support the Report's sales and marketability findings. As such, this Court should find the Scorpion Report is sufficient to sustain Plaintiffs' claims for the same reasons as in *QuantumScape*.[5]

**B.     The Complaint Sufficiently Pleads that Defendants Made or Caused the Company to Make False Statements About BLI's Product.**

In addition to attacking the Scorpion Report's reliability, Defendants contend that their statements about the Beacon are not actionable under securities laws. In particular, they assert that the misstatements alleged in the Complaint about the Beacon's purported performance and capabilities are merely puffery or statements of opinion, neither of which are actionable. *See* BLI Defs.' MTD at 9-10. Additionally, Defendants argue that these misstatements were not false at the time they were made. *See id.* at 12. Defendants' assertions are legally and factually incorrect.

**1.     Defendants Ignore the Specific, Objectively False Statements They Made Regarding the Purported Functional Superiority of BLI's Products.**

In their opening brief, Defendants provide an incomplete list of the statements that Plaintiffs alleged to be false, which conveniently omits numerous objectively false statements about BLI's products Defendants made from the time of the IPO to the end of the Class Period. For example, the Complaint alleges that in the IPO Materials, Defendants falsely claimed that the Beacon "allows our customers to find the best cells by":

- Performing rapid functional characterization of tens of thousands of single cells in parallel;

---

[5] Defendants other cited cases are also inapposite. In *Kim v. Allakos Inc*., the court rejected the plaintiffs' claims because they "relie[d] on the anecdotal postings in a private Facebook group" from persons with no personal knowledge of the material issue—whether they had received a placebo. 2022 WL 976974, at *6–7 (N.D. Cal. Mar. 31, 2022). In *Hershewe v. JOYY Inc*. (appeal pending), the court found that a short seller's "complex and technical" data collection and analysis" could not sustain the plaintiffs' highly technical allegations because the short seller did not state that its analysis "was conducted by a data scientist . . . or any other individual with expertise in large-scale data collection and analysis." 2021 WL 6536670, at *5 (C.D. Cal. Nov. 5, 2021). In *Diaz v. N. Dynasty Mins. Ltd*., the court rejected a short seller report whose sources were "not alleged to have worked for Defendants, nor do they offer any specificity about their job titles, their involvement with the Pebble Project, or corroborating information." 2018 WL 5099749, *7 (C.D. Cal. Apr. 30, 2018). And in *In re Intrexon Corp. Sec. Litig*., the court found that a short seller report was not a corrective disclosure because, unlike here, the report "attributed[] its findings to [only] public filings, websites and other publicly available documents" 2017 WL 732952, at *7 (N.D. Cal. Feb. 24, 2017).

- Precisely controlling the environment around each cell, and maintaining cells in a healthy state for further use;

- Accessing a high degree of cell biodiversity;

- Deep Opto Profiling of the relevant phenotypic characteristics, at single-cell resolution over time and connecting this to the genotypic information for each cell;

- Performing a broad range of workflows, including single-cell assays, on an integrated platform; and

- Digitally aggregating, accessing and analyzing a rich data library for each single cell.[6]

Even after the IPO, Defendants continued to peddle the objectively false narrative that the Beacon and other BLI products were superior to those by BLI's competitors. For example, during the 3Q20 earnings call on November 12, 2020, hosted by Defendants Hobbs and Holt, Hobbs claimed that BLI offered "the most advanced environment for functional testing of live single cells." *See id.* at ¶ 88. He also stated that: the BLI "platform enables customers to perform standardized and automated workflows, with precise control over the environment, which enables functional testing of 10s of thousands of live single cells in parallel"; the Company's machines created "the largest data cube for single cells in the industry"; and BLI was "the only Company commercializing a platform that can do this in a scalable way." *Id.* BLI continued to make such objectively verifiable, yet false, claims of superiority throughout the Class Period. *Id.*

Defendants also repeatedly made statements about the Company's revenue, sales, and customer demand that were false and misleading because they omitted the fact that the Company's flagship product was not actually superior to other products, as defendants falsely claimed. *See ¶¶* 87-116. As explained in the Complaint, each of these statements or omissions about BLI's products and their purported superiority were materially false and misleading.

**2.    Defendants' Misstatements Are Objectively Verifiable and Not Puffery.**

Defendants argue that the statements at issue are nonactionable puffery because the challenged statements, in their view, "are broad descriptions of BLI's mission, product platform, and product

---

[6] *See* ¶ 80. BLI made the same claims on November 19, 2020, when it filed with the SEC a prospectus on Form 424B4, which incorporated and formed part of the registration statement for the SPO and was signed by Defendants Hobbs and Holt ("SPO Registration Statement"). *See* ¶ 91.

capabilities." *See* BLI Defs.' MTD at 9-10. Contrary to Defendants' assertions, however, these statements, are capable of objective verification, such as whether the Beacon: (1) "perform[s] rapid functional characterization of tens of thousands of single cells in parallel"; and (2) "precisely control[s] the environment around each cell, and maintains cells in a healthy state for further use." ¶ 80. In reality, BLI's products could not perform these and other objectively verifiable tasks touted by Defendants because the platform suffered from numerous design and manufacturing defects, including breakdowns, high error rates, data integrity issues, and other problems.

The above statements, as well as other similar statements alleged in the Complaint about BLI's products' functionality, are "capable of objective verification" and thus are not exempt from liability as puffery. *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). Further, because "investors were not aware of the material adverse facts that cut against Defendants' optimistic statements, the Court cannot conclude as a matter of law, at this stage of the litigation, that a reasonable investor would have understood the challenged statements as mere corporate optimism." *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 942 (N.D. Cal. 2022); *accord In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *16 (N.D. Cal. Aug. 17, 2022).[7]

### 3.    Defendants' Misstatements Are Not Nonactionable Opinions.

Defendants similarly contend that "most challenged statements about BLI's product are statements of opinion that began with the words 'we believe' . . . ." BLI Defs.' MTD at 10. As an initial matter, this is untrue. Many of the false statements alleged do not contain the words "we believe." *See*, *e.g.*, Part III.B.1, *supra* (quoting ¶ 80).

But even in the limited instances where Defendants used the phrase "we believe," the appendage of those magic words to a misleading statement of fact does not absolve Defendants from

---

[7] The Ninth Circuit cases cited by BLI are inapposite because the statements at issue in those cases were not capable of objective verification. *See Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022) ("vague, generically positive terms, describing China as 'a great growth market,' 'a huge market opportunity,' 'a market that's growing significantly for us'"); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 708 (9th Cir. 2021) (statements that "touted Alphabet as 'one of the leading companies when it comes to privacy and security of user data'"); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (statements that "the opportunity for system placement at hospitals 'is still very, very large" and that "the company is 'reservedly optimistic' about sales").

liability. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188–89 (2015). As both the Supreme Court and Ninth Circuit have explained, "a reasonable investor 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.'" *Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). The Ninth Circuit applies that standard under both Section 10(b) and Section 11 claims. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017) (reversing dismissal of claim for fraud by omission under § 10(b), because CEO's "opinion statement did not 'fairly align[] with the information in [his] possession at the time'") (quoting *Omnicare*, 575 U.S. at 189). Here, Defendants' opinions about BLI's products' superior performance and purported functionality and capabilities were misleading because they did not fairly align with the information Defendants had in their possession about the Beacon and other products' numerous, inherent defects and shortcomings.

### 4. Defendants' Statements Were False at the Time They Were Made.

Defendants also assert that Plaintiffs "fail to plead particularized facts showing that statements about BLI's product were 'false or misleading at the time they were made.'" BLI Defs.' MTD at 10 (citation omitted). In particular, they claim that "Plaintiffs do not allege facts showing that BLI's platform did not offer capabilities like '[p]erforming a broad range of workflows,' or that it was not a 'fully integrated end-to-end solution.'" *Id.* (quoting ¶¶ 80, 107). Their argument misunderstands Plaintiffs' theory of Defendants' fraud.

As explained in the Complaint, each of Defendants' functionality-based statements were false and/or misleading when made because the Defendants failed to disclose that BLI's platform *always* suffered from numerous design and manufacturing defects which limited the ability of its customers to consistently use BLI's machines at scale. As such, Defendants' statements "affirmatively created an 'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014), *overruled on other grounds by Dearborn Heights*, 856 F.3d at 619. That information was material because a reasonable investor would want to know about the serious flaws that existed in the Beacon from the outset. *See Matrixx Initiatives, Inc. v.*

*Siracusano*, 563 U.S. 27, 38 (2011) (the "materiality requirement is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" (citation and internal quotation marks omitted)).

Defendants' disclosures regarding the Beacon fail to negate the misleading impression created by their misstatements. In their motion, Defendants note that they "disclosed challenges regarding reliability and yields, that errors and defects might not meet expectations, and that customers must undertake expensive and time-consuming training." *See* BLI Defs.' MTD at 10. They then assert that this quoted language disclosed "the very facts Plaintiffs claim were omitted." *Id.* But those are *not* the "very facts Plaintiffs claim were omitted." To the contrary, Plaintiffs claim that the Beacon's numerous design and manufacturing problems were so severe that they rendered the machine a nonviable product—or as put by one of BLI's largest customers, "a $2 million lemon." ¶ 136. Additionally, Plaintiffs allege that these defects were not "undetected" (like the defects warned of in BLI's risk factors, *see* ¶ 82), but were instead, known to Defendants at the time the misstatements were made.

Defendants cannot avoid liability for misstatements (and/or omissions) about the *current* efficacy of BLI's products by vaguely disclosing that BLI had "experienced *in the past*, and *may* experience in the future, challenges with respect to the reliability of our systems and workflow yields." *See* BLI Defs.' MTD at 11 (citation omitted) (emphasis added). That statement (and other statements quoted by BLI, *see id.*) does not reveal that the Beacon did not, in fact, *currently* perform as claimed. *See In re Alphabet*, 1 F.4th at 704 (holding that a "complaint plausibly allege[d] that Alphabet's warning in each Form 10-Q of risks that 'could' or 'may' occur [wa]s misleading to a reasonable investor when Alphabet knew that those risks had materialized").[8] Though Defendants are correct that "'companies do not have an obligation to offer an instantaneous update of every internal development, especially when it involves the oft-tortuous path of product development,'" s*ee* BLI Defs.' MTD at 12

---

[8] For similar reasons, Defendants' cited authority, which concern forward-looking statements about products, not current efficacy, are inapposite to the case at hand. In *Wochos v. Tesla, Inc*., 985 F.3d 1180, 1195 (9th Cir. 2021)*,* for example, the company represented that it was "in the early stages of production and have experienced the types of challenges that typically come with a production ramp." *Id.* at 1195. The Ninth Circuit held that Tesla had disclosed that it "has 'experienced to date' the sort of 'challenges' that it would have to overcome in order to achieve its stated objective." *Id*. at 1196.

(quoting *Weston Family P'ship LLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022)), they ignore that Defendants *never* disclosed that the Beacon suffered from numerous design and manufacturing defects. Indeed, Defendants fail to cite even a single instance in which they specifically disclosed the alleged flaws in the Beacon. Accordingly, their arguments fail to persuade.

### C. Defendants' Statements Regarding BLI's Financial State Were Also False and Misleading.

In addition to sufficiently alleging the falsity of Defendants' statements regarding the Beacon's performance and functionality, the Complaint also sufficiently alleges that Defendants' statements concerning: (1) BLI's 2021 revenue projections, *see* Part III.C.1, *infra*; (2) BLI's subscription programs and partnership agreements, *see* Part III.C.3, *infra*; and (3) BLI's total addressable market or TAM, *see* Part III.C.4, *infra*, were false and misleading.

Defendants contend that their misstatements about BLI's financials are not actionable for primarily two reasons. First, they argue Plaintiffs do not allege specific errors with publicly reported cost and revenue numbers, subscription numbers, and/or partnership agreements. Second, they assert that their total addressable market and revenue projections were forward looking and not false. But as discussed below, Defendants' statements regarding BLI's financials also conveyed material information about the Company's present circumstances. Moreover, Defendants knew their statements were false when made, as they were patently unrealistic, and also failed to convey "substantive information about factors that realistically could cause results to differ materially from those projected." *See Fosbre v. Las Vegas Sands Corp.*, 2013 WL 5970250, at *11 (D. Nev. Nov. 7, 2013). As such, Defendants' misstatements regarding BLI's finances are actionable.

### 1. Defendants Reiterated 2021 Revenue Guidance of $90-$100 Million When They Had No Present Basis to Believe BLI Could Meet that Projection.

Defendants contend that their statements regarding BLI's financial condition constitute forward-looking statements protected by the PSLRA's safe harbor and the bespeaks caution doctrine. This is incorrect in fact and law.

Despite mounting headwinds, Defendants reiterated their previously disclosed revenue guidance for the fiscal year, each time attributing their continued optimism to a number of current or historical developments at BLI. *See* ¶¶ 104, 111, 116 (discussing May 11, Aug. 11, and Nov. 4, 2021

reports). For example, Defendants claimed in August 2021 that "the second half of the year would see an uptick in revenue as a result of usual seasonality." ¶ 111; *see also* ¶ 104. And if usual seasonality was not enough to convince investors that BLI remained on track to meet its projected revenue for the year, despite dismal sales and unit placements in the first three quarters of 2021, Defendants also touted ongoing development deals and subscription programs. ¶¶ 111, 116. These revenue statements were not strictly forward looking, but rather mixed statements that contained, or were premised on, current or historical facts. As such, they are afforded no protection. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017); *In re SLMCorp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010) ("[W]hen an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply.").

Reiterating revenue guidance in this manner essentially assured investors and the market that BLI remained on track to meet its prior issued guidance. One analyst specifically asked about this guidance during the August 11, 2021 earnings call, noting that BLI did not appear on track to meet its year-end target. The analyst thus asked for an assurance that BLI was currently meeting and would continue to meet the guidance. ¶ 110. In response, Defendant Wood reiterated the prior guidance and pointed to the above factors or developments. ¶ 111. Defendants' revenue statements say as much— or more—about present circumstances at BLI, and as such, are not subject to the statutory safe harbor. *See In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) (in analyzing statement that company was "on track to meet analysts' earnings expectations," the court "accepts [p]laintiffs' representation that they are alleging that [d]efendants misrepresented current business conditions" and concludes that the statement is not forward-looking); *see also Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) (finding that statement that revenues "'*will continue to grow*'" though "ostensibly couched in terms of the future, also concerned historical and current facts" (emphasis in original)).

Tellingly, Defendants do not directly address Plaintiffs' allegations regarding the falsity of BLI's revenue statements. Instead, they assert that fraud-by-hindsight is not enough to plead falsity. *See* BLI Defs.' MTD at 15. They then try to provide an alternative narrative about the reasons for the

revenue shortfall. *See id.* Both of these arguments are easily dispatched with and do nothing to negate the cogent allegations of falsity regarding the revenue statements.

First, Plaintiffs do not argue fraud-by-hindsight to show Defendants' statements are false or misleading. As the Complaint explains, at the time the misstatements were made, BLI was not on track to reach its guidance, and, Defendants could not have reasonably expected BLI to meet its guidance. On August 11, 2021, Defendants were demonstrably short of the pace needed to reach $90-100 million in revenue for the year, with only $38 million in revenue and another $52 million needed in the year's second half to reach just the low end of the guidance. *See* ¶ 110. This would have required BLI to have two back-to-back all-time record revenue quarters, *see* ¶¶ 112(f), 130, and to have placed more Beacons in the final two quarters than BLI had placed in any full year prior. Such an expectation was unrealistic given the flat placement trend and unsolved problems on the product side, *see* ¶ 129.

Defendants also pointed to ongoing developments and programs at BLI that purportedly were accelerating growth, but as Plaintiffs allege, these statements were belied by other known facts. For example, Defendants pointed to the roll-out and early success of BLI's new subscription agreement as driving additional revenue in the second half, *see* ¶¶ 104, 111, but paradoxically, Defendants also explained that subscription agreements were likely to depress revenues in the short term, *see* ¶ 104. Similarly, the "partnerships" Defendants touted could not plausibly create an immediate $2 million revenue increase like a product placement would, but instead merely shifted the burden of using BLI's cumbersome and error-prone machine to BLI. *See* ¶¶ 112(g), 134. Other important internal metrics known to Defendants at the time showed that growth was diminishing, and that customer demand was waning due to the Beacon's product defects. *See* ¶¶ 183-185. All of this is more than enough to sufficiently plead that Defendants' revenue statements were false or misleading when made. *See Costabile v. Natus Med. Inc.*, 293 F. Supp. 3d 994, 1016 (N.D. Cal. 2018) (reiterating revenue guidance and touting the reiterated guidance as supported by a supply contract was false and misleading when undisclosed issues with the supply contract "undercut[] the basis for that guidance").

Defendants' contention that the "fourth-quarter miss was 'attributed entirely to the delay of 3 Beacon placements . . . all of which occurred within the last week of the quarter,'" fares no better. *See* BLI Defs.' MTD at 15 (quoting Jan. 5, 2022, J.P. Morgan Report (Dkt. No. 126-31, at 1), a document which Defendants' improperly request be judicially noticed). To begin with, this argument is simply an attempt by Defendants to set up an alternative narrative of their choosing to argue against the facts plausibly alleged in the Complaint. This tactic is not appropriate at the motion to dismiss stage, where the Court is required to accept all allegations as true and draw all reasonable inferences in Plaintiffs' favor. *See Daou*, 411 F.3d at 1013. The ultimate reason for the revenue shortfall is inconsequential. *See Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th Cir. 2001) ("Just as we cannot countenance pleading fraud by hindsight, neither can we infer innocence by hindsight."). But in any event, the delay of the three product placements highlighted in the analyst report is entirely consistent with—and, in fact, is supportive of—Plaintiffs' allegations of waning product demand and a desperate attempt by BLI to piece together whatever shards of revenue it could through subscriptions and partnership agreements. This is particularly so where BLI could not reasonably estimate when, or if ever, it would place one of the units (only indicating it would be placed "TBD"). *See* Jan. 5, 2022 J.P. Morgan Report (Dkt. No. 126-31, at 1).

### 2. Even if Forward-Looking, Defendants' Revenue Statements Are Not Protected by the PSLRA Safe Harbor.

Assuming for the sake of argument that the revenue statements were forward looking (again, they were not), they are nevertheless unprotected by the PSLRA's safe harbor because they were not accompanied by meaningful cautionary language and were knowingly false when made.

Contrary to Defendants' argument, *see* BLI Defs.' MTD at 15, it was not meaningful to warn that revenue may not meet projections because "platform sales 'require[] a substantial sales cycle' and were 'prone to quarterly fluctuations in revenue,'" when Defendants affirmatively—and repeatedly—represented that these very same risks or uncertainties (e.g., usual seasonality) were breaking in BLI's favor and would drive the increased revenue needed in the second half of 2021 to meet the guidance. *See* ¶¶ 104, 111, 132, 142, 199. "Cautionary language is meaningful if it discloses risks and thereby affects the reasonableness of reliance on the misstatements. In other words, cautionary language is

'meaningful' if it renders the alleged misstatements immaterial." *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1291 (E.D. Wash. 2007). Such equivocation on Defendants' part could not have made their misstatements about 2021 revenue immaterial as a matter of law.

Moreover, the cautionary language Defendants cite concerned only platform sales and said nothing about subscription agreements or partnerships, which Defendants also misrepresented were driving growth in 2021.[9] *See also* Part III.C.3, *infra*. Indeed, Defendants touted these alternative revenue channels as shielded from the uncertainty of platform sales and capable of providing more consistent, "recurring" revenue. As such, Defendants cannot point to their boilerplate cautionary language to insulate their revenue statements. *See Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1052 (N.D. Cal. 2018) ("[C]autionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the [statements] which the plaintiffs challenge.").

Finally, given all of the contradictory facts known by Defendants that are highlighted above, Defendants were aware at the time they reiterated revenue guidance in May, August, and November 2021 that the Company could not and would not meet the projected year-end revenue. *See In re Romeo Power Inc. Sec. Litig.*, 2022 WL 3701095, at *3 (S.D.N.Y. Aug. 25, 2022) (in finding PSLRA safe harbor did not apply, the court noted that "Defendants actually knew that they had no reasonable basis for predicting a significant ramp-up in revenue as quickly as they did, or were aware of undisclosed facts tending to seriously undermine the accuracy of those projections").

### 3.    Defendants' Statements about Subscription Programs and Partnership Agreements Were Also False and Misleading.

Plaintiffs further allege Defendants' statements about subscription programs and partnership/development agreements were false or misleading. During the Class Period, Defendants misleadingly assured investors that BLI's current outlook was strong, including by repeatedly reiterating 2021 revenue guidance, because of, among other things, the opportunities provided by these programs or agreements. *See, e.g.*, ¶¶ 103-04. But these statements were false and misleading because

---

[9] *See* ¶ 104 ("[W]e expect revenues to be more heavily weighted to the back half of the year, as more business development collaborations and partnerships come online."), ¶ 111 (claiming that fourth quarter 2021 was going to be even more heavily weighted than usual "as you ramp up on some of these business development deals like the Bayer that we talked about as well as getting the TechAccess [subscription model] more rolled out").

OMNIBUS OPP'N TO DEFENDANTS' MOTIONS TO DISMISS - 20
Case No.: 4:21-cv-09497-HSG

Defendants did not tell investors that these programs and agreements would not immediately generate material revenue like product placements, but instead were simply a means for stemming the tide of customer complaints about the Beacon's numerous design and manufacturing defects. As the Complaint clarifies, these alternative revenue channels lowered the price point of the Beacon (in the case of subscription programs) and/or shifted the burden of using and maintaining the Beacon onto BLI as opposed to customers (in the case of partnership agreements). *See ¶¶* 124-125, 183. Defendants thus concealed that subscription programs and partnership agreements were not additive in the ways Defendants represented. If anything, these programs only served to shift customers away from the direct platform purchases necessary for BLI's long-term success. *See ¶¶* 104, 105, 112, 183, 190-191.

As with Defendants' false and misleading revenue statements, *see* Part III.C.1, *supra* Defendants' subscription and partnership statements spoke to present circumstances, and as such, were not forward looking.[10] *See* ¶ 103 ("Berkeley Lights was experiencing 'strong' demand 'for both new and *existing* customers.' . . . in part driven 'by offering alternative access models.'"). Tellingly, Defendants do not address the Complaint's well-pled allegations explaining that "[t]he purpose of each of these subscription models . . . was to 'increase [BLI's] served available market, broaden [its] customer base and drive incremental demand.'" ¶ 103.

Even if such statements were forward looking, Defendants cite to the same boilerplate and non-substantive cautionary language referenced elsewhere in their brief, which does not serve to protect the statements under the PSLRA safe harbor. *See* Part III.C.2, *supra*. Moreover, Defendants knew at the time that their statements were false. For example, Defendants acknowledged that "some previously anticipated CapEx sales may transition to a subscription offering," and thus, subscriptions were not "'increasing the available market' or 'broadening the customer base.'" *See ¶¶* 103-105, 125. Further, because BLI's statements about subscription and partnership agreements are principally false

---

[10] Nor was it mere puffery to say "that the [subscription] program was 'off to a good start." *See* BLI Defs.' MTD at 15. Defendants' selective quotation to this challenged statement ignores the broader, necessary context, which, explicitly referenced the placement of three subscription units to misleadingly reassure the market that BLI was on track to meet its 2021 revenue guidance. *See Quality Sys.*, 865 F.3d at 1143 ("[E]ven general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly.").

and misleading by omission, even if forward-looking, they are not protected by the PSLRA's safe harbor or bespeaks caution doctrine. *See Mallen*, 861 F. Supp. 2d at 1126 (finding that "the PLSRA's safe harbor does not apply" to "*omission of present facts* with respect to the challenged statements").

Defendants also argue that alleged misstatements about BLI's past financial performance were literally accurate and thus cannot form a basis for Plaintiffs' securities fraud claims. BLI Defs.' MTD at 12-13. Contrary to Defendants' argument, "a statement cannot be analyzed in complete isolation. Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (internal quotation marks omitted). Here, when considered in the broader context of all of the Complaint's well-pled allegations, Defendants' statements about past financial performance misleadingly portrayed BLI as experiencing tremendous growth and posed for still more growth when it was not, and thus are actionable. *See W. Pennsylvania Elec. Emps.' Pension Fund v. Mentor Graphics Corp.*, 2017 WL 3668957, at *30 (D. Or. June 2, 2017*), R&R adopted sub nom. W. Pa. Elec. Fund v. Mentor Graphics Corp.*, 2017 WL 3622779 (D. Or. Aug. 23, 2017) (holding "there is at least a jury question as to whether material omissions rendered" misleading statement that "business was robust in light of a 65% increase in bookings" and rejecting defendants' argument that challenged statement was in fact a true, non-misleading statement of current or historical fact).

### 4.    Defendants Falsely Overstated Berkeley Lights's TAM.

Defendants stated that BLI's TAM for goods and services was $23 billion, an eye catching, yet unsupportable number aimed at little more than whipping the investing public into a frenzy about BLI's prospects. *See* ¶¶ 81, 92. Taking as true and accurate Defendants' interpretation of TAM as a revenue projection or estimate of potential revenue, a $23 billion TAM assumed a placement of seven $2 million Beacons at each and every one of BLI's potential 1,600 customers. This was patently unrealistic and misleading, especially when considered with the other facts known to Defendants, including that: (1) many of these 1,600 customers could not afford a single $2 million Beacon, let alone seven, and (2) the Beacon had proven to be incredibly unreliable and subject to numerous defects, resulting in customer dissatisfaction with the instrument. Further, the fact that BLI introduced a new subscription model on the heels of the IPO indicated that many potential customers could not afford

the hefty $2 million price tag for the Company's platform, and belied BLI's outlandish assumptions underlying the $23 billion TAM. *See* ¶126. These facts alone plausibly allege that BLI's TAM was false and misleading, but the Complaint does not stop there.

The Complaint also incorporates, the findings of the Scorpion Report and the research interviews summarized therein, which further refute the validity of BLI's TAM figure. As reported therein, "virtually every" ex-employee interviewed had described BLI's actual TAM as "negligible." ¶ 138. Moreover, the Report revealed the extent to which BLI's reported $23 billion TAM was overinflated, with one former BLI senior scientist estimating the "the Company's true TAM was at most $600 million." ¶ 231. The Scorpion Report is reliable for all the reasons explained above, *see* Part III.A, *supra*, and Plaintiffs adequately allege the falsity of BLI's sky-high TAM based on the Report's corroborated findings. The Scorpion Report's conclusions about TAM were also supported by numerous customer interviews, including:

- Amgen employee #2, "[a] scientist and group leader who has been 'living' with the system 'on a daily basis' for two years," explained that "'If this Beacon is only designed for cell line development, it's probably going to have a pretty limited number [of machines they can sell].'"[11]

- Takeda ex-lead scientist in immuno-oncology who was closely involved in buying and using BLI machine, explained that the market for the machine was "15 large pharmaceutical companies that have commercial products, and let's say another 30 to 40 companies who are enlisted clinical development and are planning to go commercial in the next five years . . . with maybe one or two machines for each one."[12]

These customer interviews include various indicia of reliability that courts look to when assessing confidential witness statements, *see* Part III.A, *supra*, and they, along with Plaintiffs' other allegations, are more than enough to adequately plead that BLI's stated TAM was false and misleading.

(a)  <u>TAM Speaks to Present Market Circumstances and Is Not Forward Looking.</u>

Defendants' statements that BLI had a $23 billion TAM were not forward looking. *See* BLI Defs.' MTD at 13-14. TAM was BLI's present assessment of "the size of the existing market" for its

---

[11] Scorpion Report at 31, 49.
[12] *Id.* at 91-94. To be sure, there were others. *See id.* at 32, 57 (Bristol Meyers Squibb employee #2, "[a]n ex-senior executive involved in bringing and championing BLI,"), *id.* at 35, 90 (Gilead scientist, "who has 5 years of experience with the instrument at previous employers,"); *id.* at 37 (Lonza scientist in leadership role in cell and gene division).

products and services, and as such, was not forward looking and not subject to the PSLRA safe harbor or bespeaks caution doctrine. *See In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526, 532 (S.D.N.Y. 2004) ("Because statements identified in the Complaint regarding the size of the existing market for [defendant's product] . . . concern existing facts and are therefore not 'forward-looking,' such statements are subject to neither the statutory 'safe harbor' nor the 'bespeaks caution' doctrine."). Thought of another way, TAM was simply the result of an exercise in market definition or market sizing and subject to verification when made. *See Longo v. OSI Sys., Inc.*, 2021 WL 1232678, at \*4 (C.D. Cal. Mar. 31, 2021) (quoting *In re ESS Tech., Inc. Sec. Litig.*, 2004 WL 3030058, \*11 (N.D. Cal. Dec. 1, 2004)) (present facts are those whose "truth or falsity could be determined at the time they were made").

As such, BLI's stated TAM was verifiably false or misleading when made. The Scorpion Report establishes as much. And in addition to the Scorpion Report, Defendants knew or should have known that many of the Company's estimated 1,600 customers could not afford a \$2 million piece of equipment or would not pay for such an expensive piece of equipment given the product issues and related customer complaints. *See, e.g.*, ¶¶ 183-185, 190-192 (alleging Defendants' knowledge). The Company tacitly admitted as much through the introduction of subscription models and push for partnership agreements. *See, e.g.*, ¶¶ 122-126, 132-134, 140, 190-192.

Defendants would have the Court believe that TAM was essentially an estimate of future revenue or a revenue projection, *see* BLI Defs.' MTD at 14, but the way in which the Company itself characterized TAM undercuts this interpretation. For example, in the very risk disclosures cited by Defendants in support of their argument that the PSLRA protects the TAM statements, the Company explained: "[O]ur estimates of the annual total addressable market and our forecasts of market growth and future revenue for our current or future products may prove to be incorrect." If Defendants' interpretation of TAM is to be believed, and TAM simply is another way of saying "future revenue" or "revenue projection," BLI's risk disclosure would become incomprehensibly repetitive; it would essentially read: "[O]ur estimates of [future revenue] and our forecasts of market growth and future

revenue for our current or future products may prove to be incorrect." This is nonsensical and TAM must be something other than an estimate of future revenue or revenue projection.[13]

(b)   Even if Forward Looking, BLI's Stated TAM Is Not Protected as Defendants Knew It Was False and Misleading When Made.

As explained above, Defendants knew the Company's statements about TAM were false and misleading and that the market for its goods and services was nowhere near $23 billion. Under such circumstances, any supposed cautionary language cannot be meaningful and the PSLRA's safe harbor and the bespeaks caution doctrine offer no protection to Defendants. *See In re SeeBeyond Techs. Corp. Sec. Litig.,* 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003) ("If the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons why it is false or misleading."); *see also Allstate Life Ins. Co. v. Robert W. Baird & Co.*, 756 F. Supp. 2d 1113, 1136–37 (D. Ariz. 2010) ("In other words, the bespeaks caution doctrine does not immunize forward-looking statements, even if accompanied by cautionary language, when a defendant asserts forward-looking statements with knowledge or awareness of their falsity."), on reconsideration in part sub nom. *In re Allstate Life Ins. Co. Litig.*, 2012 WL 1900560 (D. Ariz. May 24, 2012); *Romeo Power*, 2022 WL 3701095, at *3.

In any event, the cautionary language and risk disclosures Defendants point to as protecting the Company's statements about TAM were boilerplate and did not convey "substantive information about factors that realistically could cause results to differ materially from those projected," and as such, they do not protect Defendants. *See Fosbre*, 2013 WL 5970250, at *11. The only "detailed 'risk factors'" that Defendants point to explicitly are "risks that BLI's platform would not obtain market acceptance and BLI's disclosure that TAM was an estimate based on assumptions that may not be correct." Such

---

[13] Defendants' reference to these risk disclosures is notable for excluding the language regarding "future revenue," which makes the disclosures incomprehensibly repetitive if Defendant's interpretation of TAM is to be believed. Further, the principle case that Defendants cite in support of their argument, *Axogen*, provides an example of a reasonable, non-forward looking interpretation of TAM. Though the court, there, glosses over this interpretation because the plaintiff did not allege TAM to be false in this sense of the term, Defendants' use of TAM here is much more similar to this alternative definition supplied by the court in *Axogen* and false for the reasons explained above. *Cf. Axogen,* at *8 n.3.

risk factors provided nothing of substance about *why* TAM may ultimately prove incorrect, only simply that it may prove incorrect, and thus, are not meaningful.[14] *See Slayton v. Am. Exp. Co.,* 604 F.3d 758, 772-73 (2d Cir. 2010) (concluding that a warning that "potential deterioration in the high-yield sector . . . could result in further losses in [defendant's] portfolio" was "vague" and "mere boilerplate, essentially warning that 'if our portfolio deteriorates, then there will be losses in our portfolio'"). The Ninth Circuit requires a "stringent showing" before dismissal on the pleadings is warranted under the cautionary language prong of the safe-harbor provision. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005). Risk warnings must be clear enough that "'reasonable minds' could not disagree that the challenged statements were not misleading." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133 (N.D. Cal. 2017); *see also Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) (to warrant protection, the cautionary statement must discredit the alleged misrepresentations to such an extent that "the risk of real deception drops to nil"). The warnings here fall well short of meeting this standard.

## IV.   THE COMPLAINT SUFFICIENTLY PLEADS SECURITIES ACT VIOLATIONS

As set forth in the Complaint, Plaintiffs allege the following violations of the Securities Act: (1) violations of § 11 against BLI, Hobbs, Holt, the Director Defendants, and the Underwriter Defendants, ¶¶ 274-84; and (2) violations of § 12(a)(2) against BLI, Hobbs, Holt, the Director Defendants, and the Underwriter Defendants, ¶¶ 285-98.[15] Defendants' scattershot attacks on these well-pled Securities Act violations fail for the reasons explained below.

---

[14] The first disclosure referenced by Defendants essentially warns that the Company's stated TAM may be incorrect, and the Company may not sell as much as the TAM figure suggests because customers may not buy as much as the TAM figure suggests. This is precisely the type of vague and boilerplate risk disclosure found inadequate in *Slayton*. The second disclosure is even more obtuse, only referencing unnamed and unspecified assumptions used to calculate TAM that may be incorrect, and says nothing specific about why results may differ. *See Fosbre*, 2013 WL 5970250, at *11. Further, as explained in the Complaint, the Company otherwise divulged little about how TAM was calculated and the assumptions underlying it. ¶ 200.

[15] The Complaint's allegations regarding violations of Section 15 of the Securities Act against Hobbs, Holt, Khandros, WRVI, Sequoia, and Nikon, *see* ¶¶ 299-304, are addressed in Part IV, *infra*, which addresses Plaintiffs' control person allegations.

### A.     The Securities Act Imposes a Minimal Pleading Burden.

The Securities Act was enacted "to promote full and fair disclosure of information to the public in the sales of securities." *Pinter v. Dahl*, 486 U.S. 622, 646; *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976) ("The Securities Act . . . was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing."); *Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963) ("A fundamental purpose [of the Securities Act] was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.").

Toward this end, the Securities Act "allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement." *Huddleston*, 459 U.S. at 381 The Securities Act does not require Plaintiffs to plead scienter, loss causation, or reliance. Rather, under Section 11, a plaintiff who purchased the security "need only show a material misstatement or omission to establish his prima facie case." *Id.* at 382; *see also In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 768 (N.D. Cal. 2020) ("[A]t the pleading stage, 'Section 11 places a relatively minimal burden on a plaintiff[:] . . . he need only show a material misstatement or omission to establish his prima facie case.'") (quoting *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013)). "Liability against the issuer of a security is virtually absolute, even for innocent misstatements" and "[o]ther defendants bear the burden of demonstrating due diligence," *id.*, which raise factual issues generally inappropriate for resolution on a motion to dismiss. *See Anderson v. Teck Metals, Ltd.*, 2015 WL 59100, at \*2 (E.D. Wash. Jan. 5, 2015) ("A Rule 12(b)(6) challenge 'which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense.'") (quoting *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007)). Similarly, "Section 12(a)(2) is a virtually absolute liability provision that does not require an allegation that defendants possessed scienter." *Miller*, 519 F.3d at 886.

As non-fraud claims, alleged violations of the Securities Act are subject to the pleading standard articulated in Rule 8(a), and a complaint need only contain "a short and plain statement of the

claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *see Lyft*, 484 F. Supp. 3d at 765 ("Unlike Section 10(b) claims, the heightened pleading standards of the PSLRA do not apply to Section 11 claims. . . . '[A]llegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a).'") (quoting *Daou*, 411 F.3d at 1027). While the Securities Act Defendants contend that Plaintiffs' non-fraud Securities Act claims are subject to a heightened pleading standard as they nonetheless "sound in fraud," this is factually incorrect.[16] "Here, Plaintiffs have made conscious efforts to separate their Securities Act claims from the fraud allegations in their Exchange Act claims." *Primo v. Pac. Biosciences of California, Inc.*, 940 F. Supp. 2d 1105, 1123-24 (N.D. Cal. 2013). Where they do incorporate allegations offered in support of the Exchange Act claims into the Securities Act claims, Plaintiffs have been judicious and circumspect in limiting those allegations incorporated by reference to non-fraudulent conduct, and otherwise "expressly disclaim any allegations that allege fraud, scienter or the intent of the defendants to defraud." ¶ 257; *see also Primo*, 940 F. Supp. 2d at 1124; *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *3, 15 (N.D. Cal. Sep. 29, 2021) (notwithstanding the fact that "Plaintiffs' Section 10(b) and Section 11 claims are based on largely overlapping statements," holding that Fed. R. Civ. P. 8(a) applies to Section 11 claims because "Plaintiffs have explicitly disavowed 'any allegation that any Section 11 Defendant engaged in fraud or any other deliberate and intentional misconduct.'").

Tellingly, the only allegations 'sounding in fraud' which the Defendants point to in support of their argument that Rule 9(b) should apply are a part of Plaintiffs' Exchange Act claims and *not* incorporated into Plaintiffs' Securities Act claims.[17] "Although there are allegations in the [Complaint]

---

[16] *See* BLI Defs.' MTD at 23. The Underwriter Defendants, Celesta, Sequoia, and Nikon generally join the BLI Defendants' brief in arguing that Plaintiffs failed to adequately plead a primary violation of Section 11 of the Securities Act, as is necessary to state a claim against them under Section 12(a)(2) and Section 15. Plaintiffs' arguments in response to the BLI Defendants' motion therefore are directed at each of these defendants as well.

[17] *See* BLI Defs.' MTD at 23 (citing ¶¶ 154, 157-158). Further, it does not necessarily follow that because "the misstatements in the IPO materials 'were necessary to go public to benefit BLI, directors, and investors,'" the statements were made with fraudulent intent. The misstatements could be necessary to the IPO but still made innocently or negligently. *See Pino v. Cardone Cap., LLC*, 2021 WL 3502493, at *8 (C.D. Cal. Apr. 27, 2021) (applying Rule 8(a) to Section 11 claims where "[a]lthough such allegations [allegations suggestive of fraud, *e.g.*, that Defendants knowingly or intentionally concealed information or made misrepresentations] could be inferred, the allegations in the [Complaint] can equally support the inference that Defendants made the alleged misrepresentations without the required scienter"), *aff'd* 55 F.4th 1253 (9th Cir. 2022). This is precisely the theory Plaintiffs allege in

that some of Defendants' conduct in violation of the Exchange Act was fraudulent, Plaintiffs are permitted to plead their claims in the alternative in this manner. Accordingly, because Plaintiffs' claims under the Securities Act do not sound in fraud, they are not required to meet the particularity pleading standards in Rule 9(b)." *Primo*, 940 F. Supp. 2d at 1113-14.[18] And even if they did, Plaintiffs have sufficiently alleged violations of the Securities Act under any pleading standard, because the Complaint details "what is false or misleading about a statement, and why it is false." *In re Cloudera, Inc.*, 2021 WL 2115303, at *21 (N.D. Cal. May 25, 2021) (quoting *Yourish*, 191 F. 3d at 993).

### B. The Securities Act Defendants Made Material Misrepresentations of Fact in Connection with the IPO.

As alleged in the Complaint (¶¶ 265-269; 274-298), and for the reasons detailed in Part III, *supra*, the Securities Act Defendants violated §§ 11 and 12(a)(2) of the Securities Act by making material misrepresentations or omissions of fact in the IPO Materials. *Lyft*, 484 F. Supp. 3d at 768 (to prevail on a Section 11 claim, the plaintiff need only show a material misrepresentation or omission); *Pino*, 55 F.4th at 1257 (to prevail on a Section 12(a)(2) claim, once a predicate violation of the

connection with their Securities Act claims, averring throughout that Securities Act Defendants acted negligently or innocently and otherwise including no facts which tend to speak to or establish a fraudulent intent on the part of these defendants. *See* ¶¶ 257, 272, 276, 279, 286, 291, 292, 300.

[18] *See also In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 273 (3d Cir. 2006) (declining to apply Rule 9(b) to Securities Act claims where plaintiff "carefully segregated its allegations of negligence against [certain defendants] from its allegations of fraud against those defendants," thereby creating "a clear conceptual separation in the complaint between claims sounding in negligence and those sounding in fraud"); *Violin Memory Sec. Litig.*, 2014 WL 5525946, at *8 (applying Rule 8(a) to Section 11 claims where complaint contained "no allegation that defendants 'knowingly' or 'intentionally' concealed information or made misrepresentations"); *Schwab,* 257 F.R.D. at 545 (applying Rule 8(a) to Section 11 claims where complaint "does not specifically allege fraud," "assiduously avoids use of the word [fraud]," and generally avoids allegations "inherently suggestive of fraud such as that defendants 'knowingly' or 'intentionally' made the misrepresentations alleged"); *In re Shoretel Inc., Sec. Litig.*, 2009 WL 248326, at *1–2 (N.D. Cal. Feb. 2, 2009) (applying Rule 8(a) to Section 11 claims where "plaintiffs repeatedly allege negligence" and "never allege that any individual *knew* the statements in the Registration Statement were false"); *Sudunagunta v. NantKwest, Inc.*, 2017 WL 8811116, at *6 (C.D. Cal. May 16, 2017) ("Plaintiffs thus allege two alternate theories of liability, in addition to disclaiming the fraud allegations for purposes of evaluating the § 11 claims. Therefore, the Court concludes that the allegations supporting the § 11 claims are sufficiently different from the allegations supporting the § 10(b) claims that the less rigorous Rule 8(a) pleading standard applies.").

In light of the foregoing, Defendants' cited authority, *see* BLI Defs.' MTD at 23, Underwriter Defs.' MTD at 4-5, is inapposite and does not control here. The Complaint simply does not "employ[] the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act." *See* BLI Defs.' MTD at 23 (quoting *Rubke*, 551 F.3d at 1161). Nor are Plaintiffs' attempts to disclaim allegations of fraud "nominal." *See id.* (quoting *Rigel*, 697 F.3d at 885).

Securities Act is established, the plaintiff need only show that defendant qualifies as a statutory seller or offeror).

In an attempt to undermine Plaintiffs' well-pled falsity allegations, Defendants again attack the Scorpion Report, BLI Defs.' MTD at 23. But as explained in Part III.A, *supra*, the Report is a far cry from the anonymous and questionably sourced reports assed in *Bloom*, 2021 WL 4461171, at *10, and similar cases cited by Defendants.

Further, contrary to Defendants' argument that "no pleaded facts show that such 'adverse facts' were known at the time of the IPO," BLI Defs.' MTD at 23-24, Plaintiffs plainly allege that "*[a]t the time they were made*, the statements in ¶¶ 266-67 were materially false or misleading because they failed to disclose the adverse facts." *See* ¶ 268 (emphasis added). Defendants' argument about what was known or unknown at the time of the IPO is premised on the extraordinary proposition that all of the interviews that informed the Scorpion Report were stale at the time of IPO.[19] This proposition is simply untenable, but more basically, it requires the Court to discount the Complaint's well-pled allegations, and the reasonable inferences that can be drawn therefrom, in favor of Defendants' preferred interpretation. This is not appropriate at this stage of the litigation. *See Daou*, 411 F.3d at 1013 (In deciding a motion to dismiss, court must "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs.").

---

[19] If Defendants' proposition is to be believed, all the interviews must either pre-date or post-date the IPO. If they all pre-date the IPO, Defendants are asking the Court to buy the remarkable proposition that the complaints of 14 customers, which owned somewhere between 28 and 46 Berkeley Lights systems (or between 52% and 85% of the Company's entire installed base disclosed in the IPO Materials), were stale as of the time of the IPO. Berkeley Lights sold its first Beacon in December 2016 and didn't sell 28 Beacons until sometime in Q2 2019, a little over a year before the IPO. The Company didn't sell 46 Beacons until sometime in Q4 2019, just a few months before the IPO. Discounting these interviews as stale, as Defendants' argument requires, is simply not plausible. *See Bloom*, 2021 WL 4461171, at *12 ("As the Ninth Circuit has recognized, prior information may still 'confirm what a defendant should have known during the class period.'" (quoting *Webb v. Solarcity Corp.*, 884 F. 3d 844, 851, n.1 (9th Cir. 2018)). The only other possible interpretation of Defendants' argument is that all of the customer issues noted in the Scorpion Report occurred between the IPO and the date the Report was published. While perhaps insulating Defendants from liability for statements made in the IPO Materials, this would only confirm the plausibility of Plaintiffs' Exchange Act claims.

The Securities Act Defendants also violated their affirmative duty to disclose the significant design and manufacturing issues with BLI's flagship Beacon product under Items 303 and 105, which required these defendants to disclose the known risks, trends, and uncertainties related to the Beacon in the IPO Materials. *See* ¶¶ 270-273; *Mallen v. Alphatec Holdings, Inc.*, 2013 WL 1294640, at \*12 (S.D. Cal. Mar. 28, 2013), *aff'd sub nom. Fresno Cnty. Emps.'*, 607 F. App'x 694 ("One potential basis for liability under §§ 11 and 12(a)(2) is 'an omission in contravention of an affirmative legal disclosure obligation.'"). The significant design and manufacturing issues with the Beacon, and the numerous customer complaints about these problems that were conveyed to the Company, were vital factors making an investment in BLI securities highly risky at the time of the IPO, and thus were required to be disclosed to investors. *See Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 386-87 (N.D. Cal. 2020) (holding that failure to disclose "reliability problem" with defendant's product and "exceptional consequences" from the problem sufficiently alleged to have violated Item 303 and thus triggered liability under Securities Act), *aff'd*, 13 F. 4th 940 (9th Cir. 2021). Defendants attempt to argue that the Beacon's design and manufacturing issues were not material, BLI Defs.' MTD at 24, but the reaction of BLI stock price when the Scorpion Report revealed the existence of these issues to the market, *see* ¶ 270, belies this argument. *See Pirani*, 445 F. Supp. 3d at 386 (materiality of information indicated by market reaction to alleged disclosure).[20]

Similarly, Defendants argue that Plaintiffs fail to "explain why the robust risk factors in the IPO materials were insufficient" under Item 105, but in so arguing, Defendants do not cite or reference a single one of the supposed "robust risk factors." *See* BLI Defs.' MTD at 24. And understandably so, because the only relevant risks factors from the IPO Materials speak to hypothetical possibilities (what "may" or "may not" happen, ¶¶ 267-269), which, given the circumstances, do not provide Defendants cover. *See Lyft*, 484 F. Supp. 3d at 776 (in holding that plaintiff plausibly pled violations of Items 105 and 303, noting that "[a]lthough the disclosures discuss the hypothetical risk of defects, improper

---

[20] That the Beacon was BLI's "flagship" instrument and the success of the Company was dependent on the success of the instrument, *see* ¶¶ 1, 3, 35-39, 272, further supports that the design and manufacturing issues with the instrument were "reasonably likely to have material effects on the registrant's financial condition or results of operations." *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011).

repairs, and quality issues, at the motion to dismiss stage, the present reality of such defects and repair issues constitutes an omitted and 'significant factor[ ] that make[s] an investment . . . risky'").

Defendants' assertion that Plaintiffs' Securities Act claims fail because Plaintiffs cannot establish loss causation, *see* BLI Defs.' MTD at 24; Underwriter Defs.' MTD at 4-5, is flatly wrong. Plaintiffs need not plead loss causation to establish a right to relief under Section 11. *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013). Further, as explained in Part V.B, *infra*, it is a rare circumstance where a defendant can establish the affirmative defense of negative causation as a matter of law at the pleading stage. Those circumstances do not exist here. *See In re Lyft Sec. Litig.*, 2020 WL 1043628, at *6 (N.D. Cal. Mar. 4, 2020) ("[B]ecause an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial.").

### C.   Hobbs, Holt, the Director Defendants, and the Underwriter Defendants Are Statutory Sellers Under Section 12(a)(2).

The Complaint sufficiently alleges that Hobbs, Holt, and each of the Director and Underwriter Defendants served as a statutory "seller" within the meaning of Section 12(a)(2). These Defendants all argue otherwise. *See* BLI Defs.' MTD at 24-25; Underwriter Defs.' MTD at 5-7. They are wrong.

In its seminal *Pinter* decision, the Supreme Court held that Section 12(a)(2) liability extends to those who either: (i) pass title to the plaintiff; or (ii) successfully solicit the purchase based on a financial motivation. 486 U.S. at 647. The Court reasoned that "solicitation is the stage at which an investor is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information." *Id.* at 646-47. Importantly, the financial motivation needed to establish statutory seller liability includes not only the solicitor-seller's own financial motivation but also "those of the securities owner" (*i.e.*, the issuer in a new offering), even if just "in part." *Id.* at 647; *see also id.* at 654-55 ("But a person who solicits the buyer's purchase in order to serve the financial interests of the owner may properly be liable under [Section 12] without showing that he expects to participate in the benefits the owner enjoys.").

The Complaint has satisfied the *Pinter* standard as to Hobbs, Holt, and each of the Director Defendants. First, with the exception of Holt, each of these individuals served as directors, and in the

case of Hobbs, also as the Company's most senior executive at the time of the IPO. Holt served as CFO at the time of the IPO. As such, these individuals authorized the IPO to raise over $200 million for BLI. ¶¶ 8, 22-23, 29, 261-262, 265; *see also In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 404-05 (S.D.N.Y. 2013) ("Given their positions as officers and directors of the Company, the Individual Defendants likely participated in the Offering in order to benefit [the issuer]—if not themselves. Therefore, Plaintiffs have adequately alleged that the Individual Defendants were motivated by either their own financial interests or those of the securities owner."). The Complaint also alleges that Hobbs and Holt were "hands-on managers" with "intimate knowledge about core aspects of Berkeley Lights's financial and business operations, including the Company's proprietary technologies and business relationships . . . [and] intimately involved in deciding which disclosures would be made by the Company," including those in its IPO Materials. ¶ 25. Indeed, Hobbs participated in a whirlwind (virtual) tour in support of the IPO in the days prior to offering. ¶ 7 ("Defendant Hobbs also met personally with potential investors, holding over 180 Zoom calls in the three days preceding the IPO to help take the Company public.").

These facts, coupled with the Complaint's other allegations, are more than enough to allege Section 12(a)(2) liability against Hobbs and Holt. *See Primo*, 940 F. Supp. 2d at 1126 (where acts of solicitation included "controlling the defendant corporation," holding that plaintiffs adequately alleged officer defendants were statutory sellers under Section 12(a)(2) "including by alleging that these Defendants participated in the preparation of, and signed, the purportedly misleading solicitation documents"); *Pirani*, 445 F. Supp. 3d at 384 (allegations that "certain defendants solicited shares at the Investor Day [the IPO equivalent of a roadshow]" supportive of finding that individual director and executive defendants actively solicited sales of shares under rule). Regardless, courts in this District have held that "whether an individual is a seller under section 12 is a question of fact, not properly decided on a motion to dismiss." *In re Portal Software, Inc. Sec. Litig.*, 2006 WL 2385250, at *4 (N.D. Cal. 2006); *see also In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal. 2009).

Hobbs, Holt and the Director Defendants also signed the IPO Materials and/or were named as directors in the registrations statement used to solicit purchasers in the IPO. ¶¶ 261-262, 265; s*ee In re*

*Nat'l Golf Properties, Inc.*, 2003 WL 23018761, at \*3 (C.D. Cal. Mar. 19, 2003) ("[A]llegations that an issuer signed a registration statement is sufficient to allege active solicitation."); *see also Schwab*, 257 F.R.D. 534, 549 (N.D. Cal. 2009) ("As many courts have found, the registration statement is itself a solicitation document. Although the act of signing a registration statement, alone, may not always suffice, it is at least suggestive of solicitation activity."). But the Complaint alleges more than these Defendants' positions and roles in the IPO and their signing of the IPO Materials. It further alleges that these defendants "directly solicited the purchase of Berkeley Lights common stock through means of the IPO Materials," which included "participating in the preparation of, or signing, the false and misleading IPO Materials, and/or selling shares of stock pursuant to the false and misleading IPO Materials." ¶ 290; *see also Schwab*, 257 F.R.D. at 549-550 (plaintiffs adequately pled solicitation based on allegations that, in addition to signing the offering documents, defendants "'actively solicited the sale of the fund's shares' and that certain defendants were involved in marketing the fund"); *Portal*, 2006 WL 2385250, at \*4 (plaintiffs adequately pled solicitation where "defendants issued 'materially false and misleading written statements to the investing public' and defendants' solicitation activity 'included participating in, and signing, the preparation of the false and misleading Prospectus'").

Defendants simply ignore the vast majority of the well-pled facts establishing that Hobbs, Holt, and the Director Defendants solicited purchasers under *Pinter*. Defendants' argument on this point is limited to one short paragraph, which only mentions and specifically addresses Plaintiffs' allegation regarding the defendants "participating in the preparation of, or signing, the false and misleading IPO Materials, and/or selling shares of stock pursuant to the false and misleading IPO Materials." BLI Defs.' MTD at 24. But, as illustrated above, Plaintiffs' allegations of solicitation are much broader and more than enough to establish that Hobbs, Holt, and the Director Defendants acted as statutory sellers under Section 12(a)(2).

The Underwriter Defendants similarly argue that they are not statutory sellers under Section 12(a)(2). *See* Underwriter Defs.' MTD at 5-7. They too are wrong. Plaintiffs allege that the Underwriter Defendants "were sellers, offerors and/or solicitors of purchasers of Berkeley Lights common stock pursuant to the defective IPO Materials," ¶ 290, and as explained below, that Plaintiffs purchased shares directly in and pursuant to the IPO, *see* Part IV.D, *infra*. Nothing more is required at

this stage of the litigation to plead Section 12(a)(2) claims against the Underwriter Defendants. *See Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *18 (C.D. Cal. June 9, 2016) (holding plaintiffs sufficiently alleged Section 12 claims against underwriters, where "Plaintiffs allege that Underwriter Defendants 'offered, promoted, and sold [defendant's] common stock in the SPO' and that [one of the plaintiffs] Quad purchased shares as part of the SPO").[21]

But Plaintiffs' well-pled allegations go even further. As alleged in the Complaint, the Underwriter Defendants prepared the false and misleading IPO Materials, and they did so for their own benefit and for the benefit of the BLI. *See* ¶¶ 8, 40, 278, 290. Indeed, as alleged in the Complaint, the Underwriter Defendants had a tremendous amount to gain from the IPO through the commissions, discounts, and other fees they earned as underwriters. *¶* 8. Further, the Underwriter Defendants' overallotment option provided these defendants with the opportunity to gain still more, as the stock opened for trading at $51.05 after the IPO and the Underwriter Defendants exercised their option to purchase an additional 1,215,000 shares of common stock at the IPO price. *¶* 40. This is more than enough to plead that the Underwriter Defendants acted as statutory sellers under Section 12(a)(2). *See Evoqua*, 450 F. Supp. 3d at 404 (finding Section 12(a)(2) standing sufficiently alleged against "Underwriter Defendants [who] solicited the purchase of securities for their own and the securities owners' interests"); *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 508 (W.D. Wash. 2009) ("Plaintiffs adequately stated §12(a)(2) claims against underwriters where plaintiffs alleged "'the Underwriter Defendants, through public offerings, solicited and sold WaMu securities to members of the Class.'" (quoting complaint)).

Also, underwriting the IPO pursuant to a firm commitment agreement, there can be no doubt that the Underwriter Defendants "[sold] shares of stock pursuant to the false and misleading IPO Materials" directly to Plaintiffs and the Class. ¶ 290; *see also Pinter*, 486 U.S. at 647 (Section 12(a)(2) liability extends to those that pass title to the plaintiff); *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902,

---

[21] Because Plaintiffs solely allege Securities Act violations against the Underwriter Defendants and Director Defendants, there can be no dispute that those claims do not sound in fraud. *See Velti*, 2015 WL 5736589, at *15 ("[C]ourts regularly apply Rule 8(a) to Section 11 claims brought in the same action as Section 10(b) claims, in particular where the Section 11 defendants are not accused of violating Section 10(b).").

926 (N.D. Cal. 2015) ("[P]laintiffs adequately alleged that underwriter defendants solicited sales where complaint stated that they issued or sold the securities at issue and that plaintiffs purchased the securities in the [o]fferings".). There is no requirement that Plaintiffs need allege from which of the specific Underwriter Defendants they purchased shares. *See In re Violin Memory, Inc. Sec. Litig.*, 2015 WL 1968766, at *4 (N.D. Cal. Apr. 30, 2015) ("[P]laintiffs need not allege which underwriter sold securities to each plaintiff to state a Section 12(a)(2) claim."). Nor is there any requirement that Underwriter Defendants' "solicitation be directed or targeted to a particular plaintiff." *See Pino*, 55 F.4th at 1260.[22]

### D.     Plaintiffs Have Standing to Move Forward on the Securities Act Claims.

Plaintiffs have sufficiently alleged standing under Section 12(a)(2). Specifically, Plaintiffs have pled that Plaintiff Pompano Retirement System "acquired Berkeley Lights stock in the IPO" (*i.e.*, on the primary market), "pursuant to" the IPO Materials, on the date of the IPO and at the IPO price. These facts are confirmed by the Retirement System's certification (Dkt. No. 89-2), which was expressly incorporated into the Complaint. *See* ¶¶ 20, 281, 294. Nothing more is required. *See, e.g.*, *In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1126 (N.D. Cal. 2014), *aff'd in part*, *rev'd in part and remanded*, 669 F. App'x 878 (9th Cir. 2016) ("A plaintiff establishes standing to sue under Section 12 by showing she purchased its shares in a public offering, as opposed to the secondary market."); *Flynn*, 2016 WL 3360676, at *18 (holding that plaintiffs met their burden as to standing where one of the plaintiffs "purchased shares as part of the SPO," *i.e.*, on the date of the offering and at the offering price); *Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409, at *9 (C.D. Cal. Mar. 5, 2013) ("Paragraphs 17, 139, and 146 make clear that Lead Plaintiff and at least some class members purchased stock 'pursuant to' the offering and 'pursuant' to the prospectus. Accordingly, Lead Plaintiff

---

[22] The Ninth Circuit's recent opinion in *Pino* appears to all but repudiate Underwriter Defendants' argument and cited authority on this point. *See* Underwriter Defs.' MTD at 6 (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003)). But even if did not, *Rosenzweig* is distinguishable as it does not address what may be necessary to establish that underwriters are statutory sellers under Section 12(a)(2). If anything, *Rosenzweig* supports the fact that, here, the Underwriter Defendants are statutory sellers that may be liable to Plaintiffs and the Class under Section 12(a)(2). *Cf. id.* at 871 ("[I]n a firm commitment underwriting, such as this one, the public cannot ordinarily hold the issuers liable under section 12, because the public does not purchase from the issuers. *Rather, the public purchases from the underwriters*." (emphasis added)).

has stated a claim on behalf of itself and all class members who purchased pursuant to the offering, and that is all that is needed to survive a motion to dismiss."); *see also Violin*, 2015 WL 1968766, at *4 ("[I]nsofar as defendants' argument is related to standing issues, the Court finds persuasive the reasoning of the Third Circuit that such questions are better addressed during class certification.") (citing *In re Westinghouse*, 90 F.3d at 718 n.22).

No Defendants, other than the Underwriter Defendants, challenge Plaintiffs' standing to assert Section 12(a)(2) claims, and the Underwriter Defendants' motion is conspicuous in only seeking dismissal of "*Lead Plaintiff's*" Section 12(a)(2) claim. *See* Underwriter Defs.' MTD at 8-9. There is no basis in law to dismiss Lead Plaintiff's claim while allowing the Retirement System to proceed. *See In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *12 (C.D. Cal. July 21, 2005) ("Defendants also argue that Plaintiffs do not have standing to assert the Section 11 claim. While lead plaintiffs Poppe and Schneider may lack standing, . . . there is no dispute that representative plaintiff Watson has standing."); *Ubiquiti*, 33 F. Supp. 3d at 1126 (granting dismissal but without prejudice based on plaintiffs' ability to "allege standing if given leave to amend their complaint to *add* Gregory Osborn as plaintiff"). The Underwriter Defendants do not contest that the Retirement System has standing under Section 12(a)(2), and practical implications support the sensible legal approach that, at this stage of the litigation, Plaintiffs—both Damelio and the Retirement System alike—have standing to pursue Section 12(a)(2) claims against the Underwriter Defendants. Even if Damelio's Section 12(a)(2) claim is dismissed, the Retirement System's claim will proceed, and the Underwriters Defendants will have to defend against it.

## V.     THE COMPLAINT SUFFICIENTLY PLEADS EXCHANGE ACT VIOLATIONS

Defendants contend that the Complaint fails to plead Exchange Act violations on three grounds. First, they claim that the Complaint does not sufficiently allege that Defendants made any false or misleading statements. Plaintiffs have dispensed with this flawed argument above. *See* Part III, *supra*. Additionally, Defendants argue that the Complaint fails to plead facts showing scienter—*i.e.*, that Defendants knew that BLI's products and finances were deeply flawed—and loss causation. These arguments similarly fail to overcome the Complaint's well-pled allegations.

### A.    Plaintiffs Have Sufficiently Alleged Defendants' Scienter.

Defendants erroneously claim that Plaintiffs have not adequately alleged scienter. *See* BLI Defs.' MTD at 15–19. BLI's argument rests on the false claim that "Plaintiffs' theory is that since BLI was a growth company seeking to go public, its executives must have been motivated to deceive investors about product and financial performance." *Id*. at 19. To the contrary, Plaintiffs' theory is that BLI executives *knew* that the flagship Beacon product was deeply flawed and yet deceived the public because they "would have had difficulty convincing the investing public to buy shares in the IPO" otherwise. *See* ¶ 154. When viewed holistically, Plaintiffs' allegations establish scienter. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 326 (2007) (in assessing scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically").

BLI misapprehends the requisite holistic approach to scienter when it erroneously claims that "Plaintiffs plead *no* particularized facts showing that Defendants Hobbs, Holt, or Wood acted with scienter." BLI Defs.' MTD at 16. Contrary to BLI's argument, Plaintiffs are not required to "cite confidential witnesses purporting to have personal knowledge of what the Individual Defendants knew." *See id*. Nor must the Scorpion Report provide anyone's personal knowledge of what they knew, contrary to BLI's contention. *See id*. Instead, the particularized allegations discussed above and in the following subsections demonstrate scienter.

### 1.    Defendants' Materially False Statements and Omissions Could Not Have Occurred Without Their Knowledge and Approval.

Plaintiffs' scienter allegations are supported by the core operations doctrine, under which a court "may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue." *Alphabet*, 1 F.4th at 706. "This includes consideration of the executive's access to the information, and, whether, given the importance of the information, it would be absurd to suggest that management was without knowledge of the matter." *Id.* (internal quotation marks and citation omitted). In *Alphabet*, the Ninth Circuit held that Google's argument that its employees "concealed 'the largest data-security vulnerability in the history of two Companies whose existence depends on data security' from the CEO of Alphabet at a time when social media networks were under immense regulatory and governmental scrutiny—is not

plausible. Accordingly, we conclude there is a strong inference that [the CEO] had the requisite knowledge, which can be imputed to Alphabet." *Id.* Similarly, in *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008), the Ninth Circuit held that an inference of scienter was sufficiently supported by plaintiffs' contention that high-level managers directly responsible for day-to-day operations must have known that statements about backlogs were misleading when made, by reason of their positions of authority and the fact that the backlog issues related to the companies' core operations, such that "it would be 'absurd to suggest' that top management was unaware of them."

The core operations doctrine supports Plaintiffs' scienter allegations here. As alleged, Defendant Hobbs was BLI's 5+-year CEO, was previously VP of Commercial Development, joined BLI in 2013 to lead the development of the Company's platform, and directed the launch of the Beacon in 2016. *See* ¶¶ 22, 212. Defendant Holt similarly served as BLI's CFO for more than five years. ¶¶ 23, 212. And Defendant Wood (Holt's successor as CFO) previously served as Vice President of Business Development. ¶¶ 24, 212. So, "[g]ven the Company's size, small (in magnitude) sales, and that its lab instrument sales are purported to be the major focus of Berkeley Lights's business operations," it can be "strongly inferred" that Hobbs, Holt, and Wood "were fully aware of the status of all material matters involving Berkeley Lights's core business operations throughout the Class Period, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Plaintiffs and the members of the Class." *Id.* Moreover, the notion that Hobbs, Holt, and Wood were unaware of the performance of the Beacon is absurd, given that "the Beacon serves as the centerpiece of the Berkeley Lights platform and the Company's flagship product. As such, the success of the Beacon—that is, the machine's ability to meet the Company's promises in terms of providing 'the most advanced environment for rapid functional characterization of single cells at scale' and the Company's ability to place significant numbers of Beacon machines with customers—is vital to the Company." *See* ¶ 43. Courts have held that similar allegations suffice to show scienter.[23]

---

[23] *See Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *9 (S.D. Cal. Sept. 19, 2016) ("Nuplazid, Acadia's most advanced product candidate, was critical to the success of the company. In addition, Acadia was a relatively small company—97 employees as of December 31, 2014. . . . It would be absurd to suggest that the CEO, CFO, and Chief Medical Officer did not know that there had been no mock inspection of its manufacturing facilities and that there had been no reliable assessment of the company's manufacturing and quality assurance systems at the time they made their statements.");

Defendants' cited cases concerning the core operations doctrine are inapposite. For example, in *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1049 (9th Cir. 2014), the Court held that, "[w]ithout factual allegations showing that at least someone at NVIDIA had knowledge of the extent of NVIDIA's liability, there was "no basis to presume that NVIDIA's management" knew of "*new* problems [that] began manifesting in laptop computers incorporating NVIDIA's GPU and MCP products." *Id.* at 1064 (emphasis added). Here, in contrast, Plaintiffs allege that the Beacon was inherently flawed from the beginning, not that some units began manifesting problems only after they were used by customers. Similarly, the other cases cited by BLI do not support its argument.[24]

### 2. Defendant Hobbs and Holt's Insider Sales Also Evidence Their Scienter.

Defendants incorrectly contend that Plaintiffs' allegations of insider sales do not support a strong inference of scienter. *See* BLI Defs.' MTD at 17–18. In doing so, they ignore that the stock program *itself* supports the scienter allegations. In *Applestein v. Medivation, Inc*., 2011 WL 3651149, at *7 (N.D. Cal. Aug. 18, 2011), the court held that the "fact that the sales were made pursuant to Rule 10b5–1 plans does not preclude a finding of fraud because, at the time the plans were adopted . . . the individual defendants were allegedly already aware of the [material nonpublic information]." And in *Azar v. Yelp, Inc*., 2018 WL 6182756, at *18 (N.D. Cal. Nov. 27, 2018), the court found that "nothing before the Court establishes when precisely the trading plan was adopted. Defendants have not sought to introduce the actual 10b5-1 plan." As a result, the court found that the stock sales at issue supported an inference of scienter. *Id.* (citing *Applestein*).

---

*Mulligan v. Impax Lab'ys, Inc*., 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014) ("it is 'absurd' to think that the CEO and CFO of a pharmaceutical company would be unaware of the alleged substandard, non-compliant conditions pervading their company's manufacturing and quality control divisions—the heart of a company whose main business is manufacturing pharmaceuticals for public consumption."); *In re Intuitive Surgical Sec. Litig*., 65 F. Supp. 3d 821, 838 (N.D. Cal. 2014) (alleging that "Defendants Smith and Guthart were acutely aware of the numerous adverse effects da Vinci was imposing on patients while continuing to tout da Vinci's safety benefits and financial performance, while downplaying the risk factors, Plaintiff has sufficiently pled a strong inference of scienter").

[24] *See Police Ret. Sys.*, 759 F.3d at 1063 ("Mere access to reports containing undisclosed sales data is insufficient to establish a strong inference of scienter."); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008) (explaining that "core operations inference" applied in cases where "only two government agencies made up 80% of the company's revenue, making the loss of even one contract disastrous for the entire company" (citing *Berson*, 527 F.3d at 982)).

Similarly here, Plaintiffs allege that "[w]hile these in-Class-Period sales were made pursuant to 10b5-1 plans, Defendants entered into those plans during the Class Period while they were in possession of material nonpublic information. All of the foregoing sales were made by Defendants Hobbs and Holt without disclosing the materially adverse facts about Berkeley Lights that they were privy to." ¶ 171. Defendants do not try to show that the stock plan was adopted before the fraudulent conduct occurred. Hobbs's and Holt's trades also suspicious in terms of their scope and timing. Each sold significant quantities of shares worth millions of dollars shortly before the first corrective disclosure date, and Hobbs continued to sell millions of dollars' worth of shares over the ensuing three months before abruptly stopping this pattern less than a month before the Scorpion Report was issued. Hobbs did not sell another share during the Class Period. ¶¶ 159-174. Defendants press their own interpretation of why these trades occurred when they did, but the reasonable inference to be drawn in Plaintiffs' favor based on these facts is that, aware of non-public material information about the Beacon's significant shortcomings and with the share price sky-high as a result of their various false and misleading misstatements, Hobbs and Holts cashed in.

### 3. The Timing and Circumstances of Defendant Hobbs, Holt, and Wood's Executive Departures Demonstrates Scienter.

Defendants contend that allegations about executive departures do not support a strong inference of scienter even when viewed holistically with Plaintiffs' other allegations of scienter. *See* BLI Defs.' MTD at 18. Again, Defendants undervalue the allegations that Holt was aware of "the myriad complaints customers had regarding the Beacon and had access to the financial information pertinent to Berkeley Lights's problems deploying its product to new and existing customers," so that his "departure, first announced on February 25, 2021, on the same day that BLI previewed its lackluster FY20 annual results, is strongly indicative of" scienter. *See* ¶¶ 204–205; *Plantronics*, 2022 WL 3653333, at *19 (executive departures "near the time that the Company announced a $65 million reduction in channel inventory . . . lends further support to a finding that the scienter element is met"). Similarly, Hobbs was demoted "just one month after the filing of the first class-action complaint." And, in connection with BLI releasing disastrous Q4 and YE 2021 results consistent with those warned

by the Scorpion Report. Wood resigned shortly thereafter. *See* ¶¶ 209-210. The suspicious timing of both position changes thus supports a strong inference of scienter.

Further, there is no merit to Defendants' argument that "Hobbs, Holt, and Wood *remained* in their roles for a transition period . . . ." *See* BLI Defs.' MTD at 17 (emphasis in original). Plaintiffs allege that Holt and Wood remained in advisory roles for only one-and-a-half months and one month, respectively. *See* ¶¶ 23–24. In contrast, Defendants cite *NVIDIA*, in which it appears that a defendant remained in an advisory role for an extended period. *See NVIDIA*, 768 F.3d at 1063 ("two of the three individuals remained at NVIDIA in some type of advisory role").[25]

Finally, Defendants argue that "Hobbs did not leave BLI at all. He assumed a new role to 'focus on growing the Company's largest business line' in light of his 'deep knowledge of this area.' Ex. 18." But Defendants' Exhibit 18—a January 5, 2022 press release Defendants request the Court take judicial notice of—is not admissible for the truth of the matter asserted. *See* Part VII, *infra* (Plaintiffs' opposition to the BLI Defs.' Request for Judicial Notice). Moreover, Defendants' self-serving description of Hobbs's "new role" conflicts with Plaintiffs detailed allegations in the Complaint, which note, among other things, that the Company's claim that Hobbs lacked "experience for scaling up commercialization of" its platform was "peculiar" given that BLI "had long described Hobbs as necessary to the success of the Company and included risk disclosures in its SEC filings indicating that the loss of Hobbs could adversely impact the business." *See* ¶ 150. The Court must adopt the inference favorable to the Plaintiffs at this pleading stage.

These facts along with the many others alleged by Plaintiffs, including, e.g., contradictory data regarding the marketability of the Beacon and dwindling customer payments ignored by Defendants, ¶¶ 183-185, are more than sufficient to establish a strong inference of scienter.

---

[25] The cases cited by BLI are inapposite because the plaintiffs did not allege any facts that the resignations at issue were accompanied by suspicious circumstances. *See Zucco*, 552 F.3d at 998 ( (the "allegations demonstrate only that there was some disagreement within the corporation over its accounting processes, and not that Digimarc's management was deliberately reckless in its capitalization of certain software development costs in violation of GAAP"); *Webb*, 884 F.3d at 856 (where securities fraud claims were based on accounting error, allegations "do not give rise to an inference of scienter that is at least as compelling as the inference of an honest mistake"). Here, in contrast, the flagship Beacon was flawed from the outset.

OMNIBUS OPP'N TO DEFENDANTS' MOTIONS TO DISMISS - 42
Case No.: 4:21-cv-09497-HSG

**B.      The Complaint Adequately Pleads Loss Causation Based on the Scorpion Report and BLI's Other Class Period Disclosures Regarding its Finances and Executive Departures.**

Defendants contend that the Complaint fails to sufficiently plead loss causation on two grounds. First, they recycle their previous critiques of the Scorpion Report, asserting (erroneously) that the market did not plausibly perceive the Report's revelations as disclosing new information about Defendants' false statements due to the Report's purported "self-interested and anonymous" nature. Additionally, Defendants contend that other disclosures identified in the Complaint —that is, BLI's May 11, 2021 and August 11, 2021 disclosures concerning the Company's quarterly financial results (¶¶ 223-29) and BLI's January 5, 2022 press release announcing the year end revenue miss and that Defendant Hobbs was being replaced (¶¶ 234-38) —neither made untrue nor called into question as false their prior statements. These arguments fail to persuade, particularly at the pleading stage.

A securities fraud plaintiff's burden in pleading loss causation is not a heavy one. *See In re BofI Holdings, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). A complaint need only provide the defendant with "some indication of the loss and the causal connection that the plaintiff has in mind." *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005). "Even under Rule 9(b) the [] allegations will suffice so long as they give the defendant 'notice of plaintiffs' loss causation theory' and [] the court 'some assurance that the theory has a basis in fact.'" *BofI*, 977 F.3d at 794 (quoting *Berson*, 527 F.3d at 989-90). Indeed, loss causation "requires no more than the familiar test for proximate cause," and there are an "'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018). Allegations of a "'causal connection between the material misrepresentation and the loss'" suffice. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1211 (9th Cir. 2016) (quoting *Dura Pharms.*, 544 U.S. at 342). Ultimately, a complaint need only "raise a reasonable expectation that discovery will reveal evidence of loss causation." *Gilead*, 536 F.3d at 1057 (citation omitted).

Here, the relevant truth concealed by Defendants' false and misleading statements was gradually revealed to investors and the market through a series of partial disclosures on: (i) May 11, 2021 (1Q21 Financial Results), (ii) August 11, 2021 (2Q21 Financial Results), (iii) September 15, 2021 (Scorpion Report), and (iv) January 5, 2022 (4Q and YE2021 Financial Results and Defendant

Hobbs resignation). As discussed below, and alleged in the Complaint, each of these disclosures was causally connected to the fraud, and caused BLI's stock price to plummet. ¶¶ 219-238. Thus, loss causation is adequately pled with respect to each disclosure.

### 1.    The Scorpion Report

Defendants contend that the Scorpion Report does not constitute a corrective disclosure for two reasons. First, they assert that this Circuit's precedent, particularly *Nektar*, forecloses Plaintiffs from pleading loss causation based on information disclosed in a short seller report, which purportedly had no publicly identifiable author and has disavowed any accuracy.[26] Second, Defendants quote two analyst reports, which are not cited or referenced in the Complaint, to bolster their otherwise conclusory claim that the Report revealed no new information. Their arguments, however, misconstrue both the law and the pleading record of this case.

As established in Part III.A, *supra*, the Scorpion Report is not, as Defendants suggest, the product of "anonymous and self-interested short-sellers who disavowed any accuracy." *Nektar*, 34 F.4th at 840. To the contrary, Scorpion Capital's founder and CIO—Kir Kahlon—is an experienced securities analyst investor who has made media appearances discussing the contents of the Scorpion Report and describing the interview screening methods employed to support the findings and/or opinions asserted therein. The Report discloses over one hundred pages of note from interviews with seven former BLI employees and executives, as well as 17 scientists and users across 14 of BLI's largest customers. Further, the inordinate details provided by the witness accounts corroborates the credibility of these sources while protecting their anonymity.

Additionally, the Report does not, as was the case in *Nektar* and *BofI*, disavow the accuracy of its findings. Grasping at straws, Defendants cherry pick language in the Report stating that Scorpion Capital cannot guarantee that its sources have provided complete and accurate information. Defendants conveniently ignore, however, the very clear language in the Report expressing Scorpion Capital's

---

[26] *See* BLI Defs.' Mot. at 20. Defendants do not adopt the extreme position that a short seller report may never be used to establish loss causation. *See*, *e.g.*, *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 942 (C.D. Cal. 2012) ("A short seller report may be used to establish loss causation."),

belief that the opinions offered therein were made in "good faith," and that the experts Scorpion Capital spoke to were "reliable sources of information." More specifically, the Report states:

> *Our opinions are held in good faith*, and Scorpion Capital LLC has based them on the public information, sources, the interviewed individuals, and any social media posts cited in this report, but Scorpion Capital LLC cannot and does not provide any representations or warranties with respect to the accuracy of *those materials. . . .*

> *We believe the experts we spoke with are reliable sources of information* with respect to Berkeley Lights. However, we cannot and do not provide any representations or warranties with respect to the accuracy of the information *they have provided to us*.[27]

Contrary to Defendants' assertion, the Report indeed revealed new information to the public even though it also relied, in part, on public information regarding BLI's financials and the Beacon. *See* ¶¶ 2, 12, 79, 136 (discussing the Report's extensive proprietary research and analysis, including 24 research interviews with former BLI employees, industry scientists and end users across 14 of the Company's largest customers."). The fact that a short seller report may "rel[y] on nominally public information does not, on its own, preclude them from qualifying as corrective disclosures." *See, e.g.*, *BofI*, 977 F.3d at 797. As the *BofI* court explained: some reports "require[] extensive and tedious research involving the analysis of far-flung bits and pieces of data." *Id.* "The time and effort it took to compile this information make it plausible" that some short seller reports, including the Scorpion Report with its extensive document review and 24-witness interview process, clear the bar for "provid[ing] new information to the market, even though [some] of the underlying data was publicly available." *Id.* (citing *Amedisys*, 769 F.3d at 323).

Finally, Defendants' improper reliance on analyst reports neither cited nor referenced in the operative complaint does nothing to sever the alleged causal connection between the Scorpion Report's revelations and the nearly 30% drop in BLI's stock price over the next two days.[28]

___

[27] Scorpion Report at 2 (emphasis added). The Report goes on to disclose additional information regarding its sources that may be pertinent to a factfinder in assessing the source's credibility (*e.g.*, the positions or responsibilities of the interviewed BLI customers and their firsthand experiences purchasing and working with the Beacon).

[28] In particular, Defendants argue that an analyst report released by Underwriter Defendant Cowen in the aftermath of the Scorpion Report's publication "confirmed that it revealed nothing new." BLI Defs.' MTD at 21. Conflicts of interest aside, it is improper for Defendants to ask this Court to consider the truth of matters asserted in documents not cited or referenced in the Complaint to rebut the

### 2.    The Other Corrective Disclosures

Defendants' attacks on the Complaint's other corrective disclosures similarly fail.

With respect to BLI's May 11, 2021 and August 11, 2021 financial results, Defendants lob a number of underdeveloped arguments in the hopes that one might stick. First, they contend that, under *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, corrective disclosures cannot be made alongside other statements that were false and misleading. *See* BLI Defs.' MTD at 22 (citing 574 F.3d 29, 41). But *Flag* (a class certification decision) simply holds that a plaintiff "cannot allege that defendants made certain misstatements" (e.g., that a company was doing well compared to its competitors), while simultaneously arguing that the very same statement constituted corrective disclosures of themselves, (that is, the fact that the other companies were not doing well exposed the public to the truth about [the company's] misstatements.)." Here, Plaintiffs do no such thing. Plaintiffs cite *different* statements made on May 11 and August 11, 2021 that constituted misstatements and corrective disclosures—the latter of which partially revealed that Defendants' prior statements regarding the Beacon's purported superior performance metrics and customer demand to be false.[29]

Defendants' arguments regarding BLI's January 5, 2022 disclosures are more egregious. In short, Defendants attempt to introduce extrinsic evidence—analyst reports neither cited nor referred to in the Complaint—to create a factual narrative that counters Plaintiffs' allegations at the pleading stage. *See Khoja*, 899 F.3d at 1014 (denouncing such a strategy). Further, they suggest that the Court should disregard the applicable legal standard for a motion to dismiss and adopt inferences based on extrinsic evidence in the Defendants' favor. *See id.* As such, Defendants' arguments should be summarily rejected. *See* Part VII *infra* (discussing Defendants' improper requests for judicial notice). Even if Defendants' arguments were entertained, they miss the point. As the Complaint makes clear, the relevant disclosures—including Hobbs' resignation, revenue and product placement shortfalls, and

sufficiency of the Complaint's allegations, including Defs. Exs. 25 and 26. *See Khoja*, 899 F.3d at 1003; Part VII, *infra* (opposing request for judicial notice).

[29] *Compare* ¶¶ 101-112 (identifying prior, repeated misstatements regarding the Beacon's capabilities and new statements about purportedly "strong" customer demand) *with* ¶ 223 (alleging that May 2021 statements regarding poor product placement for quarter constituted a partial disclosure of the true state of affairs) *and* ¶ 227 (alleging that missed earnings marks and product placement targets for second consecutive quarter constituted troubling signs and thus partial disclosure).

an expected continued deterioration of BLI's product placements—all stemmed from or were partial materializations of Defendants' underlying fraud. *See, e.g.*, ¶ 150 (noting BLI's peculiar explanation for the CEO transition). Though the market may not have fully understood the reasoning why Defendants' statements were false is beside the point. As BLI's declining stock price after each loss causation event shows, the market understood, at a base level, that Defendants' prior statements regarding the Beacon's performance and demand were false and misleading.

## VI.    THE COMPLAINT SUFFICIENTLY PLEADS CONTROL PERSON LIABILITY UNDER BOTH ACTS

### A.    The Applicable Legal Standard for Control Person Liability.

To allege control person liability under Section 15 of the Securities Act, 15 U.S.C. § 77o, and Section 20(a) of the Exchange 1934 Act, 15 U.S.C. §78t(a), a plaintiff need only plead that: (i) there was a primary violation of federal securities laws; and (ii) the defendant possessed actual power or control over the primary violator. *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "The standards for liability as a controlling person under § 15 are not materially different from the standards for determining controlling person liability under § 20(a)," and courts use the same analysis for both claims. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568 n.4 (9th Cir. 1990).

Both Sections 15 and 20(a) premise liability "solely on the control relationship." *Id.* at 1575. Importantly, a plaintiff "need not show that the defendant was a culpable participant in the violation," and "it is not necessary to show actual participation or the exercise of actual power." *Howard*, 228 F.3d at 1065; *In re Energy Recovery Sec. Litig.*, 2016 WL 324150, at *25 (N.D. Cal. Jan. 27, 2016). Rather, at the pleadings stage, the only inquiry is whether the plaintiff has alleged a *control relationship* between the defendant and a primary violator. *Howard*, 228 F.3d at 1065; *see Hollinger*, 914 F.2d at 1575. The SEC defines control as the "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Courts have found that the "power to direct," even in the absence of the actual exercise of that power, is sufficient to plead control. *See In re Cylink Secs. Litig.*, 178 F. Supp. 2d 1077, 1089 (N.D. Cal. 2001) (finding plaintiffs sufficiently

alleged control with allegations that the individual defendants "by virtue of their *executive and managerial positions had the power to control and influence . . . .*" (emphasis added)).

Whether such power to control exists presents "a complex question of fact requiring a close examination of the particular situation and organization" and "how to characterize the relationship between the various alleged controlling persons and the alleged violator of the securities laws." *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987); *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (same); *see also Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994) ("Whether [the defendant] is a controlling person 'is an intensely factual question . . . .'"); *Pirani.*, 445 F. Supp. 3d at 391 ("Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." (quoting *Howard*, 228 F.3d at 1065)). "Because the concept of control . . . is an elusive notion for which no clear-cut rule or standard can be devised," it "should be construed liberally and flexibly." *Wool*, 818 F.2d at 1441. Consistent with a liberal interpretation, the heightened pleading standard of Rule 9(b) does not apply to §§ 15 or 20(a) claims. *Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1073 (N.D. Cal. 2013); *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *33 n.249 (C.D. Cal. Aug. 8, 2013).

**B.    The Control Defendants Control Over BLI.**

**1.    WRVI Capital a/k/a the Celesta Defendants**

As alleged in the complaint, Defendant WRVI Capital is a technology-focused venture capital fund that was an early investor in BLI. At the time of the IPO, via an array of subsidiaries and affiliates, WRVI Capital owned 25.5% of BLI. ¶ 26. As a direct result of its investment, WRVI appointed several members to the BLI Board of Directors, including WRVI's founding managing partner, Defendant Marks. Marks is a named defendant for the Securities Act Claims, who served on the BLI Board of Directors from April 2014 until his retirement in May 2021, at which time he was serving as the Board's Chairperson. ¶ 61. Marks also served on the Company's Audit Committee. *Id.*

### 2.   Sequoia Capital

Sequoia Capital is also a technology-focused venture capital fund that held BLI stock through a variety of subsidiaries and affiliates. ¶ 27. At the time of the IPO, Defendant Sequoia owned 15% of the Company, and appointed several members to the BLI Board of Directors, including Sequoia's managing partner Defendant Moritz. Moritz served on the Board of Directors from April 2015 through the present, as well as serving on various standing committees of the Board, including the Compensation Committee and the Nominating and Corporate Governance Committee. ¶ 61.

### 3.   Nikon Corporation

Defendant Nikon entered into a distribution agreement with BLI in January 2018, which ensured that from March 2019 through at least March 2022, Nikon served as BLI's exclusive distributor in Japan, Singapore, Thailand, and South Korea and as a non-exclusive distributor in China. ¶ 28. Additionally, Nikon had a significant financial interest in the Company prior to the IPO, owning 8.1% of the Company. *Id.* Mr. Makoto Shintani, Nikon's Corporate Vice President and Deputy General Manager from April 2015 until March 2019, and later a Senior Fellow of the Healthcare Business Unit of Nikon, served on the BLI Board of Directors from May 2018 through July 2020. *Id.*

### 4.   Igor Khandros

Defendant Khandros is the founder and former CEO of BLI. ¶ 29. At the time of the IPO, he owned 22.3% of the Company's stock, and appointed multiple members to the Board of the Directors, including himself. *Id.* Khandros served on the Board of Directors from 2011 to the present, and still maintains beneficial ownership of 13% of BLI stock. *Id.*

### C.   Defendants Hobbs, Holt, and Wood's Control Over BLI.

Defendants Hobbs, Holt, and Wood are also named as control persons under § 20(a) of the Exchange Act, and Defendants Hobbs and Holt are named as control person claims under § 15 of the Securities Act. ¶¶ 253-54, 300-01. Tellingly, in their collective motion to dismiss, Defendants Hobbs, Holt, and Wood fail to even argue that they lacked control. Rather, their lone defense is that the control-person claims brought against them must fail because "the Complaint fails to plead a primary violation

of the securities laws."[30] Not so. As described in Parts III-V, *supra,* Plaintiffs have sufficiently alleged primary violations of the Securities Act, as well as the Exchange Act. Moreover, as the Ninth Circuit recently held, a motion to dismiss control person claims necessarily fails when the defendants, as here, do not challenge the complaint's allegations of control. *See Alphabet*, 1 F.4th at 709 (reversing the district court's dismissal of plaintiffs' control claims where, as here, the defendants' motion to dismiss did not specifically challenge those claims). Here, the complaint plainly alleges, and defendants do not dispute, that Hobbs, Holt, and Wood, by virtue of their positions as senior officers and/or directors of BLI, participation in and awareness of the Company's operations, knowledge of the Company's practices, and signing of SEC filings and the IPO materials, at all relevant times acted as control persons of BLI. *See* ¶¶ 254, 258, 261, 303.

Thus, Plaintiffs' control person claims against Hobbs, Holt, and Wood should survive.

### D.    The Control Defendants Had the Power To Influence and Control, and Did Influence and Control, Berkeley Lights.

Berkeley Lights itself acknowledged that the Control Defendants had the ability to control the Company. As alleged in the Complaint, the IPO Prospectus explicitly stated that "[o]*ur directors, officers and principal stockholders have significant voting power* and may take actions that may not be in the best interests of our other stockholders." *See ¶* 65 (emphasis added). The Prospectus continued: *"[T]hese stockholders [essentially the Control Defendants]*, if they act together, *will be able to control the management and affairs of our company* and most matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions. . . . This concentration of ownership may not be in the best interests of our other stockholders." *See ¶* 66-67 (emphasis added).

Defendant WRVI attempts to minimize this clear admission of control, characterizing BLI's disclosure as merely an indication of "potential ability." *See* Celesta Defs.' MTD at 6. Defendant

---

[30] *See* BLI Defs.' MTD at 25. Khandros moves to dismiss together with the other BLI Defendants. *See id.* While Khandros' arguments for dismissal of the control person claims are as conclusory as Hobbs, Holt, and Wood's, they at least feign an attempt at arguing that Khandros is not a control person. Because of this fact, along with the fact that Khandros shares important similarities with the other Control Entity Defendants, including being a large equity shareholder, appointing members to the Board, and serving on the Board himself, Plaintiffs address the Khandros defenses along with the other Control Entity Defendants.

Sequoia takes a similar tack, discounting BLI's own risk disclosures as "vague and cherry-picked statements" about the potential for voting power coalitions. *See* Sequoia's MTD at 5. Despite Defendants' attempts to self-servingly parse semantics, having the "potential ability" to exert control is the same as having actual ability to exert control, and is sufficient to plead liability as a control person. *See Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *14 (N.D. Cal. Feb. 27, 2018) (finding control person claims adequate where plaintiffs alleged "[d]efendants had the power to control and influence by virtue of their executive and managerial positions"). Furthermore, when the IPO Prospectus first refers to the Control Defendants' "voting power," it says nothing about potential or possible power or voting power that may only arise through collective action, but instead refers only to power—plain and simple. Sequoia attempts to further obfuscate by suggesting that the disclosures in the IPO Prospectus do not refer to the Control Defendants at all, but rather, only to "*unnamed* 'directors, officers, and principal stockholders.'" Sequoia's MTD at 5. However, the IPO Prospectus is very clearly referring to the Control Defendants, *i.e.*, those directors, officers, and principal stockholders who, which the Prospectus goes on to clarify, "collectively control approximately 64% of [BLI's] stock."

There are myriad other allegations of the Control Defendants' power over the Company, detailed throughout this Opposition and otherwise alleged in the Complaint, and these facts, along with the Company's own admission of their control, are more than enough to establish a plausible right to relief under § 20(a) against these defendants.

### 1. The Control Defendants Exerted Their Control to Unload Shares in the SPO.

As alleged in the Complaint, the Control Defendants had enormous equity positions in BLI—positions that they rapidly exited beginning with the SPO. *See* ¶¶ 11, 42, 76, 160, 162, 175-82. The SPO, which required the IPO underwriters to agree to early releases from lock up agreements for the selling shareholders, returned no actual value to the Company, and solely provided benefit to the selling shareholders. Principal among these selling shareholders were WRVI (including WRVI's founding managing partner Marks), Nikon, and Khandros. *See* ¶¶ 42, 69, 76, 161. The SPO allowed these defendants to sell 3.45 million shares of common stock at $86 per share, generating $300 million

for these defendants– again, none of which was returned to BLI in the form of additional capital to support the growth of the business. ¶ 160. Early releases from lock up agreements and such a quick follow-on offering after an IPO are extremely rare and threaten to destabilize and depress the value of a company's stock. ¶ 161. The fact that the Control Defendants were able to wrest early releases from their lock up agreements from the underwriters and convince the Company to undergo the burden of conducting the SPO, which resulted in no financial gain to BLI, is highly indicative of the level of control these defendants had over the Company. *See Daou*, 411 F.3d at 1013.

### 2.    The Control Defendants' Board Seats

In their separate filings, Defendants argue that their board seats are not indicative of "control" of the Company. *See* Celesta Defs.' MTD at 8. Not so. As courts in this Circuit have recognized, "although a person's being an officer or director does not create any presumption of control, it is a *sort of red light*." *Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1397 (9th Cir. 1993) (emphasis added)). Further, it is also "not uncommon for control to rest with a group of persons, such as the members of the corporation's management." *Id.* Thus, "[c]ourts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control at the motion to dismiss stage." *Energy Recovery*, 2016 WL 324150, at *25. Here, the Complaint plainly alleges that each of the Control Defendants had the power to, and did, appoint numerous BLI board members, including appointing themselves or their managing personnel to board seats, who then served as the chairperson of the board and/or on various standing committees of the board. *See* ¶¶ 26-30, 50-56, 60-62. Indeed, as alleged in the Complaint in no uncertain terms, Control Defendants controlled the board through these appointments. *Id.* These allegations further support the necessary showing of control at this stage of the litigation.

### 3.    Control Defendants' Equity Stakes

As with board seats, the Defendants also argue that their equity stakes in BLI cannot be used to be impute control. *See* BLI Defs.' MTD at 25; Nikon's MTD at 6; Celesta Defs.' MTD at 4; Sequoia's MTD at 4. Again, this is incorrect, as "[c]ourts have concluded that the mere fact that a person or entity hold a minority interest in a company is sufficient to show control over the company." *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 174119, at *36 (C.D. Cal. Jan. 16, 2013); *see also In*

*re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 638 (S.D.N.Y. 2007) (observing that allegations of minority ownership have been held "sufficient to survive a motion to dismiss, because it was not implausible that plaintiffs could develop a record that could support a finding of control").[31] Here, the Complaint plainly alleges significant equity ownership by each of the Control Defendants, ownership far in excess of that by any other person or entity. *See* ¶¶ 26-29, 51-55, 67. Together the Control Defendants beneficially owned 62.8% of all outstanding shares of BLI stock prior to the IPO and continued to own the majority of outstanding shares after the IPO and SPO. *See ¶¶* 49-55. These allegations further support the necessary showing of control at this stage of the litigation.

**4.      The Control Defendants' Significant Involvement in and Insight into the Day-to-Day Operations of the Company.**

In assessing allegations of control, courts also consider "the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions," *Kaplan*, 49 F.3d at 1382, including whether the "defendant has responsibility over an area of the company where the underlying misconduct occurred." *In re Willis Towers Watson PLC Proxy Litig.*, 439 F. Supp. 3d 704, 718 (E.D. Va. 2020); *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012). Here, in addition to the other indicia of control, the Control Defendants were involved in or had unique insight into the day-to-day operations of BLI, and thus, the underlying fraud.

As the founder and former CEO of BLI, in addition to being one of the Company's largest shareholders and serving as a member of the Board of Directors since 2011, Defendant Khandros was intimately familiar with the Company and its flagship product the Beacon. ¶ 29. Furthermore, even after transitioning from CEO in 2017, Khandros remained active in the day-to-day operations at the

---

[31] The Control Defendants cannot evade responsibility by dividing their stakes into the smallest possible remainder because "the absence of a substantial ownership of shares does not foreclose liability under the Act as a controlling person," *Hill York Corp. v. Am. Int'l Franchises, Inc.*, 448 F.2d 680, 694, 695 n.20 (5th Cir. 1971) (rejecting defendants' very argument here as "formalism" contrary to the plain language of the regulations). "[I]ndirect means of discipline or influence [necessary to plead control under §20(a)] need not be stock ownership. It may arise from *business relationships, interlocking directors, family relationships and a myriad of other factors*." *One Longhorn Land I, L.P. v. FF Arabian, LLC*, 2015 WL 7432360, *3 (E.D. Tex. Nov. 23, 2015) (emphasis added). As a result, the question of control is an "*intensely fact intensive question* requiring a qualitative consideration of *all alleged indicia* of power and influence over the issuer. ." *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2016 WL 215476, at *11 (S.D. Tex. Jan 19, 2016) (emphasis added). This inquiry cannot be answered by imposing an *arbitrary numerical threshold*, and the Court should reject control defendants' invitation to do so. *Id.* (emphasis added).

Company: in his own words, he "maintain[ed] a very active presence in the company" as he "directs his energies to creating and building strategic partnerships." ¶ 216. Strategic partnerships or business development deals and collaborations were an important component of many of the alleged false statements.

Similarly, Defendant Nikon was in the unique position to understand BLI's product pipeline to Asia, an important and growing market for the Company. ¶ 28. As the Company's exclusive distributor of products in Japan, Singapore, Thailand, and South Korea, as well as non-exclusive distributor in China, Nikon directly observed any issues with placing the platform with customers, as well as any trends in accounts receivable. *Id.*

Moreover, Nikon and Khandros, along with WRVI and Sequoia, had information rights gained as result of their early investment in the Company, and as such, had unique insight into the Company's operations and any shortcoming or failures of the Beacon. ¶¶ 30, 62-63, 194-95. All of these facts add credence to Plaintiffs' allegations of control.

### 5.   Defendants Cannot Disclaim their Control.

The Control Defendants improperly attempt to slice and dice the allegations of the Complaint. In their separate motions, the Control Defendants try to isolate themselves from each other, and then attempt to separately address each of the particular allegations of control described above. They then refer to case law holding that one factor or another is not sufficient to plead control. *E.g.*, BLI Defs.' MTD at 32. This is not appropriate on a motion to dismiss where Plaintiffs' allegations should be considered holistically rather than pieced and parceled out as Defendants attempt to do. *See Tellabs*, 551 U.S. at 325-26 ("[A]llegations must be considered collectively . . . . [T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"). Considering Plaintiffs' allegations in the aggregate, the inevitable conclusion is that the Control Defendants, both individually and collectively, had the ability to and did exercise control over BLI.

Similarly, Defendants' argument that Plaintiffs' allegations fall short of establishing control because they at most show collective, but not individual, ability to control BLI should also be rejected. First, as illustrated above, Plaintiffs adequately plead that each Control Defendant individually had the ability to control the Company. But, second, collective power is still power, and given the

circumstances here, Plaintiffs' allegations plausibly raise a right to relief under §20(a) against the Control Defendants through the collective ability to control the Company as well. *See e.g. Cobalt*, 2016 WL 215476, at \*11.

Because the Complaint credibly alleges both ownership and control during the Class Period, Defendants' motion to dismiss Plaintiffs' Section 15 and 20(a) claims must fail.

## VII.    OPPOSITION TO JUDICIAL NOTICE

Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6). *Lee v. Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). When "matters outside the pleadings are presented to and not excluded by the court," the 12(b)(6) motion converts into one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). Then, both parties must have the opportunity "to present all the material that is pertinent to the motion." *Id.* "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." *Khoja*, 899 F.3d at 899.

The Ninth Circuit Court of Appeals has identified "a concerning pattern in securities cases like this one: exploiting these procedures [*i.e.*, incorporation-by-reference and judicial notice] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja*, 899 F.3d at 899. As the Court of Appeals noted:

> Defendants face an alluring temptation to pile on numerous documents to their motions to dismiss to undermine the complaint, and hopefully dismiss the case at an early stage. Yet the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery. This risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access.

*Id.*

Ignoring that admonition, Defendants ask this Court to "take judicial notice of, and/or consider as incorporated by reference" thirty-six documents spanning approximately 300 pages as part of their

motions to dismiss ("RJN").[32] The RJN is improper for two reasons. *First*, Defendants fail to follow any of *Khoja*'s requirements for requesting judicial notice. *Second*, Defendants use the RJN exhibits to present an alternative set of "facts" in an attempt to contradict allegations of the Complaint. *See Khoja*, 899 F.3d at 999 ("If defendants are permitted to present their own version of the facts at the pleading stage . . . it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief."). While the existence of the documents Defendants seek noticed is not in dispute, the truth of many of their contents is. Because Defendants cite the extrinsic documents to create factual disputes about the Complaint's factual allegations, the Court cannot accept them as true in deciding Defendants' motion to dismiss under *Khoja*. *See* Part VII.B, *infra*.[33]

### A. The RJN Improperly Asks this Court to Consider Wholesale 36 Documents Without Meeting the Requirements of *Khoja* as to Any of Those Documents.

#### 1. The RJN Does Not Identify Even a Single Fact that May Be Noticed.

As this Court has explained, the "Ninth Circuit has clarified that if a court takes judicial notice of a document, it must specify what facts it judicially noticed from the document." *Marsh & McLennan Agency, LLC v. Teros Advisors, LLC*, 2021 WL 4133858, at *2 (N.D. Cal. Sept. 10, 2021) (citing *Khoja*, 899 F.3d at 999); *see also Khoja*, 899 F.3d at 999 ("A court must also consider—and identify—which fact or facts it is noticing . . . ."). Indeed, the Ninth Circuit recently held that a district court "did not abuse its discretion in declining to notice particular facts within Limcaco's second requests for judicial notice. One of those requests contained 209 pages, and Limcaco did not identify any particular facts within these documents. Thus, the court could not identify any judicially noticeable facts." *Limcaco v. Wynn*, 2023 WL 154965, at *3 (9th Cir. Jan. 11, 2023).

Since *Khoja* was decided, district courts have rejected requests for judicial notice that fail to identify any *facts* that purportedly should be judicially noticed. One court in this District recently explained that the "parties are not the first to ask this Court to take judicial notice of voluminous

---

[32] *See* BLI Defs.' Request for Judicial Notice, and to Consider Incorporated Documents, in Support of Motion to Dismiss Amended Complaint ("RJN") (Dkt. No. 127). The thirty-six documents are attached as exhibits to the Berkeley Lights Defendants' motion to dismiss. *See* Dkt. No. 126–2. Only the BLI Defendants submitted the RJN, but other defendants cite documents identified in the RJN in their motions to dismiss. *See* Underwriter Defs.' MTD at 9 (citing RJN Ex. 36); Nikon's MTD at 2 n.2) (citing RJN Ex. 1); Celesta MTD at 5 (citing RJN Ex. 1).

[33] Plaintiffs do not object to the RJN as to Exhibits 34–36.

OMNIBUS OPP'N TO DEFENDANTS' MOTIONS TO DISMISS - 56
Case No.: 4:21-cv-09497-HSG

materials without identifying the specific contents pertinent to their arguments. In fact, dumping large swaths of material into a request for judicial notice has become commonplace. This catch-all approach to requesting judicial notice, however, is not consistent with the law's requirements." *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020).

And district courts decline to review an accompanying motion to dismiss to ferret out what facts the defendants want judicially noticed. For example, one court recently explained that "the RJN asks to Court to consider hundreds of pages of exhibits without identifying any particular facts that are properly subject to judicial notice." *Mills v. Molina Healthcare, Inc.*, 2022 WL 17825534, at \*6 (C.D. Cal. Dec. 8, 2022). The court noted that the "Defendants argue in their reply that even though their RJN does not identify specific facts for which they seek judicial notice, their motion to dismiss does." *Id.* "But the Court declines Defendants' invitation to sift through dozens of pages of briefing on their motion to dismiss to attempt to determine the scope of each of Defendants' requests for judicial notice. Defendants will have the opportunity on summary judgment or at trial to produce evidence in support of their arguments. They have not shown at this stage any basis for the Court to consider their hundreds of pages of exhibits in its Rule 12(b)(6) analysis." *Id. See also Capaci v. Sports Rsch. Corp.*, 445 F. Supp. 3d 607, 617 (C.D. Cal. 2020) ("Because defendant does not identify which facts within the exhibits it asks the court to judicially notice nor does it explain why the court can judicially notice those facts, the court denies defendant's request for judicial notice."). Moreover, *Khoja* explained that "[j]ust because [a] document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja*, 899 F.3d at 999.

For these reasons, none of the RJN documents should be judicially noticed.

      **2.**      **Under the Incorporation by Reference Doctrine, Defendants Do Not Even Try To Identify which RJN Documents Allegedly Were Extensively Discussed in, or Formed the Basis of, the Complaint.**

Defendants may only "seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Khoja*, 889 F.3d at 1002. But Defendants' RJN here does not address that requirement at all. Indeed, in their motions to dismiss, Defendants do not even cite thirteen of the SEC documents submitted with the RJN, *see* BLI Defs.' MTD Exs. 2–9, 11, 13–14, and 16, let alone discuss in the RJN how they meet the *Khoja*

OMNIBUS OPP'N TO DEFENDANTS' MOTIONS TO DISMISS - 57
Case No.: 4:21-cv-09497-HSG

standard. *See Khoja*, 889 F.3d at 1001 ("How 'extensively' must the complaint refer to the document? This court has held that 'the mere mention of the existence of a document is insufficient to incorporate the contents of a document' under *Ritchie*.") (citing *United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003). Once again, Defendants leave it to the Court to decide which, if any, of the submitted SEC documents satisfy the *Khoja* standards. But that is not the Court's duty.

**B.** **The RJN Is An Improper Attempt to Argue Defendants' Versions of the Facts.**

**1.** **Defendants Improperly Ask the Court To Incorporate Documents En Masse to Allow Them to Challenge Plaintiffs' Allegations on the Merits.**

In *Khoja*, the Ninth Circuit explained that the "district court's reasoning . . . demonstrates the danger in incorporating documents en masse into complaints." 899 F.3d at 1014. The Court stated that "[a]lthough incorporation by reference generally permits courts to accept the truth of matters asserted in incorporated documents, we reiterate that it is improper to do so only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint." *Id.* The "incorporation-by-reference doctrine does not override the fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage." *Id.*

Despite those admonitions, Defendants ask this Court to incorporate eighteen SEC filings (*see* Exs. 1–18) and five transcripts of earning calls (*see* Exs. 20–24) into the Complaint, without any attempt to demonstrate that such en masse incorporation will be used for proper purposes. Instead, the RJN merely cites cases that have allowed the incorporation of such documents under the facts of those cases. Under *Khoja*, that cavalier approach to the incorporation-by-reference doctrine does not suffice. In a similar case, the court explained that "the parties' briefs make oblique references to the documents attached to their requests for judicial notice, but, with few exceptions, do not draw the Court's attention to the pertinent contents of these documents." *Threshold*, 445 F. Supp. 3d at 147. The court stated that "the parties have asked the Court to do much of the heavy lifting, ferreting out the pertinent passages for which each document was selected. The Ninth Circuit has long embraced the maxim that '[j]udges are not like pigs, hunting for truffles buried in briefs.'" *Id.* (citation omitted). For the same reasons, the RJN's invocation of the incorporation-by-reference doctrine should be rejected.

**2.      Defendants Improperly Ask this Court to Judicially Notice Analyst Reports that Defendants Cite for the Truth of the Matters Asserted.**

Defendants improperly ask this Court to take judicial notice of nine analyst reports. *See* Exs. 25–33. Defendants misleadingly contend that courts in securities actions "'routinely take judicial notice of analyst reports, not in order to take notice of the truth of the matters asserted therein, but in order to determine what may or may not have been disclosed to the public.'" RJN at 4 (emphasis added; citation omitted). But the RJN does not make *any* attempt to prove that even a single analyst report is admissible to determine what may have been disclosed to the public. And that failure alone requires that the RJN be denied for those documents.

And once again, even though the Court has no duty to search the motions to dismiss in order to determine whether judicial notice is proper, a review of the motions demonstrates that not a single reference by Defendants to analyst reports is to determine what may or may not have been disclosed to the public. Instead, Defendants argue that the submitted analyst reports show that Plaintiffs and the Scorpion Report are *wrong* on the merits. Indeed, Defendants do not even try to hide that fact. For example, Defendants argue that "Scorpion lobbed 'accusations' that were not merited. *See e.g.*, Ex. 26 at 1 (J.P. Morgan: '[W]e see *little merit* in most of the accusations made in the short report.')." BLI Defs.' MTD at 20 (emphasis added). Time and again, Defendants cite the analyst reports for the purported truth of their assertions, *not* to show what was disclosed to the public:

- Research analysts issued similar comments [about the Scorpion Report]. Ex. 27 at 1 (Stifel: "Our view on Berkeley's technology and platform remains unchanged."); Ex. 28 at 1 (BTIG: "our thinking that the claims in the short report are not accurate"). *Id.* at 5.

- Looking past the report's inflammatory rhetoric, one analyst confirmed that it revealed nothing new . . . . *Id.* at 20 (citing Ex. 25).

- No pleaded facts show the market treated the CEO transition as revealing prior statements as false. Rather, analysts viewed it as evidencing "a business model shift" to "find a CEO with experience more aligned" with the subscription model approach and partnership business, plus the need for a CEO with public company experience. Ex. 29 at 1 (Cowen); Ex. 32 at 1 (BTIG: "[W]e don't view the CEO changes as due to the miss, but to higher-level succession planning and finding the best fit for Mr. Hobbs."). *Id.* at 22.

- Analysts explained that the earnings miss was 'attributed entirely to the delay of 3 Beacon placements . . . all of which occurred within the last week of the quarter.' Ex. 30 at 1 (J.P. Morgan). *Id.* at 5.

- The nonculpable inference is that the CEO change was for business reasons, as understood by the market, including the need for a CEO with public company experience. *E.g.*, Ex. 33 at 1 (William Blair: 'Dr. Hobbs informed us that he asked for this transition to take place so that the company could bring in a leader with more experience at running multiple businesses across multiple markets.'); Ex. 31 at 1 (Morgan Stanley: "[B]oth Dr. Hobbs and the Board . . . believe that given the current size and stage of BLI, the Company will need a seasoned CEO with a proven track record of scaling a company."). *Id.* at 18.

All of those assertions by the BLI Defendants are designed to convince the Court that the analysts they quote are correct on the merits. Those defendants never argue that they showed what may or may not have been disclosed to the public. *See Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*, 2020 WL 1244936, at *6 (N.D. Cal. Mar. 16, 2020) (this Court declined to take judicial notice of analyst report because "Defendants offer it to contradict Plaintiffs' allegations"); *Energy Recovery*, 2016 WL 324150, at *3 (N.D. Cal. Jan. 27, 2016) ("Determining the ultimate truth or falsity of the statements contained in the analyst reports is not a proper subject of judicial notice.").

## VIII.   CONCLUSION

For these reasons, the Court should deny the motions to dismiss filed by the BLI Defendants (Dkt. No. 126), the Underwriter Defendants (Dkt. No. 128), Nikon (Dkt. No. 129), and the Celesta Defendants (Dkt. No.131), Sequoia Capital (Dkt. No. 132). Additionally, apart from Exhibits 34-36, the BLI Defendants' request for judicial notice (Dkt. No. 127) should be denied in its entirety.

Respectfully submitted,

Dated: January 17, 2023                    HAGENS BERMAN SOBOL SHAPIRO LLP

By:   */s/ Lucas E. Gilmore*
        LUCAS E. GILMORE

Reed R. Kathrein (SBN 139304)
Lucas E. Gilmore (SBN 250893)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Raffi A. Melanson (*pro hac vice* pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
Telephone: (617) 475-1978
Facsimile: (617) 482-3003
raffim@hbsslaw.com

*Attorneys for Lead Plaintiff Michael Damelio and Lead Counsel*

Jessica T. Shinnefield (SBN 234432)
Lonnie A. Browne (SBN 293171)
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
jshinnefield@rgrdlaw.com
*lbrowne@rgrdlaw.com*

*Attorneys for Plaintiff Pompano Beach Police and Firefighters' Retirement System*

Robert A. Sugarman
Pedro A. Herrera
SUGARMAN SUSSKIND BRASWELL & HERRERA
150 Alhambra Circle, Suite 725
Coral Gables, FL 33134
Telephone: (305) 529-2801
Facsimile: (305) 447-8115

sugarman@sugarmansusskind.com
pherrera@sugarmansusskind.com

*Liaison Counsel for Pompano Beach Police and Firefighters Retirement System*