UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTOR J. NG, et al., | Case No. 21-cv-09497-HSG |
| Plaintiffs, | **ORDER GRANTING MOTIONS TO DISMISS** |
| v. | |
| BERKELEY LIGHTS, INC., et al., | Re: Dkt. Nos. 126, 128, 129, 131, 132 |
| Defendants. | |

Pending before the Court are several motions to dismiss filed by various Defendants. Dkt. Nos. 126, 128, 129, 131, 132. Plaintiffs filed an omnibus opposition to Defendants' separately filed motions. *See* Dkt. No. 137. The Court finds these matters appropriate for disposition without oral argument and the matters are deemed submitted. *See* Civil L.R. 7-1(b). For the reasons detailed below, the Court **GRANTS** Defendants' motions **WITH LEAVE TO AMEND**.

## I.   BACKGROUND

In May 2022, the Court granted Michael Damelio's motion for appointment as Lead Plaintiff in this putative securities class action. *See* Dkt. No. 81. Lead Plaintiff Damelio and Plaintiff Pompano Beach Police & Firefighters' Retirement System then filed a Consolidated Class Action Complaint in July 2022. Dkt. No. 89 ("CAC"). They brought this action against Defendants Berkeley Lights, Inc. ("BLI"); certain current and former senior BLI executives and directors;[1] several venture capital firms that invested in BLI;[2] and the underwriting firms that

---

[1] The Individual Defendants include Eric D. Hobbs, Shaun M. Holt, Kurt Wood, Igor Khandros, Michael Marks, Sarah Boyce, Gregory Lucier, Michael Moritz, Elizabeth Nelson, James Rothman, Ming Wu, and Makoto Shintani. *See* CAC at ¶¶ 22–24, 29, 262.
[2] The Venture Capital Defendants include Sequoia Capital, Celesta Capital (f/k/a WRVI Capital), Walden Riverwood GP, LLC, Walden Riverwood Ventures, L.P., WIIG Communications Management LLC, WRV-BLI LLC, WRV-BLI II, LLC, WRV-BLI III LLC, WRV-BLI IV, LLC,

United States District Court
Northern District of California

sponsored BLI's July 2020 Initial Public Offering ("IPO").[3]

According to the CAC, Defendants made false and misleading statements and omissions regarding the functionality of BLI's flagship product, a laboratory instrument called the Beacon. *See, e.g.*, CAC at ¶¶ 1, 10. The Beacon is a proprietary platform designed to analyze and process cell data for use in developing and commercializing biotherapeutics and other cell-based products. *See id.* at ¶¶ 3, 33, 35. Plaintiffs contend that sales of the Beacon and BLI's other advanced automation systems constitute the majority of BLI's revenue. *Id.* at ¶¶ 36–39, 43–48, 68.

Plaintiffs further allege that in the IPO Registration Statement and throughout the relevant class period, Defendants highlighted the superiority of the Beacon compared to other instruments on the market. *See id.* at ¶¶ 1, 6, 9, 70–71, 80, 88–91; *see, e.g.,* Dkt. No. 126-2 (Ex. 1) (BLI's IPO Registration Statement); Dkt. No. 126-13 (Ex. 12) (BLI's Q1 2021 Form 10-Q). Plaintiffs allege that BLI marketed the Beacon as faster and more precise. *See, e.g.*, CAC at ¶¶ 4, 6, 34–35. But according to Plaintiffs, the Beacon was unreliable due to several design and manufacturing defects. *See id.* at ¶¶ 1, 10, 79, 83. For example, Plaintiffs assert that the Beacon suffered from breakdowns, high error rates, and data integrity issues that prevented customers from using the technology at scale. *Id.* at ¶ 10. According to Plaintiffs, numerous customers had complained about such issues but Defendants failed to disclose this. *Id.* at ¶¶ 10, 83, 134. Additionally, Plaintiffs contend that Defendants misrepresented BLI's past financial growth and future growth potential. *See id.* at ¶¶ 1, 7, 10, 72, 75, 77–78, 81, 83–117. Specifically, Defendants allegedly touted a total addressable market ("TAM") of $23 billion. *Id.* However, Plaintiffs contend that the actual market for BLI's products was just a fraction of this $23 billion due to the Beacon's performance issues and relatively high cost. *See id.* at ¶ 83.

BLI sold approximately 9.35 million shares of common stock for $22 per share during the IPO. *See id.* at ¶¶ 8, 40. A few months later, the company conducted a secondary offering ("SPO") in which the Individual Defendants and Venture Capital Defendants sold their shares at

---

WRV GP II, LLC, and WRV II, L.P., and Nikon Corporation who had invested in BLI. *See* CAC at ¶¶ 5, 26–28, 30.
[3] The Underwriter Defendants include J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Cowen and Company, LLC, and William Blair & Company L.L.C. *See* CAC at ¶ 263.

United States District Court
Northern District of California

United States District Court
Northern District of California

$86 per share.  *See id.* at ¶¶ 42, 69, 76.  Plaintiffs contend that the flaws in BLI's business model and flagship product began emerging after both the IPO and SPO.  *See id.* at ¶ 120.  For example, in May 2021, BLI released its first quarter results, and had sold fewer Beacons than it did the prior quarter.  *Id.* at ¶ 121.  The company also introduced a subscription model, which Plaintiffs contend would ultimately lead to fewer products being sold.  *Id.* at ¶¶ 122–26.  BLI continued to miss its quarterly projections, and its stock price subsequently fell.  *Id.* at ¶¶ 127–30, 131.

In September 2021, short-seller Scorpion Capital released a report in which it revealed the alleged failures of BLI's business model and the Beacon.  *See id.* at ¶¶ 2, 12, 136–38; *see also* Dkt. No. 89-1 (Ex. A) ("Scorpion Report").  The report was based on interviews with former employees, industry scientists, and several of BLI's largest customers who allegedly stated that they were "tricked" or "misled" into buying the Beacon.  CAC at ¶¶ 136–38.  The report concluded that only a small number of biotech companies could afford the BLI instruments, and that customer complaints would further hamper the company's growth potential.  *Id.* at ¶ 138.  Following the Scorpion Report, BLI's stock price dropped to $23.53 over the course of two days, and below the IPO-offering price by the end of the following week.  *See id.* at ¶¶ 139, 145.  The stock price fell further in January 2022 following BLI's announcement that its total revenue for 2021 was expected to fall far short of projections and that the company was replacing its CEO.  *See id.* at ¶¶ 148–52.

Based on these allegations, Plaintiffs bring causes of action on behalf of a putative class under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"); Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5.  *See id.* at ¶¶ 245–304.  Defendants have moved to dismiss the CAC in its entirety.  *See* Dkt. Nos. 126, 128, 129, 131, 132.

## II.   LEGAL STANDARD

### A.   Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be

United States District Court
Northern District of California

granted under Federal Rule of Civil Procedure 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### B.    Heightened Pleading Standard

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . ."  15 U.S.C. § 78j(b).  Under this section, the SEC promulgated Rule 10b–5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5(b).  To prevail on a claim for violations of either Section 10(b) or Rule 10b–5, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

At the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b–5

1    must not only meet the requirements of Federal Rule of Civil Procedure 8, but also satisfy the

2    heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private

3    Securities Litigation Reform Act ("PSLRA").  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869,

4    876 (9th Cir. 2012).  Under Rule 9(b), claims alleging fraud are subject to a heightened pleading

5    requirement, which requires that a party "state with particularity the circumstances constituting

6    fraud or mistake." Fed. R. Civ. P. 9(b).  Additionally, all private securities fraud complaints are

7    subject to the "more exacting pleading requirements" of the PSLRA, which require that the

8    complaint plead with particularity both falsity and scienter.  *Zucco Partners, LLC v. Digimarc*

9    *Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

### III.    REQUEST FOR JUDICIAL NOTICE

11        Defendants ask the Court to take judicial notice of 36 exhibits.  Dkt. No. 127.  Defendants

12   argue that the exhibits are appropriately considered under the doctrines of judicial notice and

13   incorporation by reference.  Plaintiffs object to Defendants' request as to at least 33 of the 36

14   documents.  *See generally* Dkt. No. 137 at 67–72.[4]

15        **A.    Legal Standard**

16        "Generally, district courts may not consider material outside the pleadings when assessing

17   the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure."  *In re*

18   *Eventbrite, Inc. Sec. Litig.*, No. 18-CV-02019-EJD, 2020 WL 2042078, at *7 (N.D. Cal. Apr. 28,

19   2020) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); *Khoja v. Orexigen*

20   *Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018)); *see also* Fed. R. Civ. P. 12(d).  "This rule

21   does not apply to the incorporation by reference doctrine or judicial notice under Federal Rule of

22   Evidence 201."  *Eventbrite*, 2020 WL 2042078, at *7 (citing *Khoja*, 899 F.3d at 998).

23        A court may take judicial notice of an "adjudicative fact" pursuant to the Federal Rules of

24   Evidence, if that fact is one "that is not subject to reasonable dispute because it:  (1) is generally

25   known within the trial court's territorial jurisdiction; or (2) can be accurately and readily

26   determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

27

28   _____

[4] All references to page numbers in filings are to the ECF pagination at the top of the document.

United States District Court
Northern District of California

1    Thus, under Rule 201, courts may "take judicial notice of matters of public record, but not of facts

2    that may be subject to reasonable dispute." *United States v. Corinthian Colls.*, 655 F.3d 984, 999

3    (9th Cir. 2011) (internal quotation marks and citation omitted).

4         In the Ninth Circuit, incorporation by reference is a doctrine that "treats certain documents

5    as though they are part of the complaint itself." *Khoja*, 899 F.3d at 1002.  A document may be

6    incorporated by reference into a complaint "if the plaintiff refers extensively to the document or

7    the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908

8    (9th Cir. 2003).  "Once a document is deemed incorporated by reference, the entire document is

9    assumed to be true for purposes of a motion to dismiss, and both parties—and the Court—are free

10   to refer to any of its contents." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir.

11   2014) (internal quotation marks and citation omitted).

12        **B.    Analysis**

13         Plaintiffs oppose judicial notice of Exhibits 1–18 and 20–24 because they contend

14   Defendants' request is an improper attempt to challenge the CAC's allegations on the merits.  Dkt.

15   No. 137 at 70.  But the Ninth Circuit has explained that courts may take judicial notice of

16   documents to show "that the market was aware of the information contained" in those documents.

17   *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

18        Exhibits 1-19 are public documents filed with the SEC.  The "accuracy" of these public

19   documents "is not reasonably subject to dispute." *Wochos v. Tesla, Inc.*, No. 17-CV-05828-CRB,

20   2018 WL 4076437, at *1 (N.D. Cal. Aug. 27, 2018); *see Dreiling v. Am. Exp. Co.*, 458 F.3d 942,

21   946 n.2 (9th Cir. 2006) (noting that SEC filings are subject to judicial notice); *In re Yahoo! Inc.*

22   *Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *10 (N.D. Cal.

23   Aug. 30, 2017) ("[B]oth SEC filings and documents on government websites are proper subjects

24   of judicial notice.").  Accordingly, the Court **GRANTS** Defendants' request for judicial notice as

25   to Exhibits 1–19.

26        Exhibits 20–24 are transcripts of investor earnings calls cited in the complaint.  These

27   documents are incorporated by reference because the complaint explicitly and repeatedly refers to

28   excerpts of these exhibits to support its claims.  *See Khoja*, 899 F.3d at 998 ("a defendant may

United States District Court
Northern District of California

1   seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the

2   document or the document forms the basis of the plaintiff's claim.'") (quoting *Ritchie*, 342 F.3d at

3   907); *see, e.g.*, *Mulquin v. Nektar Therapeutics*, 510 F. Supp. 3d 854, 863 (N.D. Cal. 2020) ("The

4   Court will consider the investor presentation transcripts and investor presentation slide decks that

5   Plaintiffs allege contain false and/or misleading statements for the purpose of determining what

6   was disclosed to the market.").  Finding these documents incorporated by reference, the Court

7   **GRANTS** the motion as to Exhibits 20–24.

8        The Court takes notice of Exhibits 1-19 and 20–24 for the purpose of considering what was

9   disclosed to the market.  In doing so, the Court does not assume the truth of any of the facts

10  asserted.  *See Pardi v. Tricida, Inc.*, No. 21-CV-00076-HSG, 2022 WL 3018144, at *3–4 (N.D.

11  Cal. July 29, 2022); *Wochos*, 2018 WL 4076437, at *2.

12       Exhibits 25–33 are analyst reports about BLI.  Defendants acknowledge that of these

13  documents, Plaintiffs only explicitly refer to Exhibit 26 in the complaint.  *See* Dkt. No. 127 at 6;

14  Dkt. No. 139 at 5–6.  Specifically, Plaintiffs quote an excerpt of Exhibit 26 in support of their

15  allegations that BLI continued to issue false statements to minimize damage caused by the

16  Scorpion Report.  CAC at ¶¶ 146–47.  Given Plaintiffs' reliance on a portion of this document to

17  detail a basis for the alleged falsity in Defendants' statements, the Court finds it incorporated by

18  reference, and **GRANTS** Defendants' request as to Exhibit 26.  *See Mulquin*, 510 F. Supp. 3d at

19  863.  Again, the Court need not assume the truth of any of the facts asserted.  *Pardi*, 2022 WL

20  3018144, at *3–4; *Wochos*, 2018 WL 4076437, at *2.  Because Exhibits 25, 27–33 are not

21  specifically referenced in the complaint or relevant to the Court's analysis because they are offered

22  to dispute the CAC's well-pled allegations, Defendants' request as to those exhibits is **DENIED**.

23  *See In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 764 (N.D. Cal. 2020) (denying request for

24  judicial notice where exhibits were neither specifically referenced in the operative complaint nor

25  relevant to the Court's analysis).

26       Finally, Defendants seek judicial notice of Exhibits 34–36.  Exhibit 34 is an excerpt of a

27  profile of BLI taken from a public website, and a portion of this exhibit is quoted in the complaint.

28  *See* CAC at ¶ 3.  Exhibit 35 is a table of daily share price data for BLI throughout the relevant

class period, retrieved from a public website.  Exhibit 36 is Lead Plaintiff Damelio's certification

of his purchases of BLI stock.  *See* Dkt. No. 25-2.  Plaintiffs do not object to Defendants' request

for judicial notice as to Exhibits 34–36.  *See* Dkt. No. 137 at 68 n.33.  In light of Plaintiffs' lack of

opposition, the Court **GRANTS** Defendants' request as to Exhibits 34–36.

## IV.   MOTIONS TO DISMISS

### A.   Section 10(b) and Rule 10b-5 Claims

Plaintiffs allege that BLI and the Individual Defendants violated Section 10(b) of the

Exchange Act and Rule 10b-5 by making false statements or omissions about BLI's technology

and future revenue prospects.  *See* CAC at ¶¶ 245–251.  To plead a claim under section 10(b) and

Rule 10b-5, Plaintiffs must allege: "(1) a material misrepresentation or omission by [Defendants];

(2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale

of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

causation." *Macomb Cty. Emps. Ret. Sys. v. Align Tech., Inc*., 39 F.4th 1092, 1098 (9th Cir.

2022).

#### i.   Legal Standard for Evaluating Short-Seller Reports

As an initial matter, Defendants contend that the allegations in the CAC are insufficient

because they are premised on the Scorpion Report, which was issued by a short-seller with its own

obvious self-interest in BLI's stock price declining.  *See* Dkt. No. 126 at 6–8.  Despite

Defendants' suggestion otherwise, the Ninth Circuit has not held that short-seller reports are per se

unreliable.  *Id.*  Rather, as both parties recognize, the critical issue is the character of the report

itself.  *Compare* Dkt. No. 137 at 7–11, *with* Dkt. No. 138 at 2–5.

Because the Scorpion Report was written by Scorpion Capital, and not a named author, "it

falls 'under the umbrella of [information provided by] confidential witnesses.'"  *Hershewe v.

JOYY Inc*., No. 2:20-CV-10611-SB-AFM, 2021 WL 6536670, at *4 (C.D. Cal. Nov. 5, 2021)

(citation omitted); *see also In re Nektar Therapeutics*, No. 18-CV-06607-HSG, 2020 WL

3962004, at *10 (N.D. Cal. July 13, 2020) (where a securities plaintiff relies on an opinion,

including one presented in a short-seller's report, "such factual allegations are subject to the same

standard applied to evaluate facts alleged to have originated with any confidential informant (or

United States District Court
Northern District of California

United States District Court
Northern District of California

other witness).") (internal quotation marks and citations omitted).  "This requires allegations sufficient to 'support the probability that a person in the position occupied by the [confidential] source would possess the information alleged.'"  *Nektar*, 2020 WL 3962004, at *10 (citation omitted).

"The PSLRA does not necessarily require that a plaintiff name his confidential witnesses." *Glazer Cap. Mgmt., L.P. v. Forescout Tech., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (citation omitted).  "However, to comply with the PSLRA's particularity requirement, plaintiffs must 'reveal with particularity the sources of their information.'"  *Id.* (citation omitted).  Accordingly, "[a] complaint relying on confidential witness statements must describe the confidential witnesses 'with sufficient particularity to establish their reliability and personal knowledge.'"  *Id.* (quoting *Zucco*, 552 F.3d at 995).  "In determining whether the complaint has 'provide[d] an adequate basis for determining that the witnesses in question have personal knowledge of the events they report,' the court considers the level of detail provided by the confidential witnesses, the plausibility of the allegations, the number of sources, the reliability of the sources, corroborating facts, and similar indicia of reliability."  *Id.* (citation omitted).

### ii.  Falsity

#### a.  Legal Standard for Falsity

Defendants contend that the statements challenged in the CAC are not materially false or misleading.  *See* Dkt. No. 126 at 13–22.  "Falsity is alleged when a plaintiff points to [the] defendant's statements that directly contradict what the defendant knew at that time."  *Khoja*, 899 F.3d at 1008.  "In setting forth the reasons why they contend that each challenged statement is misleading, securities plaintiffs may rely either on an affirmative misrepresentation theory or an omission theory."  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (citing 17 C.F.R. § 240.10b–5(b)).  "Under Rule 10b–5, an affirmative misrepresentation is an 'untrue statement of a material fact,' and a fraudulent omission is a failure to 'state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.'"  *Id.*

"A statement is misleading if it would give a reasonable investor the impression of a state

of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (quotations and alterations omitted). "To be misleading, a statement must be 'capable of objective verification.'" *Id.* (quoting *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)). "For example, 'puffing'—expressing an opinion rather than a knowingly false statement of fact—is not misleading." *Id.*; *see also In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) ("Generally, such statements consist of forward-looking or generalized statements of optimism that are 'not capable of objective verification,' and 'lack[ ] a standard against which a reasonable investor could expect them to be pegged.'") (citations omitted). However, even "general statements of optimism, when taken in context," may be misleading "when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).

"Even if a statement is not false, it may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008–09. "An omission is material when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available." *Irving Firemen's Relief & Ret. Fund v. Uber Tech.*, 398 F. Supp. 3d 549, 555–56 (N.D. Cal. 2019) (citation omitted). "Omissions are actionable only where they make the actual statements misleading; it is not sufficient that an investor merely would consider the omitted information significant." *Id.* (internal quotation marks and citation omitted). "For the purposes of a 10b–5 claim, a misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

### b. The Statements at Issue

The statements challenged by Plaintiffs are susceptible to grouping into two categories: (1) the Beacon's capabilities and (2) BLI's finances and growth prospects. The Court next turns to

the specific alleged misstatements in each category and Plaintiffs' allegations of falsity as they pertain to these statements.

### 1. The Beacon's Functionality

Defendants argue that Plaintiffs fail to plead particularized facts showing that the statements about the Beacon amounted to more than puffery and opinion statements, or that the identified representations were false or misleading at the time they were made. Dkt. No. 126 at 15–19.

The challenged statements regarding the Beacon may be grouped into two categories: (a) characterizations and (b) purported misstatements by virtue of omissions. The Court addresses each grouping in turn.

### (a) Characterizations

Plaintiffs assert that the IPO Registration Statement and Prospectus contained characterizations of the Beacon that overstated the capabilities and purported superiority of the platform compared to existing technology on the market. *See, e.g.,* CAC at ¶ 80. For example, in the IPO Registration Statement, BLI stated its platform delivered "the best cells," and that "this level of scale and precision is not attainable with other approaches." *Id.*[5]

To survive this ground for dismissal, Plaintiffs must identify the statements at issue, set forth what is false or misleading about each statement, and articulate why each statement was false or misleading at the time it was made. *Rigel*, 697 F.3d at 876. In pleading the falsity of opinion statements, and specifically when proceeding on a theory of material misrepresentation, Plaintiffs

---

[5] Defendants accurately note that many of the challenged statements were prefaced with the words "we believe," which the CAC omits. Dkt. No. 126 at 17; *compare* CAC at ¶ 266 *with* Dkt. No. 126-2 (Ex. 1) at 106. As a threshold matter, the inaccuracy of Plaintiffs' allegations as to these statements calls into question the reliability of their representations in the entire CAC. Moreover, the inclusion of the words "we believe" may trigger the application of a different standard. *See, e.g., City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) ("when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that 'the supporting fact the speaker supplied is untrue.'"); *Wochos*, 985 F.3d at 1189 ("some sentences that begin with opinion words like 'I believe' contain *embedded* statements of fact.") (emphasis in original) (citation omitted). However, under either standard, the Court finds that Plaintiffs fail to plead falsity because the CAC does not contain particularized allegations plausibly alleging that any of the statements were materially false or misleading when made.

United States District Court
Northern District of California

1    "must allege both that 'the speaker did not hold the belief she professed' and that the belief is

2    objectively untrue." *Dearborn Heights*, 856 F.3d at 616.  Relying on quotes from the Scorpion

3    Report claiming the Beacon was a "a $2 million lemon," CAC at ¶ 136, Plaintiffs contend that the

4    Beacon's "numerous design and manufacturing problems were so severe that they rendered the

5    machine a nonviable product."  Dkt No. 137 at 27.

6         The CAC, however, does not explain with any level of specificity how any of the identified

7    characterizations of the Beacon are false.  These particular statements are not objectively

8    verifiable, and instead constitute classic puffery.  "These 'vague statements of optimism like

9    "good," "well-regarded," or other feel good monikers, are not actionable because professional

10   investors, and most amateur investors as well, know how to devalue the optimism of corporate

11   executives.'"  *Macomb*, 39 F.4th at 1099 (citation omitted); *see also Or. Pub. Emps. Ret. Fund*,

12   774 F.3d at 606 ("'When valuing corporations,[ ] investors do not rely on vague statements of

13   optimism like "good," "well-regarded," or other feel good monikers.  This mildly optimistic,

14   subjective assessment hardly amounts to a securities violation.'"); *Cornerstone*, 355 F. Supp. 2d at

15   1087 ("Interpretation of the 'mere puffery' rule has distinguished cases of 'definitive positive

16   projections' from statements projecting 'excellent results,' a 'blowout winner' product,

17   'significant sales gains,' and '10% to 30% growth rate over the next several years.'") (citation

18   omitted).  And Plaintiffs fail to adequately allege, as they must, that "Defendants 'did not hold the

19   belief [they] professed and that the belief is objectively untrue.'"  *Markette v. XOMA Corp.*, No.

20   15-CV-03425-HSG, 2017 WL 4310759, at *5 (N.D. Cal. Sept. 28, 2017) (quoting *Dearborn*

21   *Heights*, 856 F.3d at 616). Plaintiffs fail to plausibly plead any basis for concluding that any of

22   Defendants' opinion statements directly contradicted what they knew at the time and were

23   therefore false, *Khoja*, 899 F.3d at 1008, and generalized allegations characterizing "defects" and

24   "complaints" do not supply the necessary detail under the PSLRA.

25              **(b)  Statements Alleged to be False or Misleading Under an**
                      **Omissions Theory**
26
27        The CAC also identifies numerous factual statements that allegedly misled investors as to

28   the product's capabilities because the statements failed to disclose unfavorable facts about BLI

United States District Court
Northern District of California

and problems with the Beacon. *See, e.g.*, CAC at ¶¶ 80, 85, 88, 107, 266. For example, the IPO Registration Statement described how the Beacon provides "the most advanced environment for rapid functional characterization of single cells at scale" and "the deepest information, with linked phenotypic and genotypic data, on tens of thousands of live single cells relevant to the customers' end product specifications." *Id.* at ¶ 80. Plaintiffs also identify statements claiming that the Beacon allows customers "to find the best cells" by offering advanced capabilities like "controlling the environment around each cell," "[p]erforming a broad range of workflows," and "[d]igitally aggregating" data for each cell. *Id.* at ¶¶ 80, 266. BLI also stated that its platform "captures and delivers rich single-cell data to find the best cells" and "allows for a high level of control over live single cells or other micro-objects throughout the functional characterization process." *Id.* at ¶ 85.

Similarly, Defendant Hobbs claimed on an earnings call that BLI offered "the most advanced environment for functional testing of live single cells," and that the BLI "platform enables customers to perform standardized and automated workflows, with precise control over the environment, which enables functional testing of 10s of thousands of live single cells in parallel." *Id.* at ¶ 88. Defendant Hobbs also represented that BLI's machines created "the largest data cube for single cells in the industry" and that BLI was "the only Company commercializing a platform that can do this in a scalable way." *Id.* In addition, the 2Q21 Form 10-Q highlighted the Beacon's claimed capabilities and effectiveness, stating that the platform "is a fully integrated, end-to-end solution, comprised of proprietary consumables, including our OptoSelect chips and reagent kits, advanced automation systems and advanced application and workflow software." *Id.* at ¶ 107.

Plaintiffs contend these statements were materially false and misleading because they failed to disclose adverse facts pertaining to BLI's business, operations, and financial condition. *Id.* at ¶ 83. This appears to be Plaintiffs' primary theory. Namely, they contend the Beacon "suffered from numerous design and manufacturing defects," and that BLI had received "numerous customer complaints regarding the durability and effectiveness" of its automation systems. *Id.* Plaintiffs further assert that the enumerated "Risk Factors" were "generic" and "did

not disclose the specific risks associated with the capabilities and reliability of the [BLI] platform and their impact on [BLI's] business, operations, and financial condition." *Id*. at ¶ 269.[6]

Plaintiffs' omission theory fails to pass muster under the PSLRA. Although "general statements of optimism" made against a clearly pessimistic backdrop "may form a basis for a securities fraud claim," the CAC does not sufficiently plead this. *Macomb*, 39 F.4th at 1099 (quoting *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014)). The Court agrees with Defendants that BLI was not required to disclose that its product had experienced defects or recite the specifics of all customer complaints every time it described the Beacon. *See* Dkt. No. 126 at 18–19. Importantly, the CAC fails to adequately allege a link between any of Defendants' specific representations and Plaintiffs' generalized allegations regarding the Beacon's defects and customer complaints so as to plausibly plead that omitting information regarding these topics "affirmatively led [Plaintiffs] in a wrong direction (rather than merely omitted to discuss certain matters)." *In re OmniVision Tech., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1101 (N.D. Cal. 2013) (emphasis omitted); *see also Markette*, 2017 WL 4310759, at *7. Other courts in this district have rejected allegations as insufficient where, as here, "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves and the [CAC] does not contain any particularized allegations demonstrating that any of the statements were materially false or misleading when made." *Jui-Yang Hong v. Extreme Networks, Inc.*, No. 15-CV-04883-BLF, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017); *accord In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 2857397, at *15–16 (N.D. Cal. June 2, 2020). "Without specific allegations to connect the dots, [p]laintiffs' theory fails to plead securities fraud." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 832 (9th Cir. 2022) (finding plaintiffs did not adequately allege falsity where they failed to "sufficiently explain what the clinical trial would have shown without the alleged outlier

---

[6] Plaintiffs acknowledge that the IPO Registration Statement included a statement regarding one of its "Risk Factors," noting that the BLI platform is comprised of systems and software "which may contain undetected errors or defects and may not meet the expectations of [its] customers, which means [its] business, financial condition, results of operations and prospects could suffer." *Id*. at ¶ 267.

data" and "specify how that would have affected the investing public's assessment of the drug").

Nor does the Scorpion Report supply the necessary detail. Plaintiffs rely heavily, if not exclusively, on the Scorpion Report in the CAC. *See, e.g.*, CAC at ¶ 2 n.1 (incorporating all the allegations in the Scorpion Report); *id.* at ¶ 117 ("the [Beacon's] high error rates, repeated equipment malfunctions, and dissatisfied customers documented in the Scorpion [ ] Report were true, and had a material effect on the successful growth of [BLI]."). The Court, however, has serious reservations as to the reliability of the Scorpion Report, and finds that it does not adequately meet Plaintiffs' PSLRA burden for several reasons.

First, the Scorpion Report is a report by a short-seller. Although short-sellers "can perform a useful function by bringing information that securities are overvalued to the market[,] . . . they have an obvious motive to exaggerate the infirmities of the securities in which they speculate." *Hershewe*, 2021 WL 6536670, at *4 (citation omitted). Because Scorpion Capital had a financial interest in BLI's decline, the Court assesses the report's allegations with caution.

Second, the Scorpion Report is based on "confidential" sources that are essentially unidentified and unspecified. Though Plaintiffs need not necessarily name these confidential sources, they must describe them "with sufficient particularity to establish their reliability and personal knowledge." *Glazer Cap. Mgmt.*, 63 F.4th at 766. To this end, Plaintiffs contend that the Scorpion Report describes interviews with seven former BLI employees and fourteen "major BLI customers." Dkt No. 137 at 20 (citing CAC at ¶¶ 142–43). Plaintiffs assert that the information provided by these sources "shows that the interviewed employees held relevant roles" at BLI "through which they could observe details about the Beacon and BLI's finances." *Id.* Plaintiffs also assert that the report "summarizes information provided by 17 scientists and users across 14 of BLI's largest customers—all of whom worked with the Company's platform and confirmed that the Beacon suffered from numerous design and manufacturing defects hindering its represented functionality and marketability." *Id.* at 21 (citing *no* paragraph of the CAC).

However, the CAC entirely relies on the self-interested short-seller's *own* assertions that the characterizations passed on by the witnesses were credible. *See* CAC at ¶ 143; *see also Nektar*, 34 F.4th at 837 ("conclusory adjectives do not meet the PSLRA's heightened pleading

1    requirements.").  Importantly, the allegations in the CAC (like those in the Scorpion Report itself)

2    include no particularized details about these former employees' job titles or period of employment,

3    nor do they provide details establishing that any of the witnesses had routine interactions with the

4    Beacon or firsthand knowledge of facts contradicting BLI's executives' public statements.  *See id*.

5    at ¶¶ 137–38.  Likewise, Plaintiffs plead no specific details about the positions of the interviewed

6    customers, and they fail to allege particularized facts to substantiate the Scorpion Report's overall

7    subjective conclusion that all of these witnesses "indicated that BLI's machine is a flop."  *Id*. at

8    ¶ 137.  To be credited as reliable, a witness must be in a position to personally know the

9    information alleged.  *See Zucco*, 552 F.3d at 996; *see, e.g., Quality Sys.,* 865 F.3d at 1137–39

10   (confidential witnesses found reliable when they knew firsthand that the executives were engaged

11   in a "continuous reforecasting process" based on real-time information concerning the company's

12   revenues and income, and "were aware of real time data that contradicted their public

13   statements").  As pled, the allegations in the CAC fail to allege such personal knowledge, or

14   plausibly allege a basis for concluding that the witnesses' purported characterizations are reliable.

15        "[W]here these two problematic features coincide—when a complaint's factual attributions

16   to unidentified sources derive not from interviews by plaintiffs' counsel, but from a short-seller

17   report's attributions to such sources—there is still greater need for care."  *In re DraftKings Inc.*

18   *Sec. Litig*., 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023).  "The author of such a report is

19   economically motivated to drive the issuer's stock price down," and "is not an attorney with

20   professional obligations to the Court, such as that under Federal Rule of Civil Procedure 11(b) to

21   certify that a pleading's factual averments were the product of an inquiry reasonable under the

22   circumstances."  *Id*. (citations omitted).  As the court explained in *DraftKings*,

23            To be sure, where "well-pled independent and particularized facts
            corroborate those attributed to anonymous sources in short-seller
24            reports, courts have sustained such complaints." But when plaintiffs'
            counsel has not interacted with the unidentified source—and does not
25            even know the source's name, position, or other attributes tending to
            bear on the source's credibility—and instead extracted and pled as
26            true statements from a report by a short seller attributing adverse facts
            to unidentified persons, these aspects of the complaint, if not
27            corroborated, are fairly discounted or put aside altogether as ill-pled.

28   *Id*. (internal citations omitted).  Given Scorpion Capital's obvious self-interest in BLI's stock price

     *United States District Court*
     *Northern District of California*

                                              16

1    declining and the lack of sufficient indicia plausibly demonstrating the report's reliability, the

2    Court finds that Plaintiffs have not sufficiently alleged that the Scorpion Report supports their

3    allegations of falsity.

4          Accordingly, the Court concludes that, as currently pled, Defendants' claim based on

5    allegedly false or misleading statements regarding the Beacon's functionality fails to meet the

6    heightened pleading standard mandated by the PSLRA.

### 2.  BLI's Finances and Growth Prospects

8          Defendants argue that, even as alleged, statements about BLI's prospects for future

9    operational and financial growth in the industry were not false, and thus were not actionable.  Dkt.

10   No. 126 at 19–22.  Specifically, Defendants assert that representations about the TAM,

11   subscription model, and revenue projections were forward-looking statements protected by the

12   PSLRA's safe harbor doctrine.  *Id*.

13         The Court finds that these statements are either (a) non-actionable opinion statements or

14   (b) forward-looking statements protected by the PSLRA's safe harbor doctrine, and addresses each

15   category in turn.

### (a)  Opinion Statements

17         Plaintiffs contend that Defendants misleadingly communicated optimism as to BLI's

18   growth.  *See, e.g*., CAC at ¶ 103.  For example, during an earnings call, Defendant Hobbs stated

19   BLI was experiencing "strong" demand for both new and existing customers, driven in part "by

20   offering alternative access models to accommodate customers through a subscription-based

21   approach."  *Id*.  According to Plaintiffs, these statements were misleading and/or misrepresented

22   material facts because BLI's new subscription models were exposing the Beacon's weaknesses to

23   new customers, and these customers were "unlikely" to become BLI's long-term subscription or

24   platform customers due to the Beacon's "repeated material failures."  *Id*. at ¶ 105.

25         These optimistic representations regarding BLI's growth are not objectively verifiable, and

26   amount to inactionable puffery.  *See, e.g*., *Macomb*, 39 F.4th at 1099 (finding identified statements

27   to "plainly fit beneath the umbrella of puffery" where they "use[d] vague, generically positive

28   terms, describing China as 'a great growth market,' 'a huge market opportunity,' 'a market that's

United States District Court
Northern District of California

1    growing significantly for us,' and possessing 'really good' 'dynamics,' and describing [the

2    company's] performance there as 'tremendous' and 'great.'").  As with their allegations regarding

3    the Beacon,  Plaintiffs fail to plausibly allege that Defendants did not hold the optimistic beliefs

4    they professed, or that these beliefs are objectively untrue.  *Dearborn Heights*, 856 F.3d at 616;

5    *Markette*, 2017 WL 4310759, at *5.

6                            **(b)  Forward-Looking Statements**

7            Plaintiffs further contend that Defendants overstated BLI's prospects for future operational

8    and financial growth in the industry.  *See, e.g.*, CAC at ¶¶ 81, 103, 111, 266.  For example, the

9    IPO Registration Statement represented that the TAM for BLI's products and services was $23

10   billion.  *Id.* at ¶ 81.  Defendant Hobbs also said that BLI intended to introduce a second

11   subscription model "to better meet [customers'] specific capacity needs," and that the purpose of

12   each of these subscription models was to "increase [their] served available market, broaden [their]

13   customer base and drive incremental demand."  *Id.* at ¶ 103.  On a conference call, Defendant

14   Wood stated, "We continue to expect revenue to be in the range of $90 to $100 million . . . ."  *Id.*

15   at ¶ 104.  He subsequently reiterated this revenue guidance in response to an analyst's question

16   about his confidence for BLI to reach this projection, and he explained that the second half of the

17   year would see an uptick in revenue as a result of usual seasonality.  *Id.* at ¶¶ 110–11.  In addition,

18   Defendants touted ongoing development deals and subscription programs.  *Id.* at ¶¶ 111, 116.

19           Plaintiffs assert that the actual market for BLI's products and services was "a fraction of

20   the $23 billion represented to investors" due to "the relatively high cost of [BLI's] instruments and

21   consumables and inability to provide the sustained performance necessary to justify these high

22   costs," among other things.  *Id.* at ¶¶ 83, 86, 90, 112.  They also contend that BLI's subscription

23   offerings were not "increasing the available market" or "broadening the customer base" because

24   smaller customers were choosing the subscription model "over the Beacon's [$2 million] platform

25   price tag."  *Id.* at ¶ 105.  In addition, Plaintiffs claim that BLI's year-end revenue guidance was

26   unachievable.  *Id.* at ¶ 112.  While Plaintiffs acknowledge that Defendants disclosed "Risk

27   Factors" associated with BLI's platform, they contend that Defendants improperly failed to

28   "disclose the specific risks associated with the capabilities and reliability of the [BLI] platform and

United States District Court
Northern District of California

their impact on [BLI's] business, operations, and financial condition." *Id*. at ¶ 269.

The Court finds that these statements are protected by the PSLRA's safe harbor doctrine. "The PSLRA's safe harbor provision exempts, under certain circumstances, a forward-looking statement, which is 'any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues.'" *Intuitive Surgical*, 759 F.3d at 1058 (citation omitted). "The PSLRA safe harbor applies only when the truth or falsity of the statement cannot be discerned until some point in time after the statement is made." *Apple*, 2020 WL 2857397, at *12 (internal quotation marks and citation omitted). "By contrast, statements involving future predictions are actionable when they make representations about the past or present that 'can demonstrably be proven false.'" *Id*. (quoting *Mulligan v. Impax Labs., Inc*., 36 F. Supp. 3d 942, 965 (N.D. Cal. 2014)).

Plaintiffs contend that these revenue statements incorporate separable, non-forward looking statements that are afforded no protection under the PSLRA. *See* Dkt. No. 137 at 29 (citing *Quality Sys.*, 865 F.3d at 1141). "In the context of such 'mixed' statements, only the forward-looking aspects could be immunized from liability, because the safe harbor is not 'designed to protect [issuers] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement.'" *Wochos*, 985 F.3d at 1190 (quoting *Quality Sys.*, 865 F.3d at 1141–42).

In *Wochos*, the Ninth Circuit rejected the plaintiffs' argument that a predictive statement indicating Tesla was "on track to achieve a 5,000 unit week by the end of the year" contained embedded assertions of present facts that were actionable under *Quality Systems*. *Wochos*, 985 F.3d at 1191. As the *Wochos* court described,

> The definition of "forward-looking statement[s]" [ ] expressly includes "statement[s] of the *plans and objectives* of management for future operations," 15 U.S.C. § 78u-5(i)(1)(B) (emphasis added), and "statement[s] of the *assumptions* underlying or relating to" those plans and objectives, *id*. § 78u-5(i)(1)(D) (emphasis added). Consequently, in order to establish that a challenged statement contains non-forward-looking features that avoid this definition, a plaintiff must plead sufficient facts to show that the statement goes

> *beyond* the articulation of "plans," "objectives," and "assumptions" and instead contains an express or implied "concrete" assertion concerning a specific "current or past fact[ ]." *Quality Sys.*, 865 F.3d at 1142, 1144. Thus, in *Quality Systems*, we held that, even though they were combined with forward-looking projections about revenue growth, the defendants' affirmative statements that the defendant company's *current* sales and performance were comparable to those in the past were not forward-looking because they "provided a concrete description of the past and present state of the [company's sales] pipeline." *Id*. at 1143–44.

*Id*. at 1191–92 (emphasis in original). As a result, the Ninth Circuit found that Tesla's statements that it was "on track" to achieve a goal of producing 5,000 vehicles per week and that "there were no issues" that "would prevent" Tesla from achieving this goal were forward-looking statements. *Id*. at 1192.

Here, the statements identified by Plaintiffs are forward-looking, such that their truth or falsity could not be discerned until after the statements were made. Nor does Plaintiffs' reliance on the Scorpion Report provide any basis on which the Court could plausibly find that Defendants' statements as to future projections contained representations about the past or present that could "demonstrably be proven false." *Apple*, 2020 WL 2857397, at *12.

Moreover, Plaintiffs fail to plead that any of the challenged statements about BLI's revenue guidance contain an actionable representation of current or past fact. As in *Wochos*, "any announced 'objective' for 'future operations' *necessarily* reflects an implicit assertion that the goal is achievable based on current circumstances." *Wochos*, 985 F.3d at 1192 (emphasis in original). Accordingly, "an unadorned statement that [BLI] is 'on track' to achieve an announced objective, or a simple statement that [BLI] knows of no issues that would make a goal impossible to achieve, are merely alternative ways of declaring or reaffirming the objective itself." *Id*. "The statutory safe harbor would cease to exist if it could be defeated simply by showing that a statement has the sort of features that are inherent to *any* forward-looking statement." *Id*. (emphasis in original).

And Plaintiffs' reliance on the Scorpion Report again does not move the needle. Plaintiffs explain that they "rely on sales, marketability, and product defect information provided to Scorpion Capital by credible BLI customers and former BLI employees with personal knowledge of the matters on which they spoke." Dkt. No. 137 at 22. However, confidential witness statements describing the Beacon's purported manufacturing defects and customer complaints

1  about the product fall short of plausibly pleading that BLI's representations about its revenue

2  projections were materially false or misleading.  Generalized allegations that financial projections

3  are false because they "created the overarching impression that [BLI] was outperforming

4  expectations" are insufficient.  *Metzler Inv. GMBH v. Corinthian Coll., Inc.*, 540 F.3d 1049, 1071

5  (9th Cir. 2008).  "The PSLRA requires a clearer explication of why a statement is false."  *Id.*

6       Insofar as Plaintiffs proceed on an omission theory, their claim fails for the same reasons

7  that their allegations regarding the Beacon did.  *See Brody v. Transitional Hosps. Corp.*, 280 F.3d

8  997, 1006 (9th Cir. 2002) (rejecting argument that there is a "freestanding completeness

9  requirement" under the securities laws).  In sum, the purported omission of specific claimed

10  shortcomings as to BLI's platform is fatally disconnected from corporate statements regarding

11  BLI's revenue projections and growth potential.  *See, e.g.*, *Metzler*, 540 F.3d at 1071 (finding

12  failure to plead falsity by omission where the complaint claimed general statements about the

13  company's current revenue projections and anticipated growth were false and misleading).

14       Accordingly, the Court concludes that the CAC's allegations that statements regarding

15  BLI's revenue projections and growth potential were false or misleading fail to satisfy the

16  PSLRA's heightened pleading standard.

17          **iii.**    **Scienter**

18               **a.**  **Legal Standard for Scienter**

19       Defendants also contend that Plaintiffs' allegations are insufficient to support a "strong

20  inference" of scienter.  Dkt. No. 126 at 22–26.  Under the PSLRA, whenever intent is an element

21  of a claim, the complaint must "state with particularity facts giving rise to a strong inference that

22  the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  "The PSLRA's

23  strong inference requirement has teeth," and "is an exacting pleading obligation" that "present[s]

24  no small hurdle for the securities fraud plaintiff."  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414

25  (9th Cir. 2020) (citing *Zucco*, 552 F.3d at 990).  "A complaint will only survive only if a

26  reasonable person would deem the inference of scienter cogent and at least as compelling as any

27  plausible opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues*

28  *& Rts., Ltd.*, 551 U.S. 308, 310 (2007).  "In this circuit, the required state of mind is a mental state

that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023) (citation omitted). "'[D]eliberate recklessness' is more than '*mere* recklessness or a motive to commit fraud.'" *Nguyen*, 962 F.3d at 414 (citations omitted) (emphasis in original). "It is instead 'an *extreme* departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *Id*. (citation omitted) (emphasis in original).

Plaintiffs allege scienter under four separate theories: (1) direct scienter; (2) core operations; (3) insider trading; and (4) executive departures. *See* Dkt. No. 137 at 50–54. The Court considers each of Plaintiffs' scienter theories in turn, and then considers the allegations of scienter holistically.

### b.  Direct Scienter

Plaintiffs obliquely claim direct scienter as to the Individual Defendants. *See* Dkt. No. 137 at 50. Plaintiffs' theory appears to be that BLI executives knew that the Beacon was "deeply flawed," and yet, they "deceived the public because they 'would have had difficulty convincing the investing public to buy shares in the IPO' otherwise." *Id*. (citing CAC at ¶ 154).

However, the CAC does not plead with particularity that the Individual Defendants knew about any of the Beacon's specific claimed defects or particular customer complaints at the time they made the challenged statements. As Defendants persuasively emphasize, the allegations regarding the Scorpion Report do not shed light on when the interviewed customers made their statements, nor do they indicate over what period of time the interviewed former employees worked at BLI or to what extent they interacted with BLI technology. *See* Dkt. No. 138 at 10. "There is thus no factual basis for the allegation[s] that [BLI executives] acted with knowledge or deliberate recklessness." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021); *see also Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) ("the PSLRA requires [plaintiffs] to plead scienter with respect to those individuals who actually made the false statements"). "[C]orporate management's general awareness of day-to-day workings of the company's business does not establish scienter — at least absent some additional allegations

of specific information conveyed to management and related to the fraud." *Prodanova*, 993 F.3d at 1109 (quoting *Metzler*, 540 F.3d at 1068).  No such particularized allegations are present in the CAC.  Therefore, the Court finds that Plaintiffs fail to plead a "strong inference" of direct scienter.

### c.  Core Operations

Plaintiffs next rely on the "core operations" theory of scienter, alleging that it may be "strongly inferred" that some of the Individual Defendants, by virtue of their positions as executives at BLI, "were fully aware of the status of all material matters" involving BLI's core business operations throughout the class period, "including the truth as to the matters alleged [in the CAC] to have been materially misrepresented to and/or concealed from Plaintiffs and the members of the Class."  CAC at ¶ 212.

The core operations theory "presumes that 'corporate officers have knowledge of the critical core operations of their companies.'"  *Prodanova*, 993 F.3d at 1111 (quoting *Intuitive Surgical*, 759 F.3d at 1062).  As the Ninth Circuit explained in *Prodanova*,

> There are three circumstances under which core operations allegations can support a strong inference of scienter: (1) when they, along with other allegations, support a cogent and compelling inference of scienter; (2) when they are themselves particular and suggest that the defendants had actual access to the disputed information, and (3) in the "rare circumstances" when they are not particularized, but "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter."

*Id*. (citation omitted).  "Proof under this theory is not easy."  *Intuitive Surgical*, 759 F.3d at 1062. Plaintiffs "must provide either specific admissions by the executives that they were involved in the details of a company's operations or witness statements that the executives were specifically involved in producing the false reports."  *Prodanova*, 993 F.3d at 1111.

Here, the CAC does not plead particularized facts sufficient to support any of the three formulations of the core operations theory.  First, the CAC does not contain any allegations that the specific Individual Defendants admitted any involvement with the minutiae of specific customer complaints or the Beacon's claimed technical defects.  *See Prodanova*, 993 F.3d at 1111–12.  Rather, all the CAC alleges is that "it may be strongly inferred" that the Individual Defendants were "fully aware of all material matters" involving BLI's core business operations

United States District Court
Northern District of California

1   due to their positions, the company's size, and its focus on lab instrument sales.  CAC at ¶ 212.

2   These conclusory allegations, without more, are not enough.  *See Prodanova*, 993 F.3d at 1112.

3          Likewise, this is not the "rare circumstance" in which it would be "absurd" to suggest that

4   management was without granular knowledge of the contents of the customer complaints or

5   technical defects relating to the Beacon.  The CAC fails to set forth allegations of specific

6   discussions about these customer complaints or defects, other than what amounts to generalized

7   speculation that "some discussions occurred at some point."  *Intuitive Surgical*, 759 F.3d at 1063.

8   Moreover, "mere access" to reports containing customer complaints or indications that the Beacon

9   had defects "is insufficient to establish a strong inference of scienter."  *Id*.

10          Accordingly, the Court finds that Plaintiffs fail to meet to their "high burden of proof" of

11   establishing a "strong inference" of scienter through their core operations theory.

12                    **d.  Insider Trading**

13          Plaintiffs also contend that stock sales by Defendants Hobbs and Holt support a "strong

14   inference" of scienter.  *See* Dkt. No. 137 at 52–53 (citing CAC at ¶¶ 159–174).  In particular,

15   Plaintiffs allege that Defendants Hobbs and Holt made suspicious sales during the class period

16   pursuant to Rule 10b5–1 trading plans "while they were in possession of material non-public

17   information" and "without disclosing the materially adverse facts about [BLI] that they were privy

18   to," and that they continued to make suspicious trades thereafter.  *See* CAC at ¶¶ 165–171.

19          As a preliminary matter, sales made according to pre-determined plans weigh against an

20   inference of scienter.  *See Metzler*, 540 F.3d at 1067 n.11 (rejecting allegations that insider trading

21   raised a "strong inference" of scienter at the motion to dismiss stage, and stating that "[s]ales

22   according to pre-determined plans may 'rebut [ ] an inference of scienter.'").  While insider

23   trading may serve as circumstantial evidence of scienter, it "is suspicious only when it is

24   dramatically out of line with prior trading practices at times calculated to maximize personal

25   benefit from undisclosed inside information."  *Intuitive Surgical*, 759 F.3d at 1063–64 (quoting

26   *Zucco*, 552 F.3d at 1005).  The allegations that Defendants Hobbs and Holt made significant

27   profits from the sale of BLI stock "do not raise an inference of scienter, let alone a strong

28   inference, because the [CAC] contains no allegations regarding the defendants' prior trading

24

1   history, which are necessary to determine whether the sales during the class period were 'out of

2   line with' historical practices." *Id.* Therefore, the Court agrees that Plaintiffs' allegations

3   regarding stock sales by Defendants Hobbs and Holt do not support a "strong inference" of

4   scienter.

### e. Executive Departures

6   Lastly, Plaintiffs allege that the departures of some of the Individual Defendants establish a

7   "strong inference" of scienter. *See* CAC at ¶¶ 203–10. "[A]n employee's resignation supports an

8   inference of scienter only when 'the resignation at issue was uncharacteristic when compared to

9   the defendant's typical hiring and termination patterns or was accompanied by suspicious

10  circumstances.'" *Dearborn Heights*, 856 F.3d at 622 (quoting *Zucco*, 552 F.3d at 1002).

11  Otherwise, "the inference that the defendant corporation forced certain employees to resign

12  because of its knowledge of the employee's role in the fraudulent representations will never be as

13  cogent or as compelling as the inference that the employees resigned or were terminated for

14  unrelated personal or business reasons." *Zucco*, 552 F.3d at 1002.

15  Here, the CAC highlights that a number of Individual Defendants announced their

16  resignations following various events, including the same day that BLI "previewed its lackluster

17  FY20 results" and made an announcement "revealing that the Beacon could not meet the lofty

18  promises made by [BLI]." *See* CAC at ¶¶ 203–10. But resignations that occur shortly after a

19  company announces poor financial results do not suggest that an executive intentionally deceived

20  investors unless the plaintiff "plead[s] facts refuting the reasonable assumption" that the

21  resignations occurred as a result of the poor results themselves. *Zucco*, 552 F.3d at 1002 (citing *In

22  re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) ("Plaintiff can

23  point to no particularized allegation refuting the reasonable assumption that [the defendant] was

24  fired simply because the errors that lead to the restatement occurred on his watch or because he

25  failed adequately to supervise his department.")); *see, e.g.*, *Mallen v. Alphatec Holdings, Inc.*, 861

26  F. Supp. 2d 1111, 1138 (S.D. Cal. 2012) (finding the timing of the resignation of the company's

27  CFO, only two months after a "corrective" announcement reporting poor financial results, did not

28  support a strong inference of scienter "without any other facts about the resignation"). Plaintiffs

United States District Court
Northern District of California

fail to adequately plead such facts here.

### f.   Holistic Assessment

In sum, read both independently and holistically as a whole, "the allegations in the [CAC] at best establish 'mere recklessness or a motive to commit fraud and opportunity to do so.'" *Intuitive Surgical*, 759 F.3d at 1062.  Accordingly, the Court finds that Plaintiffs' factual allegations fall short of plausibly pleading the required "strong inference" of scienter under any of the theories raised in the CAC.

### iv.   Loss Causation

#### a.   Legal Standard for Loss Causation

Defendants further assert that the Scorpion Report and other alleged disclosures highlighted by Plaintiffs do not qualify as corrective disclosures.  *See* Dkt. No. 126 at 26–30. "[T]o satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff."  *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3d Cir. 2007)).  This "burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264 (2014)).  However, this is not the only way to meet the pleading burden.  Instead, "loss causation is simply a variant of proximate cause," and "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  *Id.* at 1210; *see also Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) ("To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss . . . by tracing the loss back to 'the very facts about which the defendant lied.'") (citations omitted).

#### b.   The Scorpion Report

Citing *Nektar* and *BofI*, Defendants contend the Scorpion Report cannot constitute a

United States District Court
Northern District of California

corrective disclosure.  Dkt. No. 126 at 26–29.  In *BofI*, the Ninth Circuit outlined "a flexible approach to evaluating corrective disclosures," under which the court asks whether, "[b]ased on plaintiffs' particularized allegations, [it can] plausibly infer that the alleged corrective disclosure provided new information to the market that was not yet reflected in the company's stock price." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 795 (9th Cir. 2020).  Factors relevant to this inquiry include whether the underlying data was publicly available, the complexity of the data and its relationship to the alleged misstatements, and the "great effort needed to locate and analyze it." *Id*.  Applying this approach, the Ninth Circuit concluded that shareholders had not plausibly alleged that blog posts based on publicly available information qualified as corrective disclosures. *Id*. at 797.  The Ninth Circuit reasoned that "[t]he posts were authored by anonymous short-sellers who had a financial incentive to convince others to sell, and the posts included disclaimers from the authors stating that they made 'no representation as to the accuracy or completeness of the information set forth in [the] article,'" such that "[a] reasonable investor reading these posts would likely have taken their contents with a healthy grain of salt."  *Id*.

Similarly, in *Nektar*, the Ninth Circuit noted that the short-seller's report at issue "[p]erhaps . . . did provide new information to the market," given that "[i]ts analysis pulled together disparate sources and connected data in ways that were not plainly obvious."  *Nektar*, 34 F.4th at 840.  Nonetheless, for the same reasons outlined in *BofI*, the Ninth Circuit concluded that "it was not plausible that the market would perceive the [short-seller's report] as revealing false statements because the nature of the report means that investors would have taken its 'contents with a healthy grain of salt.'"  *Id*. (citing *BofI*, 977 F.3d at 797).

In light of the "high bar" Plaintiffs must meet in relying on the "musings" of a self-interested short-seller, *Nektar*, 34 F.4th at 832, 839, the Court finds that the Scorpion Report was not a corrective disclosure.[7]  Importantly, the report contains a multitude of disclaimers as to its

---

[7] Plaintiffs contend the Scorpion Report is distinguishable from short-seller reports in other cases because the report's author, Scorpion Capital, is not anonymous, but instead is a well-known "activist" short-seller entity.  *See* Dkt. No. 137 at 19–20.  The Court does not find this distinction persuasive, as the identity of the entity that sponsored the report (as opposed to the identity of any actual person who wrote the representations in it) does not change the "character" of the report itself—namely, that it was based on secondhand information gathered by a self-interested short-

1    completeness and accuracy:

> Our opinions are held in good faith, and Scorpion Capital LLC has based them on the public information, sources, the interviewed individuals, and any social media posts cited in this report, but Scorpion Capital LLC cannot and does not provide any representations or warranties with respect to the accuracy of those materials . . . We believe the experts we spoke with are reliable sources of information with respect to [BLI]. However, we cannot and do not provide any representations or warranties with respect to the accuracy of the information they have provided to us. The quotations of experts used in this article do not reflect all information they have shared with us, including, without limitation, certain positive comments and experiences with respect to [BLI]. In addition, the experts have typically received compensation for their conversations with us and may have conflicts of interest or other biases with respect to [BLI], which may give them an incentive to provide us with inaccurate, incomplete or otherwise prejudiced information. The former employees of [BLI] that we spoke with are by definition separated from the company and thus the information they have provided may be outdated . . . The quotations of experts used in this article are based on Scorpion Capital LLC conversations with such experts and may be paraphrased, truncated, and/or summarized solely at our discretion, and do not always represent a precise transcript of those conversations. We have not conducted any diligence or other verification with respect to any social media posts included in this article with respect to [BLI]. Thus, we cannot and do not provide any representations or warranties with respect to the accuracy of such social media posts. Any social media posts used in this article may not reflect all information the persons posting have shared on social media, including, without limitation, certain positive comments and experiences with respect to [BLI]. In addition, the persons posting may have conflicts of interest or other biases with respect to [BLI], which may give them an incentive to post inaccurate, incomplete or otherwise prejudiced information on social media.

19   Dkt. No. 89-1 (Ex. A) at 3.

20        Because Scorpion Capital is an admitted short-seller with an admitted financial incentive

21   to convince others to sell, the nature of the Scorpion Report would invariably cause investors to

22   take its "contents with a healthy grain of salt." *BofI*, 977 F.3d at 797; *accord Nektar*, 34 F.4th at

23   840.  This is still so even if the Scorpion Report "provide[d] new information to the market" by

24   providing analysis that "pulled together disparate sources and connected data in ways that were

25   not plainly obvious."  *Nektar*, 34 F.4th at 840.  As in *BofI* and *Nektar*, the "character" of the

26   Scorpion Report—produced by a "self-interested" short-seller "who disavowed any accuracy"—

27   _____

28   seller.  *See, e.g., Nektar*, 34 F.4th at 833–34 (anonymous short-sellers authored the "Plainview Report").

28

renders it inadequate to amount to a corrective disclosure. *Id.*; *see also BofI*, 977 F.3d at 797; *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1208 (9th Cir. 2020) (holding that an article was not a corrective disclosure where it was written by an anonymous short-seller, was based on publicly available information, did not require expertise beyond that of a typical market participant, included a disclaimer as to its accuracy and completeness, and encouraged investors to do their own research).

Accordingly, because Plaintiffs fail to plausibly allege that the Scorpion Report constitutes a corrective disclosure under *BofI* and *Nektar*, the Court finds that the CAC does not sufficiently plead loss causation on this basis.

### c.   Other Alleged Corrective Disclosures

Plaintiffs also claim the challenged statements artificially inflated BLI's stock price, which dropped after three corrective disclosures ostensibly revealed the truth of the company's financial situation and the issues surrounding the Beacon. *See* CAC at ¶¶ 219–22. First, two days after BLI announced its Q1 2021 financial results on May 11, 2021, the stock price dropped from $45.54 to $36.40 per share. *Id.* at ¶¶ 223–26. Second, immediately after BLI announced its Q2 2021 financial results on August 11, 2021, the stock price dropped from $43.79 to $39.65 per share. *Id.* at ¶¶ 227–29. Third, after BLI issued a press release on January 5, 2022, describing its plans to replace its CEO, Defendant Hobbs, the stock price dropped further from $16.27 to $9.88 per share. *Id.* at ¶¶ 234–35.

"Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd*, 811 F.3d at 1210 (internal citation omitted). "[T]o prove loss causation by relying on one or more corrective disclosures, a plaintiff must show that: (1) a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements; and (2) disclosure of the truth caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate." *BofI*, 977 F.3d at 791. "At the pleading stage, the plaintiff's task is to allege with particularity facts 'plausibly suggesting' that both showings can be made." *Id.* (citing *Twombly*, 550 U.S. at 557).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Here, Plaintiffs do not sufficiently plead that either of the two announcements of earnings results or the announcement of Defendant Hobbs' planned departure constituted a corrective disclosure, because they do not allege that those results "revealed, in whole or in part, the truth concealed by [BLI's] misstatements." *BofI*, 977 F.3d at 791. Taken as true, the facts alleged in the CAC do not support a reasonable inference that the two earnings results revealed that BLI had concealed adverse facts relating to the company's business and growth prospects. And BLI's press release indicating the company's plans to replace its CEO cannot plausibly be understood as an admission of past concealment, but rather as a forward-looking statement of changes to the company. *See, e.g., Loos v. Immersion Corp.*, 762 F.3d 880, 887–88 (9th Cir. 2014) (allegations regarding the company's "disappointing" financial results were insufficient to plead loss causation where the results "[did] not tend to suggest that the company had engaged" in fraud, but rather, were "merely indicative of poor financial health" and the disclosures "simply reveal[ed] that [the company] failed to meet its revenue goals"); *In re eHealth, Inc. Sec. Litig.*, No. 20-CV-02395-JST, 2023 WL 6390593, at *7–8 (N.D. Cal. Sept. 23, 2023) (rejecting allegations that an announcement of earnings results, a short-seller's report, and a statement on an earnings call revealed any specific past fraud so as to constitute corrective disclosures).

\*\*\*\*\*\*\*\*\*

In sum, because Plaintiffs fail to sufficiently plead falsity, scienter, or loss causation, their Section 10(b) securities fraud claims against Defendants must be **DISMISSED**.

### B.    Control Person Liability Claims

Plaintiffs also bring control person liability claims against the Individual Defendants and the Venture Capital Defendants under Section 20(a) of the Exchange Act and Section 15 of the Securities Act. *See* CAC at ¶¶ 252–56, 299–304. Plaintiffs contend that because of the Individual Defendants' positions within BLI and the Venture Capital Defendants' stock holdings, they were control persons within the meaning of Section 20. *Id.*

The Individual Defendants and the Venture Capital Defendants argue that because the CAC fails to plead a primary violation of securities laws, the control person claims must also fail. *See* Dkt No. 126 at 32; Dkt. No. 129 at 6–13; Dkt. No. 131 at 5–11; Dkt. No. 132 at 5–10. The

1   Court agrees.  "Section 20(a) and [S]ection 15 both require underlying primary violations of the

2   securities laws." *Rigel*, 697 F.3d at 886 (citing 15 U.S.C. §§ 77*o*, 78t(a)).  Because Plaintiffs have

3   failed to adequately plead a violation of the federal securities laws, it follows that they have also

4   failed to plead violations of Section 20(a) and Section 15.  *Id*.  Accordingly, these claims must

5   also be **DISMISSED**.  *See Zucco*, 552 F.3d at 990.

6       **C.    Section 11 Claims**

7       Finally, Plaintiffs contend BLI issued false and misleading prospectuses and registration

8   statements in connection with the company's July 2020 IPO, which misrepresented the value of

9   BLI, in violation of Section 11 of the Securities Act.[8]  *See* CAC at ¶¶ 257–59, 274–84.  BLI and

10  the Underwriter Defendants argue that Plaintiffs' Section 11 claims sound in fraud and thus must

11  meet the heightened pleading requirements of Rule 9(b).  Dkt. No. 126 at 30–32; Dkt. No. 128 at

12  8–9.  They contend that Plaintiffs fail to state a cognizable claim under that standard.  *Id*.

13      "Section 11 of the Securities Act contains a private right of action for purchasers of a

14  security if the issuer publishes a registration statement in connection with that security that

15  'contain[s] an untrue statement or omit[s] to state a material fact required to be stated therein or

16  necessary to make the statements therein not misleading.'"  *Rubke v. Capitol Bancorp Ltd.*, 551

17  F.3d 1156, 1161 (9th Cir. 2009) (quoting 15 U.S.C. § 77k(a)).  To allege a Section 11 claim, a

18  plaintiff must show "(1) that the registration statement contained an omission or

19  misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would

20  have misled a reasonable investor about the nature of his or her investment."  *Id*. (quotation

21  omitted).  "No scienter is required for liability under § 11; defendants will be liable for innocent or

22  negligent material misstatements or omissions."  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404

23  (9th Cir. 1996) (citation omitted).

24      Unlike Section 10(b) claims, the heightened pleading standard of the PSLRA does not

25

26  _____

27  [8] Plaintiffs bring the Section 11 claim against Defendants BLI; BLI's former CEOs, Igor Khandros and Eric Hobbs; BLI's former CFO, Shaun Holt; Venture Capital Defendants WRVI, Sequoia, and Nikon; BLI Board of Directors members Michael Marks, Sarah Boyce, Gregory Lucier, Michael

28  Moritz, Elizabeth Nelson, James Rothman, Ming Wu, and Makoto Shintani; and the Underwriter Defendants.  *See* CAC at ¶¶ 22–23, 26–29, 261, 262–63.

United States District Court
Northern District of California

apply to Section 11 claims. *See Rubke*, 551 F.3d at 1161. However, "[t]he particularity requirements of Rule 9(b) apply to claims brought under [S]ection 11 when such claims are grounded in fraud." *Rigel*, 697 F.3d at 876. The Ninth Circuit has held that "a plaintiff's nominal efforts to disclaim allegations of fraud with respect to its [S]ection 11 claims are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims." *Id*. "To ascertain whether the complaint sounds in fraud, [the Court] must normally determine, after a close examination of the language and structure of the complaint, whether the complaint allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim." *Id*. (internal quotation marks and citations omitted).

Here, Plaintiffs claim that "[w]here they do incorporate allegations offered in support of the Exchange Act claims into the Securities Act claims, Plaintiffs have been judicious and circumspect in limiting those allegations incorporated by reference to non-fraudulent conduct, and otherwise 'expressly disclaim any allegations that allege fraud, scienter or the intent of the [D]efendants to defraud.'" Dkt No. 137 at 40 (quoting CAC at ¶ 257). Although the Section 11 claims do not adopt all of the allegations contained in the rest of the CAC, these claims do not allege different misrepresentations. Rather, the Section 11 claims rely on the same alleged misrepresentations that are central to Plaintiffs' Section 10(b) fraud claims. *See* CAC at ¶ 274 (incorporating by reference *id*. at ¶¶ 261–73); *see, e.g.*, *Rigel*, 697 F.3d at 886; *Rubke*, 551 F.3d at 1161 ("Where as here, however, a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud.").

Plaintiffs' Section 11 claims are grounded in fraud, and therefore, must meet Rule 9(b)'s pleading requirements. For the same reasons discussed above regarding the Section 10(b) claims, the Court finds that Plaintiffs have failed to meet Rule 9(b)'s requirements with respect to pleading a false or misleading statement. *See Rigel*, 697 F.3d at 885–86. Therefore, Plaintiff's Section 11 claims must be **DISMISSED**.[9]

---

[9] Even if Plaintiffs' claims were not grounded in fraud and thus not subject to Rule 9(b)'s pleading requirements, they still would fail to plead falsity for the reasons already explained. Because

**V.   CONCLUSION**

Accordingly, the Court **GRANTS** the motions to dismiss.  Dkt. Nos. 126, 128, 129, 131, 132.  However, at this stage in the litigation, the Court cannot say that amendment would be futile.  Plaintiffs may therefore file an amended complaint within 21 days of the date of this order.  When preparing any amended complaint, Plaintiffs are further ordered to prepare a statement-by-statement chart of the information required by 15 U.S.C. § 78u-4(b)(1) and (2) that specifically identifies: (A) each statement or action alleged to have been false or misleading, (B) the reasons the statement or action was false, misleading, or deceptive when made, and (C) if an allegation regarding the statement or omission is made on information and belief, all facts on which the belief is formed.  The chart must clearly identify which statements or omissions are attributable to which Defendants, and include a detailed statement of the facts giving rise to a strong inference that each defendant acted with the required state of mind.  Plaintiffs should also summarize their allegations regarding what each Defendant knew with regard to the statement or omission, and when they knew it.  Such a chart must be included within, or attached to, any amended complaint.  For guidance on the format for such a chart, the Court directs Plaintiffs to review *In re NVIDIA Corp. Sec. Litig.*, 18-cv-07669-HSG, Dkt. No. 149-2.

In the event Defendants seek to file dispositive motions in response to an amended pleading, the Court directs Defendants to meet and confer and make a good-faith effort to agree on the coordination of the response so as not to necessitate five separate motions.  Any overlapping arguments, for example, should not be repeated.  The Court will set a case management conference once any amended complaint is filed to discuss how this coordination can most efficiently be accomplished.

**IT IS SO ORDERED.**

---

Plaintiffs fail to state a Section 11 claim, dismissal of their claims under Section 12(a)(2) is also warranted. *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1072–73 (N.D. Cal. 2010) (dismissing a Section 12(a)(2) claim because the complaint failed to state a Section 11 claim and both claims were based on the same alleged misstatements and omissions).  For the same reasons, their allegations under 17 C.F.R. § 229.303 ("Item 303") and 17 C.F.R. § 229.105 ("Item 105") also fail.  *See In re ON24, Inc. Sec. Litig.*, No. 4:21-CV-8578-YGR, 2023 WL 7449838, at *15 (N.D. Cal. July 7, 2023) (finding the plaintiff's Item 303 and 105 claims failed for the same reasons as the Section 11 claim).

Dated:     2/20/2024

HAYWOOD S. GILLIAM, JR.
United States District Judge